UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,   :       06 Civ. 14338 (SHS)
                             :
                Plaintiff,      :
                             :       OPINION AND ORDER
         -against-        :
                             :
EDWIN BUCHANAN LYON, IV,         :
GRYPHON MASTER FUND, L.P.,       :
GRYPHON PARTNERS, L.P.,          :
GRYPHON PARTNERS (QP), L.P.,      :
GRYPHON OFFSHORE FUND, LTD.,     :
GRYPHON MANAGEMENT PARTNERS, L.P.,  :
GRYPHON MANAGEMENT PARTNERS III, L.P., :
and GRYPHON ADVISORS, L.L.C.,       :
                             :
                Defendants.     :
------------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

      The Securities and Exchange Commission ("SEC") brings this action for

securities fraud, insider trading, and the unlawful distribution of unregistered securities

against Edwin Buchanan Lyon IV and seven entities – Gryphon Master Fund, L.P.,

Gryphon Partners, L.P., Gryphon Partners (QP), L.P., Gryphon Offshore Fund, Ltd.,

Gryphon Management Partners, L.P., Gryphon Management Partners III, L.P., and

Gryphon Advisors, L.L.C. (collectively, the "Gryphon Entities") – for which Lyon serves

as managing partner and chief investment officer.  Lyon and the Gryphon Entities have

moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Complaint for failure to state a

claim upon which relief can be granted.  Because the SEC has adequately pled securities

fraud and insider trading, defendants' motion to dismiss is denied as to those claims.

      The SEC's unregistered-distribution claim, however, is premised on the

assumption that the shares ultimately used to cover a short sale are deemed to have been

sold when the underlying short sale was made.  The Court finds that assumption unwarranted and therefore concludes that the SEC has not stated a plausible claim against Lyon and the Gryphon Entities for distributing unregistered securities or for fraud arising from the distribution of unregistered securities.  Accordingly, defendants' motion to dismiss is granted with prejudice with respect to those claims.

## I.    BACKGROUND

The SEC's Complaint alleges the following facts, which are assumed to be true for the purposes of this ruling.  Edwin Buchanan Lyon IV – a resident of Dallas, Texas – is the managing partner and chief investment officer of the Gryphon Entities, a collection of onshore and offshore hedge funds and related companies involved in the investment-management business.  (Compl. ¶¶ 1, 13-20.)  From 2001 to 2004, Lyon and the Gryphon Entities participated in at least thirty-six Private Investments in Public Equities ("PIPE") transactions, involving the issuance of unregistered securities in publicly traded companies.  (Id. ¶¶ 21, 26.)  An unregistered security, in general, cannot be sold publicly until a registration statement is filed by the issuer and declared effective by the SEC.  (See id. ¶ 21.)  Securities distributed through nonpublic offerings, however, may be eligible for an exemption from registration and, if such an exemption is applicable, those securities may be distributed pursuant to that exception and are then referred to as "restricted" because of the restrictions placed on their subsequent resale.  (Id.)

PIPE securities are generally issued pursuant to a nonpublic-offering exemption from the registration requirements of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77e, that allows the shares to be sold privately.  (Id. ¶¶ 21, 46-47.)  In order to ensure the applicability of one of these exemptions, the PIPE issuers require investors –

including Lyon and the Gryphon Entities – to pledge that they will refrain from immediately redistributing their PIPE shares to the public.  (Id. ¶ 46.)  Accordingly, each relevant PIPE securities purchase agreement contained a provision requiring investors to represent that they were "purchasing the securities for [their] own account and without any present intention of distributing the securities."  (Id.)  Lyon and the Gryphon Entities – or their representatives – signed these securities purchase agreements in connection with the PIPE transactions in which they participated.  (Id. ¶ 48.)

Upon the public announcement of the issuance of restricted shares in a PIPE offering, the price of the PIPE issuer's publicly traded stock generally declines.  (Id. ¶ 51.)  This decline occurs for two reasons.  One, the issuance of additional shares means that each share represents a smaller percentage of the issuer's total outstanding equity, i.e., each share is "diluted" in value.  (Id.)  Two, PIPE shares are usually issued at a price below the prevailing market price for publicly traded shares of the issuer's stock because PIPE shares, as restricted securities, are effectively illiquid, i.e., they are not freely alienable.  (Id. ¶¶ 7, 51.)

Advance knowledge of a PIPE offering, therefore, provides an investor able to trade on that knowledge with a clear advantage over the general investing public.  (Id. ¶ 52.)  To combat the risk that prospective investors will trade on such information before it becomes public, PIPE issuers take steps to keep their planned offerings confidential; indeed, at least four of the PIPE issuers in this case required investors to maintain information about the transactions in confidence and to refrain from trading on that information until it became public.  (Id. ¶ 54.)  For one of those offerings, the securities purchase agreement – which was signed by defendants – stated that the purchaser agreed

to "keep confidential all information concerning this private placement" and "to use the information . . . for the sole purpose of evaluating a possible investment" in the PIPE shares. (Id. ¶ 55-56.) For the other three offerings, the confidentiality requirement was stated in the private placement memoranda (id. ¶¶ 60, 62) or in the text of an e-mail that transmitted the private placement materials as an attachment (id. ¶ 58).

As noted above, once they are issued, PIPE shares are considered restricted and cannot be publicly traded until the issuer files and the SEC declares effective a resale registration statement. (Id. ¶ 21.) In the interim between the acquisition of restricted shares and the effective date of corresponding resale statements, PIPE investors often "hedge" their investments – i.e., attempt to reduce their risk – by selling short the PIPE issuer's publicly traded securities. (Id. ¶ 22.) Although the concept of selling short is explained in greater detail below, it consists principally of an investor selling a security that she does not own by first borrowing the security from someone else, usually a broker, selling it through a market transaction, and later purchasing (or otherwise obtaining) the security and returning it to the lender.

Lyon and the Gryphon Entities hedged all but one of their PIPE investments by executing short sales that fully hedged – or hedged as much as possible – their PIPE positions. (Id. ¶¶ 25-26.) These short sales were executed both in the United States – which required sellers to borrow the shares sold short – and in Canada – which had no such borrowing requirement during the period relevant to the Complaint.[1] (Id. ¶¶ 22, 28-

---

[1] Executing a short sale in a security without first borrowing that security is known as "naked" short selling. (Compl. ¶ 29.) Cf. In re Phlo Corp., Exchange Act Release No. 55,562, 2007 SEC LEXIS 604, at *15 n.22 (Mar. 30, 2007) (A naked short sale occurs when an investor "sells a security without owning or borrowing it and does not deliver the security when due.").

29.)  That is, during the relevant time period in Canada, an investor could sell shares that he neither owned nor had borrowed.

When defendants shorted the PIPE issuers' publicly traded stock, no resale registration statement was in effect for the corresponding PIPE shares and no registration exemption applied to those shares.  (Id. ¶ 30.)  To "cover" their short positions, Lyon and the Gryphon Entities waited until the SEC declared a PIPE resale registration statement effective and then used their formerly restricted PIPE shares to close out their short positions.  (Id. ¶ 31.)  Defendants accomplished this by (a) directly delivering the PIPE shares to their trading account or (b) executing sales and repurchases with brokers – in what the SEC terms "wash sales" and "matched orders" – to ensure the delivery of the requisite shares to their trading account.  (Id. ¶¶ 32-37.)

Based on these transactions, the SEC brought this action against Lyon and the Gryphon Entities for violations of the federal securities laws.  The SEC alleges in its First Claim for Relief that defendants made material misrepresentations and committed insider trading in violation of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.  In addition, the Complaint contains a separate claim for insider trading – the Second Claim for Relief – based on the same conduct, but brought pursuant to section 17(a) of the Securities Act, 15 U.S.C. § 77q.  In its Third Claim for Relief, the SEC charges defendants with violations of the registration requirements contained in section 5 of the Securities Act, 15 U.S.C. § 77e.  To remedy these violations, the SEC seeks the entry of injunctive relief, disgorgement, and civil monetary penalties against Lyon and the Gryphon Entities.

Defendants, in turn, have moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted.

## II.     DISCUSSION

### A.     Standard of Review

When reviewing a Rule 12(b)(6) motion to dismiss, the Court assumes the truth of all facts asserted in the complaint and draws all reasonable inferences from those facts in favor of the plaintiff.  See Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006). The Court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003) (internal quotation marks omitted). Accordingly, a motion to dismiss will be granted only if the plaintiff has not pled "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. __, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007).  Pursuant to this "flexible 'plausibility standard,'" Iqbal v. Hasty, 490 F.3d 143, 158 (2d Cir. 2007), a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," Twombly, 127 S. Ct. at 1965.  A plaintiff, therefore, need not provide a "heightened fact pleading of specifics" to avoid dismissal, but, if it "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed."  Id. at 1974.

When a complaint includes allegations of fraud, however, those claims must satisfy the heightened pleading requirements established by Fed. R. Civ. P. 9(b). Pursuant to Rule 9(b), "the circumstances constituting fraud . . . shall be stated with

particularity" in the complaint.  A "complaint making such allegations must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  Shields v. Citytrust Bancorp., 25 F.3d 1124, 1127-28 (2d Cir. 1994) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).  Accordingly, the SEC's securities fraud claims must satisfy this heightened standard.

      B.      Section 10(b) and Rule 10b-5 Securities Fraud Claims

The SEC charges defendants with section 10(b) and Rule 10b-5 violations arising from (1) defendants' allegedly false representations that their PIPE investments were in compliance with section 5 of the Securities Act and (2) four transactions in which defendants shorted the publicly traded stock of a PIPE issuer while possessing material, non-public information that a PIPE offering was forthcoming.  Lyon and the Gryphon Entities maintain, however, that their representations of section 5 compliance were not false and that no duty of confidentiality barred their trading in the PIPE issuers' stock.  On that basis, defendants urge dismissal of the SEC's allegations of securities fraud pursuant to section 10(b) and Rule 10b-5.

          *1.*      *False Representations of Compliance with Section 5*

Section 10(b) of the Exchange Act forbids the use of "any manipulative or deceptive" practice "in connection with the purchase or sale of any [registered] security." 15 U.S.C. § 78j(b).  Rule 10b-5 – which was promulgated by the SEC pursuant to section 10 of the Exchange Act – states that it is "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made,

not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R.
§ 240.10b-5.

To state a claim pursuant to section 10(b) and Rule 10b-5, a plaintiff must
adequately allege the following elements: "(1) a material misrepresentation (or omission),
(2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a
security, (4) reliance, often referred to in cases involving public securities markets (fraud-
on-the-market cases) as 'transaction causation,' (5) economic loss, and (6) 'loss
causation,' i.e., a causal connection between the material misrepresentation and the loss."
Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 342, 125 S. Ct. 1627, 161 L. Ed. 2d 577
(2005) (internal citations omitted).

The SEC alleges that defendants violated section 10(b) and Rule 10b-5 by making
materially false representations to the PIPE issuers that their purchases complied with
section 5 of the Securities Act. (Compl. ¶ 46.) Section 5 forbids the sale or offer for sale
of a security unless a registration statement has been filed for that security. 15 U.S.C.
§ 77e. According to the Complaint, PIPE securities are generally exempt from section 5
registration because they are issued pursuant to an exemption for nonpublic offerings.
(Compl. ¶ 21.) In order to qualify for this exemption from registration, PIPE issuers
allegedly must require purchasers to pledge that they do not have a present intention to
distribute the PIPE securities they receive – in other words, that the buyers are purchasing
the PIPE securities in compliance with section 5 of the Securities Act. (Id. ¶¶ 46-47.)

Each PIPE purchase agreement relevant in this action allegedly "contained a
provision in which [defendants] represented that [they were] purchasing the PIPE
securities in compliance with Section 5 of the Securities Act." (Id. ¶ 46.) And, according

to the Complaint, Lyon and the Gryphon Entities represented that they were "purchasing the securities for [their] own account and without any present intention of distributing the securities."  (Id.)

The SEC maintains that Lyon and the Gryphon Entities made these representations falsely because they planned to "distribute the PIPE securities through . . . short selling and covering with the PIPE shares in violation of" section 5.  (Id. ¶ 48.) Defendants maintain that their representations were not false because their short sales did not constitute a distribution under the Securities Act, and thus they did not misrepresent their investment intentions.  The Court agrees with defendants' position.  As discussed in more detail below, see infra Part D, defendants' short sales, as alleged in the Complaint, did not violate section 5.  Accordingly, defendants' alleged intention to short the PIPE issuers' publicly traded securities did not undermine their pledge of compliance with section 5.  Because the SEC has failed to plead a plausible claim of section 10(b) and Rule 10b-5 securities fraud arising from defendants' statements pertaining to their compliance with section 5, those claims are dismissed.

### 2.  *Insider Trading*

The SEC also alleges that Lyon and the Gryphon Entities committed insider trading in violation of section 10(b) and Rule 10b-5.  According to the Complaint, defendants shorted the publicly traded stock of four PIPE issuers while in possession of material, non-public information about the corresponding PIPE offerings and in violation of their pledges to keep that information confidential.  (Compl. ¶¶ 49-69.)  Based on these allegations, the SEC appears to bring this claim pursuant to the "misappropriation theory" of insider trading, which "holds that a person commits fraud 'in connection with'

9

a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." United States v. O'Hagan, 521 U.S. 642, 652, 117 S. Ct. 2199, 138 L. Ed. 2d 724 (1997).

In O'Hagan, the U.S. Supreme Court explained that a company's confidential information constitutes "property to which the company has a right of exclusive use" and "[t]he undisclosed misappropriation of such information, in violation of a fiduciary duty . . . constitutes fraud akin to embezzlement . . . ." Id. at 654. When confidential information is obtained in this fashion and used in connection with a securities transaction, a claim for insider trading may arise under a "misappropriation theory" of liability. See id. at 665. Unlike "classical" insider trading, which "premis[es] liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information." Id. at 652. Accordingly, under this theory of insider trading, "a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information." Id.

Lyon and the Gryphon Entities contend that the SEC has failed to state a claim for insider trading under this theory, because the SEC has not adequately pled that defendants were bound by a duty of confidentiality when they took short positions in the PIPE issuers' publicly traded stock. In support of their position, defendants rely on caselaw establishing that the mere receipt of confidential information does not

necessarily give rise to a duty of confidentiality. Indeed, the U.S. Court of Appeals for the Second Circuit has observed that fiduciary duties "cannot be imposed unilaterally by entrusting a person with confidential information." United States v. Chestman, 947 F.2d 551, 567 (2d Cir. 1991). Instead, "a fiduciary relationship, or its functional equivalent, exists only where there is explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties." United States v. Falcone, 257 F.3d 226, 234 (2d Cir. 2001). Defendants maintain that with respect to the relevant PIPE transactions, the SEC has not alleged facts showing that Lyon and the Gryphon Entities either consented to be bound by a duty of confidentiality or entered into a "relationship of trust and confidence" that would imply such a duty.

On this issue, the SEC has alleged that documents pertaining to four PIPE offerings – the Gentner, PhotoMedex, Manufacturers' Services, and Celsion offerings – contained confidentiality provisions imposing a duty of confidentiality on defendants. (Compl. ¶¶ 54-62.) Specifically, the Complaint states that the purchase agreement in the Gentner offering represented that "the Purchaser agreed orally with the Placement Agent to keep confidential all information concerning this private placement" and "[t]he Purchaser agrees to use the information contained in the Private Placement Memorandum for the sole purpose of evaluating a possible investment in the Shares . . . ." (Id. ¶ 55.) Defendants allegedly signed this agreement. (Id. ¶ 56.)

The SEC further alleges that the placement agent for the PhotoMedex offering sent investment materials to defendants by e-mail, and in that e-mail, the agent wrote:

> By accepting the attached materials pertaining to PhotoMedex, Inc. (the "Company"), you agree that the attached materials and any other

information which you receive from us or the Company in connection
with your evaluation of the Company ("Collectively, the "Confidential
Information") will be used by you and your affiliates and advisors solely
for the purpose of evaluating the potential acquisition of the Company's
securities and the Confidential Information will be kept confidential by
you and your affiliates and advisors . . . .

(Id. ¶ 58.)  For the Manufacturers' Services and Celsion offerings, the Complaint states

that the corresponding private placement memoranda included provisions requiring that

prospective investors maintain the confidentiality of the information contained in those

materials.  (Id. ¶¶ 60, 62.)  On the basis of these provisions, the SEC alleges that Lyon

and the Gryphon Entities were bound by a duty of confidentiality to Gentner,

PhotoMedex, Manufacturers' Services, and Celsion as regards their respective PIPE

offerings.

    Lyon and the Gryphon Entities respond that they did not, in fact, agree to be

bound by the confidentiality provision contained in the Gentner purchase agreement,

because the version of the agreement that they signed contained no such provision.

(Def.'s Mem. in Support of Mot. at 24.)  More broadly, defendants contend that the fact

that they received documents containing confidentiality clauses in connection with

certain PIPE offerings does not establish that they were bound by a duty of

confidentiality with respect to those offerings.

    The SEC, however, need not establish the existence of such a duty in order to

survive a motion to dismiss.  At this early stage of the litigation, the SEC need only plead

facts – albeit with the particularity required by Fed. R. Civ. P. 9(b) – that state a

"plausible" claim for relief.  See Twombly, 127 S. Ct. at 1974.  And the SEC has done so.

By alleging that the Gentner purchase agreement and the PhotoMedex, Manufacturers'

Services, and Celsion offering materials required investors to keep the information

conveyed in connection with those offerings confidential – and setting forth the specific language in the private placement memoranda and e-mails – the SEC has alleged facts with the requisite specificity that plausibly support its claim that a confidential relationship arose between defendants and those four PIPE issuers. Whether such a relationship did in fact develop need not be resolved now and no doubt will be explicated further as this litigation progresses. It may be, for example, that in discovery the SEC uncovers communications showing that defendants explicitly accepted the relevant confidentiality conditions or that the customary practice among participants in the private-placement market is to be bound and abide by the confidentiality provisions stated in the offering memoranda.

Regardless of how – or whether – the SEC ultimately carries its burden of proving that defendants were bound by a duty of confidentiality in the relevant transactions, all that the SEC need do now is state with particularity a plausible claim for the existence of such a duty. Because the SEC has done so, defendants' motion to dismiss the insider-trading claim brought pursuant to section 10(b) and Rule 10b-5 for failure to plead the existence of a duty of confidentiality is denied.

C.    Section 17(a) Insider Trading Claim

Pursuant to section 17(a) of the Securities Act, 15 U.S.C. § 77q, the SEC brings a second claim of insider trading against Lyon and the Gryphon Entities arising from the same conduct discussed in the previous section. The Second Circuit has observed that "[e]ssentially the same elements are required" to prove fraud under section 17(a) as are required under section 10(b) of the Exchange Act, SEC v. Monarch Funding Corp., 192

F.3d 295, 308 (2d Cir. 1999);[2] indeed, defendants do not distinguish between the SEC's

section 17(a) and section 10(b) insider-trading claims in their submissions.  They rely on

the same argument for dismissing both the section 17(a) and section 10(b) insider-trading

claims – i.e., the absence of a duty of confidentiality – that was discussed, and rejected,

above.  The Court therefore denies defendants' motion to dismiss the section 17(a)

insider-trading claim for the reasons discussed in the previous section.

      D.     <u>Section 5 Registration and Prospectus Delivery Claims</u>

The SEC's third claim against Lyon and the Gryphon Entities arises from section

5 of the Securities Act, 15 U.S.C. § 77e.  Pursuant to section 5, it is unlawful to (a) sell or

deliver unregistered securities, (b) sell or deliver registered securities unless accompanied

or preceded by a prospectus that complies with section 10 of the Securities Act, and (c)

offer to sell or offer to buy – through a prospectus or otherwise – unregistered securities.

<u>See</u> 15 U.S.C. § 77e.  Under the Securities Act, a "sale" includes "every contract of sale

or disposition of a security or interest in a security, for value," and an "offer to sell"

includes "every attempt or offer to dispose of, or solicitation of an offer to buy, a security

or interest in a security, for value."  15 U.S.C. § 77b(a)(3).

The SEC must allege three elements to state a prima facie claim of a section 5

violation: "(1) lack of a registration statement as to the subject securities; (2) the offer or

sale of the securities; and (3) the use of interstate transportation or communication and

the mails in connection with the offer or sale."  <u>SEC v. Cavanagh</u>, 445 F.3d 105, 111 n.13

(2d Cir. 2006) (quoting <u>Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas</u>

---

[2] One fundamental difference between the two statutory provisions is that section 17(a) applies only to the "offer or sale" of securities, 15 U.S.C. § 77q(a), while section 10(b) governs both purchases and sales, 15 U.S.C. § 78j(b).  <u>See</u> <u>Chemical Bank v. Arthur Andersen & Co.</u>, 726 F.2d 930, 941-42 (2d Cir. 1984).  For the purposes of this litigation, however, that distinction is not significant because the SEC bases its insider-trading allegations on defendants' sales, which may be actionable under either provision.

London, 147 F.3d 118, 124 n.4 (2d Cir. 1998)) (internal quotation marks omitted).  If the SEC makes a prima facie case of a section 5 violation, defendants then "bear[] the burden of proving the applicability of an exemption" from section 5's registration requirement. Id.

The SEC alleges that Lyon and the Gryphon Entities violated section 5 each time they (1) took a short position in a PIPE issuer's publicly traded shares at a time when no PIPE resale registration statement was in effect and then (2) "covered" their short position with PIPE shares after the effective date of the relevant resale registration statement.  (Compl. ¶¶ 25-37.)  Under the SEC's theory, defendants unlawfully sold PIPE shares to the public via an unregistered three-step distribution.  First, defendants bought PIPE shares issued by publicly traded companies that were restricted from being sold publicly.  Next, they sold short the PIPE issuers' public shares prior to the effective date of a resale registration statement for the PIPE shares.  Finally, after the resale registration statements for the PIPE shares became effective, defendants "covered" their short positions with those PIPE shares.

Lyon and the Gryphon Entities urge dismissal of this claim on the grounds that the SEC has failed to state a claim arising from section 5.  Defendants maintain that the delivery of once-restricted PIPE shares to close a short position does not convert the underlying short sale into a sale of PIPE shares.  From defendants' perspective, the SEC's claim that such a transaction violates section 5 finds no support in the text or purpose of the statute.  For the reasons that follow, the Court agrees with defendants' reasoning and therefore grants their motion to dismiss with respect to the SEC's section 5 claim.

*Securities Used to Close a Short Position Are Not Sold or Offered for Sale at the Time When a Short Sale Is Made.*

Whether a plausible section 5 claim can be based on the short sales at issue in this case depends on what security was sold or offered for sale in those transactions. The SEC contends that PIPE shares were sold or offered for sale by defendants when they transacted their short sales; Lyon and the Gryphon Entities maintain that publicly traded shares were offered and sold through those trades. To determine which characterization most plausibly captures the nature of these transactions, the Court must attempt to elucidate the mechanics of a short sale.

The Second Circuit recently explained that "[a]n investor sells short when he sells a security that he does not own by borrowing the security, typically from a broker. At a later date, he 'covers' his short position by purchasing the security and returning it to the lender." ATSI Communs., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 96 n.1 (2d Cir. 2007) (citing Levitin v. PaineWebber, Inc., 159 F.3d 698, 700 (2d Cir. 1998)). For the purposes of this Opinion, this type of transaction is called "conventional" short selling. Naked short selling, by contrast, occurs when an investor "sells a security without owning or borrowing it and does not deliver the security when due." In re Phlo Corp., Exchange Act Release No. 55,562, 2007 SEC LEXIS 604, at *15 n.22 (Mar. 30, 2007). Thus, conventional short selling and naked short selling – both of which are at issue in this case – involve a transaction that creates a short position in a security and later, a transaction that closes out – or "covers" – that short position.

A short sale of a security, then, produces two consequences: (1) a sale of that security and (2) a deficit in the seller's trading account. This deficit, which is called a short position, must be satisfied at some point in the future. Investors usually cover their

short positions by purchasing securities from the market, see Shaar Fund, 493 F.3d at 96 n.1, but they need not necessarily do so. If investors hold securities that can be converted into the type of security owed, such as convertible preferred stock, see id. at 96-97, they may elect to exercise their right of conversion and cover their short position using the newly converted securities.

According to the SEC, the means that an investor uses to close down his short position determines what security was actually sold when the short sale was executed. Consider an investor who shorts the common stock of a company and then covers his short position by converting convertible bonds into the common stock owed. Under the SEC's theory, that investor sold convertible bonds – not common stock – through his short sale. The Court finds this characterization of a short sale inaccurate and not reflective of what occurs in the market. Indeed, the buyer on the other side of that hypothetical short sale received common stock, not convertible binds. Accordingly, from the Court's perspective, a short sale of a security constitutes a sale of that security. How an investor subsequently chooses to satisfy the corresponding deficit in his trading account does not alter the nature of that sale.

In addition to its inherent logical implausibility, the SEC's characterization of a short sale does not advance the purposes that animate section 5's registration requirement. The Supreme Court has observed that "[t]he primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce." Pinter v. Dahl, 486 U.S. 622, 638, 108 S. Ct. 2063, 100 L. Ed. 2d 658 (1988); see also SEC v. Ralston Purina Co., 346 U.S.

119, 124, 73 S. Ct. 981, 97 L. Ed. 1494 (1953) ("The design of the [Securities Act] is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions."). The SEC has not alleged that the buyers on the other side of defendants' short sales lacked the information required by the Securities Act with respect to the securities that they purchased. In the relevant short sales, buyers contracted to purchase the publicly traded shares of the PIPE issuers. The Complaint does not allege that these securities failed to comply with section 5's registration requirements; nor does the Complaint explain how the means by which a short position is closed alters what information must be disclosed to the buyer. All of which means that the buyers were presumably in possession of all the information to which they were entitled pursuant to section 5.

Because construing a short sale as a sale of the security that is eventually used to close down the short position neither comports with the plain textual meaning of section 5 nor advances the statute's underlying purpose, the Court declines to apply that characterization of a short sale to the transactions at issue in this litigation.

2. *The Authority Cited by the SEC Does Not Compel a Different Result.*

The SEC relies on the Supreme Court's analysis in Rubin v. United States, 449 U.S. 424, 101 S. Ct. 698, 66 L. Ed. 2d 633 (1981), to support its characterization of the short sales at issue in this case. The question in Rubin was whether a pledge of stock as collateral for a bank loan constituted an offer or sale pursuant to the Securities Act. The Supreme Court held that "[o]btaining a loan secured by a pledge of shares of stock unmistakably involves a 'disposition of [an] interest in a security, for value'" and thus a

"sale" pursuant to section 5. <u>Rubin</u>, 449 U.S. at 429 (quoting 15 U.S.C. § 77b(a)(3)). The Court explained:

> The economic considerations and realities present when a lender parts with value and accepts securities as collateral security for a loan are similar in important respect to the risk an investor undertakes when purchasing shares. Both are relying on the value of the securities themselves, and both must be able to depend on the representations made by the transferor of the securities, regardless of whether the transferor passes full title or only a conditional and defeasible interest to secure repayment of a loan.

<u>Id.</u> at 431. Thus, <u>Rubin</u> stands for the proposition that a transfer of a partial interest in securities constitutes a sale pursuant to the Securities Act.

The holding in <u>Rubin</u>, however, does not weigh in favor of adopting the SEC's position in this case. Here, the SEC has not alleged that Lyon and the Gryphon Entities either pledged their PIPE shares or otherwise used them as collateral in connection with their short selling. Nor does the SEC claim that defendants were under any legal obligation to use their PIPE shares to cover their short positions. The SEC alleges only that defendants "waited until the Commission declared effective the resale registration statement and then began to use their PIPE shares to cover the short positions . . . ." (Compl. ¶ 31.) Thus, no interest in the PIPE shares is alleged to have been transferred prior to the effective dates of the relevant resale registration statements. Once the registration statements became effective, the PIPE shares were registered pursuant to section 5 and therefore could be sold or offered for sale without violating the Securities Act. Accordingly, the facts alleged in this case do not fall within the scope of <u>Rubin</u>.

The SEC also relies on a series of agency releases, proposals and requests for comment that it considers strong support for its interpretation of section 5. The Court recognizes its duty to give "effect to an agency's regulation containing a reasonable

interpretation of an ambiguous statute." Christensen v. Harris County, 529 U.S. 576, 586-87, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000) (citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984)); see also Clearing House Ass'n, L.L.C. v. Cuomo, __ F.3d __, No. 05-5996-cv (L), 05-6001-cv (CON), 2007 U.S. App. LEXIS 27938, at *28-29 (2d Cir. Dec. 4, 2007). However, this Court has found section 5 unambiguous with respect to whether a security used to close a short position is considered "sold" under the statute at the time when the short position is first established. Even if Chevron deference were applicable here, none of the agency materials cited by the SEC constitutes an agency determination that the security used to close a short position is the security sold via the short sale. As is set forth below, these documents provide negligible support for the SEC's view of short sales.

First, the SEC quotes selectively – and in the Court's view misleadingly – from a 1972 SEC release entitled Short-Selling Practices Related to Registered Offerings of Securities in Which There Is an Existing Trading Market, Securities Act Release No. 5323, Exchange Act Release No. 9824, 1972 SEC LEXIS 250 (Oct. 16, 1972). In this release, the SEC stated:

> It appears that certain investors and broker-dealers have been utilized by underwriters and have acted in concert with the underwriters in an undisclosed manner in an effort to facilitate the distribution. Such investors and broker-dealers, desiring to participate in so-called 'hot' issue offerings, agree to accommodate the underwriters and therefore participate in the so-called 'cold' issue. Such persons reportedly then attempt to protect themselves against losses by selling the securities short prior to the distribution, intending to cover their short position with the securities being offered. It is the opinion of the staff that the above described activities involve possible violations of the anti-fraud and anti-manipulative provisions of the federal securities laws, specifically Sections 9(a)(2) (or 15(c)(1)) and 10(b) of the Securities Exchange Act

and Rule 10b-5 thereunder, Section 17(a) of the Securities Act and the registration and prospectus delivery requirements of Section 5 of the Securities Act.

1972 SEC LEXIS 250, at *2-3. The SEC contends that this statement "addressed the practice of investors selling short securities that are the subject of registered offerings and covering their short positions after the effective date with the securities obtained in the offering" and "advised that, depending on the specific structure of the transactions, such practices 'involve possible violations . . . of the Securities Act and the registration and prospectus delivery requirements of Section 5 of the Securities Act.'" (Pl.'s Mem. in Opp. to Mot. at 9.) The Court disagrees. Under its reading, the relevant section of the release is narrowly focused on a particular scheme in which underwriters and broker-dealers conspire to distribute securities and, in furtherance of that scheme, engage in short sales to hedge against losses. The SEC's case against Lyon and the Gryphon Entities, however, does not involve such conspiracies. Moreover, the release does not explain precisely what aspect of the conduct described violates section 5. As a result, the 1972 release provides scant support for the SEC's position before this Court.

The SEC also relies on a 1974 notice of proposed rulemaking entitled Notice of Proposed Rules 10b-20 and 10b-21 and Amendments to Rule 17a-3(A)(6) and 17a-3(A)(7) under the Securities Exchange Act of 1934, Exchange Act Release No. 10636, 1974 SEC LEXIS 3486 (Feb. 11, 1974), which states:

> It is the Commission's view that short sales made prior to the effective date of a pending registration statement filed with the Commission covering securities of the same class of the same issuer as those sold short, which short sales are covered, as planned at the time of sale, with shares obtained in the registered offering, raise serious questions under Section 5 of the Securities Act of 1933. Therefore, any person intending to purchase securities in any registered secondary offering should be on notice that his selling short the same class of securities prior to the offering may be

> subject to the registration requirements of Section 5 of the Securities Act, as well as other applicable statutes and rules.

1974 SEC LEXIS 3486, at \*2-3 (emphasis added). The Court observes that the SEC's equivocal statements in this release provide some support for the SEC's decision to bring this action. The 1974 release, however, amounts to little more than an expression of concern over the propriety of certain short sales. It does not squarely or meaningfully address the contested issue in this litigation – whether a security used to cover a short position is effectively sold at the time of the earlier short sale – and therefore does not counsel against the Court's rejection of the SEC's position on that issue.[3]

Even less persuasive are the SEC's references to various materials pertaining to Rule 144, a "nonexclusive safe harbor provision" for unregistered securities sales, <u>see SEC v. Cavanagh</u>, 445 F.3d 105, 114 (2d Cir. 2006).[4] As an initial matter, the propriety of the sales at issue in this litigation does not turn on the availability of the Rule 144 safe harbor. Lyon and the Gryphon Entities contend that it was the resale registration agreements – not Rule 144 – that authorized the sale of their PIPE securities, while the SEC maintains that the sales actually occurred before the resale registration agreements were in effect, and therefore while the securities were still restricted. Rule 144 is simply not implicated by the facts alleged in the Complaint.

Moreover, whether or not defendants' short sales and hedging activity would have theoretically precluded them from the Rule 144 safe harbor is a different question from whether that same conduct violated section 5, because failure to comply with a

---

[3] For the same reasons, the SEC release entitled Short Sales in Connection with a Public Offering, Securities Act Release No. 6798, Exchange Act Release No. 26028, 1988 LEXIS 1706 (Aug. 25, 1988), is not persuasive.

[4] In particular, Resales of Restricted and Other Securities, Securities Act Release No. 6099, 1979 SEC LEXIS 968 (Aug. 2, 1979), Revision of Rule 144, Rule 145 and Form 144, 62 Fed. Reg. 9246 (proposed Feb. 28, 1997), 1A Harold S. Bloomenthal and Samuel Wolff, <u>Going Public and the Public Corporation</u> § 6:31 (2004).

nonexclusive safe harbor does not amount to a violation of the underlying statutory

provision.  See Cavanagh, 445 F.3d at 114.  Nevertheless, the Court notes that executing

short sales in a security while holding the same issuer's restricted stock would likely fall

outside of Rule 144's protection.  According to the SEC release entitled Revision of Rule

144, Rule 145 and Form 144, 62 Fed. Reg. 9246, 9252 n.59 (proposed Feb. 28, 1997):

> With respect to short sales "against the box," (meaning that the person
> sells short even though the person owns securities that can be delivered)
> the Division continues to take the position expressed in the 1979 Rule 144
> interpretative release (Release No. 33-6099, (August 2, 1979) [44 FR
> 46572]) that a person who has held restricted securities for less than one
> year cannot effect a short sale of securities of that class and then cover the
> short position with restricted securities (even after expiration of the one
> year holding period) since the initial short sale did not qualify under Rule
> 144.

As is clear from this passage the reason that these transactions are not within the safe

harbor is that they fail to comply with the requirements of Rule 144, not because they

necessarily violate section 5.  This prohibition, then, does not clarify the requirements of

section 5.

The SEC also asks the Court to consider a settled administrative proceeding that

purportedly contains "similar" facts to those alleged in this action.  In re Rooney, Pace

Inc., Securities Act Release No. 33-6743, Exchange Act Release No. 34-25125, 1987

SEC LEXIS 3200 (Nov. 16, 1987), involved an alleged scheme between a broker-dealer

and an issuer to distribute securities and manipulate the market via short selling in

advance of a secondary offering.  The SEC's findings in Rooney – much like the passage

in the 1972 release discussed above – describe a "preconceived agreement" between the

broker-dealer and the issuer to unlawfully distribute shares through a warrants issue,

short selling, and the use of shares from a secondary offering to close down short

positions. <u>Rooney</u>, 1987 SEC LEXIS 3200, at *31. The fact pattern in <u>Rooney</u>, then, bears little resemblance to the allegations presented in the instant case, where no scheme or "preconceived agreement" between the PIPE issuers and defendants has been alleged. Moreover, the SEC findings in the <u>Rooney</u> proceeding do not address the question of how to determine what security is truly sold in a short sale. For these reasons, the Court finds <u>Rooney</u> unhelpful in resolving defendants' motion.

Finally, the SEC refers the Court to two staff interpretations reported in its <u>Manual of Publicly Available Telephone Interpretations</u>. By way of introduction, the manual contains a disclaimer, announcing:

> The responses discussed in this manual do not necessarily reflect the views and policies of the Commission or the Division of Corporation Finance. These responses are not rules, regulations, or statements of the Commission. Further, the Commission has neither approved nor disapproved these responses. The responses discussed in this manual do not necessarily contain a discussion of all material considerations necessary to reach the conclusions stated. Accordingly, these responses are intended as general guidance and should not be relied on as definitive. There can be no assurance that the information in this manual is current, as the positions expressed may change without notice.

SEC Division of Corporation Finance, <u>Manual of Publicly Available Telephone Interpretations</u>, available at http://www.sec.gov/interps/telephone.shtml ("<u>Telephone Manual</u>"). <u>See also</u> <u>SEC v. Calvo</u>, 378 F.3d 1211, 1219 (11th Cir. 2004) ("The SEC's website is replete with unambiguous statements explaining that this [telephone] interpretation is not binding."). Because telephone interpretations are expressly not rules, regulations, or even approved statements of the SEC, they are not entitled to any deference beyond their "power to persuade." <u>Christensen</u>, 529 U.S. at 587.

The first telephone interpretation states:

> An issuer filed a Form S-3 registration statement for a secondary offering of common stock which is not yet effective. One of the selling shareholders wanted to do a short sale of common stock 'against the box' and cover the short sale with registered shares after the effective date. The issuer was advised that the short sale could not be made before the registration statement becomes effective, because the shares underlying the short sale are deemed to be sold at the time such sale is made. There would, therefore, be a violation of Section 5 if the shares were effectively sold prior to the effective date.

Telephone Manual, A. Securities Act Sections ¶ 65. This telephone interpretation is consistent with the position that the SEC takes in this litigation. Aside from demonstrating that the SEC's position is not newly adopted, however, this interpretation provides extremely limited support for the SEC's argument. It is simply a conclusory statement that does not set forth the reasoning underlying the opinion it expresses. As such, its power to persuade is limited, and the Court finds that it adds little weight to the argument presented by the SEC in its briefing of this issue. The second telephone interpretation cited by the SEC concerns the applicability of Rule 144, see Telephone Manual, C. Securities Act Rule 144 ¶ 3, which the Court has already determined to be irrelevant here.

Taking into account the authority presented by the SEC in support of its position, this Court nevertheless finds implausible the proposition that a short sale constitutes a sale of the security that is eventually used to cover the short position. The Court therefore concludes that the PIPE shares used to cover defendants' short positions cannot be considered sold or offered for sale pursuant to section 5 at the time defendants sold short the PIPE issuers' publicly traded securities. Accordingly, the SEC has not pled a plausible claim against Lyon and the Gryphon Entities for violating section 5, and that claim is hereby dismissed.

## III. CONCLUSION

For the reasons stated in this Opinion and Order, this Court concludes that the SEC has adequately pled securities fraud and insider trading against Lyon and the Gryphon Entities, and therefore defendants' motion to dismiss those claims is denied. The SEC has not, however, stated a plausible claim against Lyon and the Gryphon Entities for distributing unregistered securities or for fraud arising from that conduct, and accordingly, defendants' motion to dismiss is granted with prejudice with respect to those claims.

Dated: New York, New York
       January 2, 2008

SO ORDERED:

Sidney H. Stein, U.S.D.J.