## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

**SECURITIES AND EXCHANGE COMMISSION,**

    **Plaintiff,**

    **v.**

                             **06 Civ. 14338 (SHS)**

**EDWIN BUCHANAN LYON, IV, et al.,**

    **Defendants.**

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT AS TO INSIDER TRADING CLAIMS

Date:  June 9, 2008

James A. Kidney
Anthony S. Kelly
Julie M. Riewe

Counsel for the Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549-4010
(202) 551-4441 (Kidney)
(202) 772-9246 (fax) (Kidney)
kidneyj@sec.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES

FACT SUMMARY ..................................................................................................... 1

    A.   Celsion (FOF ¶¶ 28-46) ...................................................................... 3
    B.   Gentner (now ClearOne)  (FOF ¶¶ 47-55) ......................................... 5
    C.   Manufacturers Services Limited (FOF ¶¶ 52-64) ............................... 6
    D.   PhotoMedex (FOF  ¶¶ 74-82) .............................................................. 8

ARGUMENT ........................................................................................................... 10

    I.   The Standards for Summary Judgment ................................................ 10

      A.   Defendants' Lack of Recollection Is Insufficient
         to Place An Issue in Genuine Dispute .............................................. 11

    II.   Defendants Misappropriated Material Nonpublic
         Information In Breach of a Duty and Used It In
         Connection with the Purchase and Sale of Securities ....................... 13

      A.   A Duty Was Accepted and Breached ................................................ 13
      B.   The Information Was Material .......................................................... 16

CONCLUSION ....................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

Basic, Inc. v. Levinson, 485 U.S. 224 (1988) .................................................................. 16

Boehner v. McDermott, 332 F. Supp. 2d 149, (D. D.C. 2004) ......................................... 12

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ................................................................ 13

Craig v. Colonial Penn Insurance Co., 335 F. Supp. 2d 296 (D. Conn. 2004) ................ 13

FDIC v. National Union Fire Ins. Co., 205 F.3d 66 (2d Cir. 2000) ........................... 11, 12

Federal Election Comm. v. Toledano, 317 F.3d 939 (9th Cir. 2002) .............................. 12

Greene v. Dalton, 164 F.3d 671 (D.C. Cir. 1999) ............................................................ 12

In re Adler Coleman Clearing Corp., 469 F. Supp. 2d 112 (SDNY 2007) ...................... 11

J. Geils Band Employee Benefit Plan v. Smith Barney
   Shearson, Inc., 76 F.3d 1245 (1st Cir. 1996 ............................................................... 12

List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965) .................................................. 16

Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5 (1st Cir. 1990) .................... 12

New York ex rel. Spitzer v. Saint Francis Hosp., 94 F. Supp. 2d 423 (SDNY 2000) ...... 12

SEC v. Mayhew, 121 F.3d 44 (2d Cir. 1997) ................................................................... 16

SEC v. Singer, 786 F. Supp. 1158 (SDNY 1992) ............................................................ 12

SEC v. Texas Gulf Sulphur Co., 401 F.2d 833  (2d Cir. 1968) (en banc) ....................... 16

SEC v. Warde, 151 F.3d 42 (2d Cir. 1998) ...................................................................... 16

Tinder v. Pinkerton Security, 305 F.3d 728,  (7th Cir. 2002) .......................................... 12

United States v. O'Hagan, 521 U.S. 642 (1997) .............................................................. 14

**Federal Statutes**

Securities Act of 1933, 15 U.S.C. § 77q(a) ................................................................ 2, 13

Securities and Exchange Act, 15 U.S.C. § 78j(b) ....................................................... 2, 13

Securities Exchange Act of 1934 Rules, 17 CFR § 240.10b-5 ......................................... 2

**Federal Rules**

Federal Rule of Civil Procedure 56(c) .............................................................................. 8

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

    **Plaintiff,**

    **v.**

                                **06 Civ. 14338 (SHS)**

EDWIN BUCHANAN LYON, IV,
et al.,

    **Defendants.**

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT AS TO INSIDER TRADING CLAIMS

Plaintiff, the Securities and Exchange Commission ("the Commission"), submits this memorandum in support of its motion for summary judgment against all defendants as to its First and Second Claims for Relief -- insider trading violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934.  15 U.S.C. §§77q(a) and 78j(b) and 17 CFR § 240.10b-5.  A Statement of Uncontested Material Facts is filed in support of the motion and incorporated herein.[1]

## FACT SUMMARY

The Complaint alleges that the defendants, who operate and control various hedge funds for their own investments and for their clients ("the Gryphon Funds"), engaged in

---

[1] Grant of summary judgment and entry of an appropriate final judgment for injunction, disgorgement, interest and civil penalties will conclude this litigation in this Court. Claims under Section 5 of the Securities Act, 15 U.S.C. § 77e, were dismissed on Jan. 2, 2008.  See Doc. No. 17.

unlawful insider trading in the securities of four issuers who solicited the defendants to participate in PIPE offerings.

PIPE is an acronym for **p**rivate **i**nvestment in a **p**ublic **e**quity.[2]  PIPEs are marketed only to qualified investors as a private offering, and, therefore, PIPE shares cannot be freely traded until the issuer files a resale registration statement and the Commission declares it effective.  This usually occurs 60 to 120 days after PIPE shares are sold to qualified investors.  The PIPE shares are sold in the private offering at a discount to the market price because, among other things, they are temporarily illiquid.

A public announcement that an issuer is conducting a PIPE offering frequently has a depressive effect on the price of the company's stock.  Issuers, therefore, often choose to treat the proposed offering as confidential material nonpublic information until the PIPE offering is publicly announced.  It is necessary, however, to disclose a planned PIPE offering to qualified investors in order to solicit their investment.  These potential investors are required first to agree to treat the information, including the identity of the PIPE issuer, as confidential. Only after agreement is obtained are the prospective investors provided details of the offering.  A duty to the issuer arises to maintain the PIPE information in confidence and to not use such information for any purpose except to evaluate whether to participate in the PIPE offering.

The evidence in this case from PIPE issuers and their placement agents establishes that these defendants agreed to keep information about the four PIPEs confidential, and then breached their agreement by using -- misappropriating -- the inside

---

[2] The operation of a PIPE and why soliciting investor participation may be confidential is described at ¶¶ 13-27 of plaintiff's proposed findings of fact ("FOF").

information that a PIPE was planned to sell securities of those issuers short, knowing that they could "cover" with lower priced securities.  These lower priced securities were either PIPE shares purchased by the defendants at a discount to the then- market price and then sold after the Commission declared effective a resale registration statement, or market shares purchased after the PIPE offering was announced and the market price of the issuer's shares declined.  In this way, the defendants realized trading profits of at least $535,571.

The defendants do not and cannot deny these facts.  They claim to have no recollection of the events at issue.  They did know, through defendant Lyon, who made the investment decisions for the Gryphon Funds, that issuers of PIPE offerings and their placement agents demanded confidentiality agreements which restricted trading.  At one point -- before the trades at issue in this litigation -- the defendants tried to avoid such restrictions by proposing language in private placement memoranda or security subscription agreements that would have eliminated them.  These attempts failed.  The defendants proceeded to simply breach their duties to the issuers to forward their own fraudulent stock trading scheme.  FOF ¶¶ 24-26.

Other than expert depositions, if any, discovery is completed.  Following is a summary of the facts in the record, with reference to the more detailed paragraphs of the Statement of Material Uncontested Facts that cite to record evidence filed herewith as exhibits ("FOF").

### A.    Celsion (FOF ¶¶ 28-46)

Sworn testimony and contemporaneous documents establish that:

3

1.     Celsion Corporation considered information about a planned PIPE offering confidential and required its placement agent, Sterling Investment Group ("Sterling"), to keep the information confidential.  FOF ¶¶ 28-29.

2.     Sterling had procedures in place to ensure that prospective investors agreed to keep the information confidential and not use it for purposes other than deciding whether to invest in the PIPE offering.  Before informing a prospective investor the name of the PIPE issuer by telephone and sending written materials about the deal, the Sterling agent obtained an agreement from the investor to keep the information confidential.  FOF ¶¶ 34-37.

3.     The Sterling agent who dealt with the defendants testified that he was instructed to keep information about the Celsion PIPE confidential and that he spoke to Gryphon on the telephone to recommend that the firm invest in the Celsion PIPE.  There is no evidence in the record that the agent would have breached this duty to his employer and to Celsion by not obtaining an agreement to confidentiality from  the defendants. FOF ¶ 33-38.

4.     An executive summary of the Celsion PIPE sent to Gryphon by Sterling on May 21, 2003 is clearly marked "confidential", as is a more extensive 249-page "Confidential Private Placement Memorandum" also sent to the defendants, which included an all-capital letters warning that the information was not to be used for any purpose other than to consider whether to invest in the offering.  FOF ¶¶ 39-40.

5.     The defendants have no recollection of their participation in any part of the Celsion PIPE offering. Defendant Lyon testified that he does not know whether he read any of the offering materials.  FOF ¶¶ 30, 41.  The evidence, however, discloses that

Lyon read the materials carefully enough to propose the defendants' own terms to the placement agent under which the defendants would take a lead role in the Celsion offering.  FOF ¶ 42.

6.      The defendants began selling short Celsion stock on June 9, 2003, at least two weeks after they had agreed to keep the information confidential and to use it only to consider participation in the offering.  By the time Celsion publicly announced the PIPE offering on July 8, 2003, the defendants had accumulated a 377,700 share short position.  On the day of the public announcement, Celsion's stock price dropped 8.65 percent from previous day's closing price.  The defendants ultimately closed out the short position after the Commission declared effective the resale registration statement.  As a result, they realized $153,725 in ill-gotten gains from their unlawful trading.   FOF ¶¶ 43-46.

**B.      Gentner (now ClearOne)  (FOF ¶¶ 47-55)**

Sworn testimony and contemporaneous documents establish that:

1.      Gentner Communications Corp. considered the fact that it was planning a PIPE offering to be material confidential information.  FOF ¶ 47.

2.      Defendant Lyon, who had sole trading authority for the defendants, was the direct recipient of the confidential private placement memorandum and stock purchase agreement for the Gentner offering.  He received them on October 24, 2001.  These documents contained extensive warnings that the information was confidential and was to be used only for evaluating investment in the PIPE offering.  FOF ¶¶ 49-50.

3.      On November 15, 2001, defendant Lyon executed a stock purchase agreement with Gentner which stated as one of the contract terms, in part:

> [f]or the benefit of the Company, the purchaser agreed
> orally with the Placement Agent to keep confidential all

> information concerning this private placement.  The
> Purchaser understands that the information contained in the
> Private Placement Memorandum is strictly confidential and
> proprietary to the Company and has been prepared from the
> Company's publicly available documents and other
> information and is being submitted to the Purchaser solely
> for such Purchaser's confidential use.  The Purchaser
> agrees to use the information contained in the Private
> Placement Memorandum for the sole purpose of evaluating
> a possible investment in the Shares . . . .

FOF ¶ 51.

4.     Defendant Lyon, on behalf of himself and the other defendants, testified

that he could not recall anything about the defendants' participation in the Gentner PIPE

other than the name of the company.  He further testified that he cannot recall what he

understood about the document he signed.  FOF ¶¶ 52-53.

5.     The defendants sold short 87,500 Gentner shares on November 15, 2001.

When Gentner publicly announced the PIPE offering the next day, its share price fell 4.88

percent.  The defendants covered the short position after the Commission declared

effective the resale registration statement.  As a result of their unlawful insider trading,

the defendants realized ill-gotten gains of $332,000.  FOF ¶¶ 54-56.

### C.     <u>Manufacturers Services Limited (FOF ¶¶ 52-64)</u>

Sworn testimony and contemporaneous documents establish that:

1.     Manufacturers Services Limited ("MSL") employed Robertson Stephens

as the underwriter for a 2002 PIPE offering.  Robertson Stephens required that

prospective investors agree to treat information about a PIPE as confidential before it

identified the issuer or conveyed any documents to the prospect.  FOF ¶¶ 57-59.

2       In connection with the MSL offering, a printed script was provided to the

salespersons for this purpose on or about February 27, 2002.  It clearly required the

salesperson to ask the potential investor "Would you like to hear more about this transaction? (Yes/No)." If the prospect answered "yes," then the salesperson offered to send a package of public information, but cautioned the investor:

> I must add, however, [that my] disclosing the name of the company will require you to keep the transaction confidential and may restrict you from trading the stock until the transaction is announced.

FOF ¶ 60.

3.       Also on February 27, 2002, the date of the sales script requiring an agreement to confidentiality, the salesperson sent defendant Lyon a Confidential Private Placement Memorandum which contained extensive warnings of confidentiality. It said, in part, in bold capital letters:

> WE HAVE PREPARED THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM SOLELY FOR THE BENEFIT OF PERSONS INTERESTED IN THIS OFFERING OF OUR SECURITIES. THE INFORMATION CONTAINED IN THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM IS STRICTLY CONFIDENTIAL. YOU AGREE TO USE THIS INFORMATION FOR THE SOLE PURPOSE OF EVALUATING A POSSIBLE INVESTMENT IN OUR SECURITIES AND FOR NO OTHER PURPOSE. . . .

FOF ¶ 67.

4.       Although the Robertson Stephens salesperson who contacted the defendants to solicit their interest in the MSL PIPE cannot specifically recall the details of his conversation with defendant Lyon soliciting Gryphon's interest in the MSL PIPE, he testified that he had no reason to depart from his routine of using the script to obtain an oral confidentiality agreement. "[I]t would have been routine for me to do it and that was my job to do that," the agent testified. He testified that he would not have provided

defendant Lyon with additional information about the offering had Lyon not consented to keep the information confidential.  FOF ¶ 61.

5.      The salesperson's recollection is confirmed by a contemporaneous writing.  On March 18, 2002, he confirmed to a colleague that defendant Lyon, among others, had been "brought over the wall" on the MSL transaction.  FOF ¶ 62-65.

6.      The defendants sold short 23,000 MSL shares during the period March 6-11, 2002 – i.e., after they had agreed to keep the PIPE information confidential.  When MSL publicly announced the PIPE offering on March 13, 2002, its stock price declined 6.25 percent from the previous day's closing price.  The defendants did not participate in the MSL PIPE offering, but were able to profit from their unlawful use of material nonpublic PIPE information by closing out their short position on March 14, 2002 – one day after the stock price declined as a result of the PIPE announcement.  The defendants' ill-gotten gains totaled $12,346.  FOF ¶¶ 69-73.

**D.      PhotoMedex (FOF  ¶¶ 74-82)**

1.      PhotoMedex retained Pacific Growth Equities as its placement agent for a $10 million PIPE offering in 2001.  PhotoMedex's chief financial officer testified that information about a PIPE offering is confidential until the issuer makes a public announcement.  He testified he told Pacific Growth the information was confidential -- "Absolutely we had that conversation".  FOF ¶ 74.

2.      Before Pacific Growth Equities conveys any confidential, material nonpublic PIPE information to a potential investor, it obtains a confidentiality agreement from the investor.  A long-time vice president at Pacific Growth Equities testified that "[w]hether it was verbal or written, it was always done because it was -- you know,

before anything could be sent out, there had to be some sort of confidentiality agreement," and that "there would have been something sent or verbally agreed upon before [any written offering materials] [were] sent to a client.  It's a pretty standard practice."  She further testified that she was not aware of any exceptions to these procedures.  She also testified that one of the reasons Pacific Growth Equities obtains confidentiality agreements from potential investors is because the PIPE information "could be good information to know ahead of other people for obvious reasons."  FOF ¶¶ 75-77.

3.      Although the Pacific Growth witness was not the employee who personally contacted the defendants by telephone to obtain a confidentiality agreement, on March 21, 2001, she sent defendant Lyon an e-mail attaching PhotoMedex private placement documents.  It would not have been sent under company procedures unless the defendants had agreed to keep information about the offering confidential.  Above the witness's "signature" line was a lengthy warning that the information was to be treated as confidential.  It said in part:

> By accepting the attached materials pertaining to PhotoMedex, Inc. (the "Company"), you agree that the attached materials and any other information which you receive from us or the Company in connection with your evaluation of the Company (collectively, the "Confidential Information") will be used by you and your affiliates and advisors solely for the purpose of evaluating the potential acquisition of the Company's securities and the Confidential information will be kept confidential by you and your affiliates and advisors . . . .

FOF ¶ 78.

4.      Defendant Lyon testified that he recalled nothing about the PhotoMedex e-mail.  His current understanding of the confidentiality warning is that the document contained what may have been confidential information.  FOF ¶ 79.

5.      On the same day defendant Lyon received the offering documents, the defendants sold short 50,000 PhotoMedex shares.  When PhotoMedex publicly announced the PIPE offering two days later, on March 23, 2001, its stock price fell 5.98 percent from the previous day's closing price.  As a result of their unlawful conduct – i.e., trading on the confidential, material nonpublic PIPE information after agreeing to keep it confidential – they realized $37,500 in ill-gotten gains.  FOF ¶¶ 80-82.

## ARGUMENT

### I.      The Standards for Summary Judgment

Summary judgment shall be granted if the admissible record shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. Proc.  The moving party bears the burden of establishing the absence of any genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party.  Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001).  The Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion.  The Court is not to assess credibility or weigh the evidence at this stage.  SEC v. Universal Express, Inc., 475 F. Supp. 2d 412, 421 (SDNY 2007) and cases cited therein.

The non-moving party may not simply rely on "conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998); aff'd in part, vacated in part on other grounds, 143 F.3d 105 (2d Cir. 1998).  Rather, the non-movant must "set out specific facts showing a genuine issue for trial."  Rule 56(e) Fed. R. Civ. P.  Nor may a party create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that contradicts the affiant's previous deposition testimony. In re Adler Coleman Clearing Corp., 469 F. Supp. 2d 112, 120 (SDNY 2007) and cases cited therein.

In this case, the evidence shows that the defendants breached a duty of trust or confidence by selling short the four issuers' PIPE shares, and the defendants can offer nothing to contradict this evidence.

### A.      Defendants' Lack of Recollection Is Insufficient to Place An Issue in Genuine Dispute

Defendants, through defendant Lyon and his principal assistant, Wolters, have testified under oath that they are unable to recall any conversations, documents or other activities undertaken as part of the defendants' participation in the subject PIPE offerings. Such lack of recollection is not equal to a recollection and denial that an action did or did not take place.  Rather, a lack of recall is insufficient to place a fact otherwise reasonably established in dispute.  FDIC v. National Union Fire Ins. Co., 205 F.3d 66, 71 (2d Cir. 2000);[3] In re Adler Coleman Clearing Corp., 469 F. Supp. 2d 120; Tinder v. Pinkerton

---

[3]      Folks's unsubstantiated, self-serving testimony that he does not "recall" whether or not he was ever informed of Diesenhouse's wrongdoing does not place this issue in genuine dispute.  Because there is no evidence from which a jury could reasonably conclude otherwise, no genuine dispute exists as to whether Folks committed dishonest acts under the fidelity bond.  205 F.3d at 71.

11

Security, 305 F.3d 728, 735 (7th Cir. 2002) (applying summary judgment rules to an arbitration issue, holding lack of recollection does not raise a genuine issue of material fact).   A lack of recollection does not "limn differing versions of the truth which a fact finder must resolve." J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1257 (1st Cir. 1996), quoting Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

    "Defendant's repeated reliance on faulty memory in the face of direct contrary evidence fails to create a genuine issue of material fact." Boehner v. McDermott, 332 F. Supp. 2d 149, 168 (D. D.C. 2004), citing Greene v. Dalton, 164 F.3d 671, 674 (D.C. Cir. 1999); Federal Election Comm. v. Toledano, 317 F.3d 939, 950 (9th Cir. 2002) ("[F]ailure to remember and lack of knowledge are not sufficient to create a genuine dispute.") and FDIC v. National Union Fire Ins. Co., supra at 75 ("[V]ague denials and memory lapses  . . . do not create genuine issues of material fact.")

    On the other hand, the testimony of placement agents as to their practices and belief that they followed those practices with respect to the defendants are entitled to weight because they are based on personal experience over time.   The fact they cannot recall specific conversations with the defendants or details of those conversations does not render their testimony inadmissible or equivalent in weight to the defendants' total lack of recollection.   SEC v. Singer, 786 F. Supp. 1158, 1165-69 (SDNY 1992); New York ex rel. Spitzer v. Saint Francis Hosp., 94 F. Supp. 2d 423, 425 (SDNY 2000).   That is especially so where, as here, the testimony also is supported by other direct and

circumstantial evidence, including contemporaneous documents and the timing of the defendants' trading in the subject securities.  <u>Singer</u>, 786 F. Supp. at 1164-65.[4]

In sum, defendants' lack of recollection cannot constitute *evidence* from which a genuine issue of fact may be erected.  All of the *evidence* -- sworn testimony of issuers and placement agents that they intended the information to be confidential and had procedures in place to achieve that goal, plus contemporaneous documents marked as confidential and an agreement in one instance signed by defendant Lyon that he had treated the information as such -- supports liability of the defendants.  Because there is no colorable *evidence* for the jury to weigh against it, summary judgment in favor of the plaintiff is appropriate.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986) (holding that moving party may meet burden of establishing there is no genuine issue of material fact by pointing to the absence of evidence to support the non-moving party) as summarized in <u>Craig v. Colonial Penn Insurance Co.</u>, 335 F. Supp. 2d 296, 305 (D. Conn. 2004).

## II. Defendants Misappropriated Material Nonpublic Information In Breach of a Duty and Used It In <u>Connection with the Purchase and Sale of Securities</u>

### A. A Duty Was Accepted and Breached

The evidence, which is not genuinely controverted by contrary evidence, establishes that the defendants accepted a duty of confidentiality in return for access to information about four prospective PIPE investments and violated that duty by misappropriating the information to sell the securities of those issuers short in

---

[4]     Courts in the Southern District have held that circumstantial evidence such as suspicious timing of trades, contacts between potential tippers and tippees, and incredible reasons for such trades provide an adequate basis for inferring that tipping activity has occurred.  <u>SEC v. Musella</u>, 748 F. Supp. 1028, 1038 (SDNY 1989) ("<u>Musella II</u>"); <u>SEC v. Musella</u>, 578 F. Supp. 425, 441-42 (SDNY 1984) ("<u>Musella I</u>").

anticipation of the PIPEs.[5]  The defendants then breached this duty by misappropriating

the information as a critical part of a fraudulent scheme by which they realized over half

a million dollars.

The "misappropriation theory" of insider trading "holds that a person commits

fraud 'in connection with' and thereby violates § 10(b) and Rule 10b-5, when he

misappropriates confidential information for securities trading purposes in breach of a

duty owed to the source of the information." United States v. O'Hagan, 521 U.S. 642,

652 (1997).[6]  The self-serving use of a principal's information to purchase or sell

securities in breach of a duty of confidentiality defrauds the principal of the exclusive use

of that information to, in this case, solicit participation in a PIPE offering without thereby

causing additional market activity which could harm the issuer and its shareholders.  Id.[7]

The evidence that the defendants agreed to treat the PIPE information as

confidential is that the issuers and their agents had procedures in place for enforcing their

---

[5] The Commission has argued in opposing defendants' motion to dismiss that the
defendants' conduct constituted a deceptive scheme for several reasons, including insider
trading.  This motion is limited to insider trading, but the Commission does not thereby
waive other arguments addressed in its memoranda opposing dismissal should this matter
go to trial.

[6] Liability under Sec. 17(a) of the Securities Act is the same as liability under Sec. 10(b)
of the Exchange Act, except that Sec. 17(a) is limited to sale of securities while Sec.
10(b) applies to both purchase and sale.  SEC v. First Jersey Securities, 101 F.3d 1450,
1466(2d Cir. 1996).  The defendants here engaged in both purchase and sale as part of
their scheme to defraud.

[7] Defendants' trading also was unlawful under the "classic" insider trading analysis
because the defendants were made "temporary insiders" when they agreed to
confidentiality. Because this status created a duty by the defendants to the issuer and its
shareholders, the classic insider trading analysis is applicable.  The overlap between the
misappropriation analysis adopted in O'Hagan and the classic analysis of Dirks v. SEC,
463 U.S. 646 (1983) is addressed in United States v. Chestman, 947 F. 2d 551, 566-67
(1991) (en banc).  If the Court is more comfortable analyzing this issue using the Dirks
temporary insider approach, the Commission will not object.

expectation that information about a pending PIPE offering be treated as confidential. FOF ¶¶ 28-29, 33-38 (Celsion), ¶ 47 (Gentner),  ¶¶ 57-65, 68 (MSL) and ¶¶ 74-78 (PhotoMedex).  The representatives of the agents retained by three of the issuers each testified that procedures were in place to obtain oral agreements from investors before a PIPE issuer was identified.  For the Gentner PIPE offering, defendant Lyon executed a written contract acknowledging that he had agreed to keep all information confidential. FOF ¶ 51.  Of course, the record also is filled with private placement memoranda and e-mail delivered to the defendants strongly reminding them of their agreement -- often in bold capital letters.  See, e.g.,  FOF ¶ 40 (Celsion), ¶¶ 49-51 (Gentner), ¶¶ 67 (MSL) and 78 (PhotoMedex).

Defendants, through Lyon and Wolters, who represented the Gryphon Funds in these deals, cannot recall anything about telephone conversations or documents.  Their testimony -- and, thus, the defense evidence -- is a nullity.  FOF ¶¶ 30-31, 41 (Celsion), ¶¶ 52-53 (Gentner), ¶¶ 79 (PhotoMedex).[8]  However, the evidence is clear that Lyon, who made all trading decisions for the defendants, knew that PIPE issuers imposed trading restrictions to preserve confidentiality which, if heeded, would ruin the defendants' fraudulent scheme.  FOF ¶¶ 24-26.  Unable to obtain agreement from issuers to permit the defendants to trade, the defendants simply breached the prohibitions they agreed to and misappropriated the identity of PIPE issuers and the knowledge a PIPE offering was pending.

---

[8] Neither defendant Lyon nor Wolters were asked about their recollection of the MSL deal, but it would be surprising if they recollected a deal profiting the defendants only $12,346 and forgot about Gentner ($332,000) or Celsion ($153,000).

**B.      The Information Was Material**

There is no doubt that the fact these issuers were conducting a PIPE offering was material.   "Information is material if 'there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest].'"   <u>SEC v. Warde</u>, 151 F.3d 42, 47 (2d Cir. 1998), quoting <u>Basic, Inc. v. Levinson</u>, 485 U.S. 224, 231 (1988). The information certainly was material to the defendants, whose trading strategy depended upon learning about a PIPE offering, selling short the PIPE issuers freely trading securities, and later covering the short position at a profit either with shares obtained in the PIPE offering after they became freely tradable or with shares acquired in the marketplace after the price dropped due to the PIPE announcement.  FOF ¶¶ 20-23.

A fact also is material "which in reasonable and objective contemplation *might* affect the value of the corporation's stock or securities."  <u>SEC v. Mayhew</u>, 121 F.3d 44, 52 (2d Cir. 1997) (emphasis in original), quoting <u>SEC v. Texas Gulf Sulphur Co</u>., 401 F.2d 833, 849 (2d Cir. 1968) (<u>en banc</u>).  Here, the significant marketplace reaction to the public announcement of the PIPE offerings confirms that the information misappropriated by the defendants was material.  The price of the shares of each of the four issuers closed the day the PIPE was publicly announced significantly lower than the close the day before the announcement.  FOF ¶¶ 45 (Celsion, 8.5 percent decline), 55 (Gentner, 4.9 percent decline), 70 (MSL, 6.3 percent decline) and 81 (PhotoMedex, 6 percent decline).

## <u>CONCLUSION</u>

For the reasons stated herein, as well as the accompanying Statement of

Uncontested Material Facts and the exhibits thereto, plaintiff's motion for summary

judgment as to Claims One and Two should be granted.

Dated: June 9, 2008

                                        Respectfully submitted,

                                        <u>s/James A. Kidney</u>

                                        James A. Kidney
                                        Anthony S. Kelly
                                        Julie M. Riewe

                                        Counsel for the Plaintiff
                                        Securities and Exchange Commission
                                        100 F Street, N.E.
                                        Washington, D.C.  20549-4010
                                        (202) 551-4441 (Kidney)
                                        (202) 772-9246 (fax) (Kidney)
                                        kidneyj@sec.gov