# EXHIBIT D

```
1              UNITED STATES DISTRICT COURT
2         FOR THE SOUTHERN DISTRICT OF NEW YORK
3    --------------------------x
4    SECURITIES AND EXCHANGE     *
.  .     COMMISSION,             *
5                                *
.  .    Plaintiff,               *
6                                *
.  .    VS.                      *  06 CV 14338(SHS)
7                                *
.  .    EDWIN BUCHANAN LYON, IV, *
8    et al,                      *  ECF CASE
.  .     *                       *
9         Defendants.            *
.  .    --------------------------x
10
11               Fort Worth, Texas
12               Friday, July 20, 2007
13   Deposition of WARREN W. GARDEN, as herein called
14   for examination by counsel for Plaintiff in the
15   above-entitled matter, pursuant to notice, the
16   witness being duly sworn by DEBORAH MARKS,
17   Certified Shorthand Reporter in and for the State
18   of Texas, taken at the offices of The Securities
19   and Exchange Commission, 801 Cherry Street, Suite
20   1100, Fort Worth, Texas, at 9:06 a.m., Friday, July
21   20, 2007, and the proceedings being taken down by
22   stenotype by DEBORAH MARKS, CSR, and transcribed
23   under her direction.
24
25
```

```
1              A P P E A R A N C E S
2    FOR THE PLAINTIFF:
3       MR. JAMES A. KIDNEY
4       MR. ANTHONY S. KELLY
5       Securities and Exchange Commission
6       Division of Enforcement
7       100 F Street, NE
8       Washington, DC 20549
9       202.551.4441
10      202.772.9246 - fax
11      KidneyJ@sec.gov
12   FOR THE DEFENDANTS:
13      MR. CHRISTOPHER J. CLARK
14      MR. JOHN LETTERI
15      LeBoeuf, Lamb, Greene & MacRae, LLP
16      125 West 55th Street
17      New York, New York 10019-5389
18      212.424.8555
19      212.649.0953 - fax
20      CJClark@llgm.com
21   ALSO PRESENT:  Ms. Lisa Tatum, Videographer
22
23
24
25
```

```
1                    I N D E X
2    WITNESS
.  .   WARREN W. GARDEN
3
4    EXAMINATION                                 PAGE
5      BY:  Mr. Kidney                            5
6                   EXHIBITS
7    NUMBER          DESCRIPTION        IDENTIFIED
8    1      Consulting agreement,
9           Gryph-03-21-06_007 to 0014            11
10   2      Gryphon Management Partners, LP,
11          Supervisory Procedures and Compliance
12          Manual, GRYPH DC 0318919 to 951       48
13   3      E-mail, subject:  Memo, GRYPHON DC
14          0398134 to 149                        63
15   4      Memo attaching Compliance Manual,
16          12/29/03                              67
17   5      Gryphon Management Partners, LP,
18          Supervisory Procedures and Compliance
19          Manual, GRYPH DC 0082581 to 610       72
20   6      Letter, 11/8/02, Garden to Gryphon
21          Master Fund                           74
22   7      Letter, 10/9/02, Macleod Dixon to
23          Gryphon Master Fund                   76
24   8      E-mail, subject:  Bobbie Majumba is a
25          knucklehead, GRYPHON DC 0397302       77
```

```
1            EXHIBITS (Continued
2    NUMBER          DESCRIPTION        IDENTIFIED
3    9      Letter, 7/11/03, Hagar to Wolters,
4           GRYPHON-001033 041                    82
5    10     Manual of Publicly Available
6           Telephone Interpretations,
7           Securities Act Sections               90
8    11     Manual of Publicly Available
9           Telephone Interpretations, Rule 144   95
10   12     Exhibit 3 to Plaintiff's Memorandum
11          in Opposition to Motion to Dismiss    99
12   13     Exhibit 4 to Plaintiff's Memorandum
13          in Opposition to Motion to Dismiss   103
14   14     E-mail, subject:  New Draft of Ernst
15          & Young PIPE memo, GRYPH 89128 to 131 107
16   15     E-mail, subject:  SEC/PIPEs,
17          GRYPH DC 0315123                      110
18   16     Affidavit of Warren W. Garden, Esq.   112
19
20   QUESTIONS ASKED, WITNESS INSTRUCTED NOT TO ANSWER
21             Page 115/Lines 17, 21, 24
22             Page 116/Line 3
23
24
25
```

1       P R O C E E D I N G S
2           THE VIDEOGRAPHER:  Going on the record
3    9:06 a.m. on Friday, July 20, 2007.  This is the
4    oral and videotaped deposition of Warren Garden in
5    a case styled SEC versus Lyon, IV, et al.
6               Will counsel please introduce
7    themselves, after which the court reporter will
8    swear in the witness.
9           MR. KIDNEY:  James Kidney, counsel for
10   plaintiffs, Securities and Exchange Commission.
11          MR. KELLY:  Anthony Kelly, Securities and
12   Exchange Commission.
13          MR. CLARK:  Chris Clark, LeBeouf, Lamb,
14   Greene & MacRae for the witness, Mr. Garden,
15   Mr. Lyon and the Gryphon entities.
16          MR. LETTERI:  John Letteri, LeBeouf,
17   Lamb, Greene & MacRae for the witness, Mr. Garden,
18   Mr. Lyon and the Gryphon entities.
19               WARREN W. GARDEN,
20   having been duly sworn, testified as follows:
21               EXAMINATION
22   BY MR. KIDNEY:
23       Q.  Good morning, Mr. Garden.
24       A.  Good morning.
25       Q.  AS you know, my name is Jim Kidney with

1        A.  My current employment is I'm an employee
2    of a professional corporation called Warren W.
3    Garden, PC.
4        Q.  And is that a law firm?
5        A.  Yes.  But -- it is a law firm, but it's a
6    partner of a limited liability partnership called
7    Block & Garden, LLP.
8        Q.  Who is Block?
9        A.  Block is my partner, Steven Block.
10       Q.  How do you spell that?
11       A.  B-L-O-C-K.
12       Q.  One of your clients Bucky Lyon --
13       A.  Yes.
14       Q.  The fourth?
15       A.  Yes.
16       Q.  When you gave testimony to the SEC about a
17   year and a half ago -- do you remember that?
18       A.  Yes, I do.
19       Q.  First, let me ask you, have you had an
20   opportunity to read that one day of transcript
21   recently?
22       A.  Yes.
23       Q.  Is there anything in that transcript that
24   you think was wrong that you'd like to correct as
25   you sit here today?

1    the SEC.  Any time you need a break, I'm sure
2    you'll feel free to ask for it.
3               You are -- you are yourself an
4    attorney?
5        A.  Yes, I am.
6        Q.  When were you -- to what bars are you
7    admitted?
8        A.  Currently I'm just admitted to the Bar of
9    the State of Texas.
10       Q.  When were you admitted?
11       A.  I believe it was 1992.
12       Q.  So you're familiar with the way that
13   depositions operate and that you can ask for a
14   break when you need one.  If you need to confer
15   with your counsel, you can ask for an opportunity
16   to do that.  And if there's a question that you
17   don't understand, you can ask for me to rephrase it
18   or restate it.
19       A.  I understand.
20       Q.  Let's just update the existing record a
21   little bit that provides some background
22   information for someone who may just be reading
23   this transcript.
24               What's your current
25   employment?

1        A.  Not that I'm aware of.
2        Q.  At that time we established that you had
3    an independent contractor arrangement with the
4    Gryphon entities and Mr. Lyon.  Is that still the
5    case?
6        A.  Yes, it's technically still the case,
7    although now my -- my provision of legal services
8    to Mr. Lyon and the Gryphon entities is run
9    directly through Block & Garden, LLP.
10       Q.  Do they still constitute your principal
11   or -- your principal client?
12       A.  They constitute probably now 70 percent of
13   my -- my work.
14       Q.  You still officed with the Gryphon
15   entities?
16       A.  Yes.
17       Q.  Is Mr. Block officed with them, too?
18       A.  No.
19       Q.  Where is Mr. Block officed?
20       A.  Currently Mr. Block is officing with one
21   of the firm's other clients, although we're looking
22   for office space --
23       Q.  What client --
24       A.  -- in Dallas.
25       Q.  What client is that?

1     A.  I'm not sure.  I -- I -- I'm not sure I
2  know the name of the client.
3     Q.  Have you visited the office?
4     A.  No.
5     Q.  When did you start associating with
6  Mr. Block?
7     A.  Initially, I started associating with
8  Mr. Block at Fish & Richardson.
9     Q.  And you were employed there when?
10    A.  From approximately October '90 until the
11 end of April 1992 or -- excuse me -- October 2000
12 to the end of April 2003.
13    Q.  Fish & Richardson was a Dallas firm?
14    A.  It had a Dallas office.  It's main office
15 is in Boston.
16    Q.  Maybe the easiest thing, so we don't have
17 to repeat a lot of what was in the earlier record,
18 is for you to just, if you can, narrate for us what
19 changes have occurred in your professional
20 employment since April -- or since April of 2006.
21 I think it's actually February of 2006 when your
22 investigative testimony was taken.
23    A.  I think the primary thing that has changed
24 since that time is that I now provide my legal
25 services through a new partnership called Block &

1  Garden.  I still office with and -- and provide a
2  significant amount of my time to Mr. Lyon and the
3  Gryphon entities, still office with them, but have
4  expanded my law practice to include other clients
5  that I was not doing a lot of work for back in
6  February of 2006.
7     Q.  Is that in part because your -- the amount
8  of work you have to do for the Gryphon entities and
9  Mr. Lyon has declined?
10    A.  That may have something to do with it.
11 That's not the primary reason.  It's a combination
12 of I'm doing less work for the Gryphon entities and
13 the reason I'm doing less work for the Gryphon
14 entities is primarily because one of the funds
15 is -- is in liquidation.  That also has -- has
16 happened since February of 2006.
17         And I have an opportunity to
18 expand my other practice, my nonGryphon practice,
19 through an association with some former partners
20 and colleagues and -- and that's just the direction
21 I'm going in now.
22    Q.  Let me ask you, are you still functioning
23 as the chief operating officer of the Gryphon
24 entity?
25    A.  Yes.

1     Q.  Are you still functioning as the chief
2  compliance officer?
3     A.  Yes.
4     Q.  Are you still functioning as the general
5  counsel of Gryphon Partners?
6     A.  Yes.
7     Q.  What -- now, you -- you --
8     MR. KIDNEY:  Why don't we mark this next
9  as Garden Exhibit 1, please.
10        (Exhibit No. 1 marked)
11    Q.  (By Mr. Kidney) Mr. Garden, I put before
12 you what's been marked as Garden Exhibit Number 1.
13 This is something called a consulting agreement
14 with an amendment to the consulting agreement.
15 Production number is Gryph-03-2106-0007 through
16 0014.
17        Can you identify this document
18 for us, please?
19    A.  Yes.  This is the consulting agreement
20 between Gryphon Management Partners, LP and my
21 personal PC.
22    Q.  It says that it's entered into effective
23 as of June 1, 2003.  Is that when you began being
24 officed at Gryphon and providing services that we
25 identified a minute or two ago, chief -- chief

1  operating officer and so forth?
2     A.  Actually I think my first day officing
3  with them was -- was May 1, 2003.
4     Q.  That's not the first time you began
5  providing legal counsel to Bucky Lyon or the
6  Gryphon entities, is it?
7     A.  No.
8     Q.  When did you begin doing that?
9     A.  Well, I began providing legal advice in
10 one form or another to Mr. Lyon and his father,
11 E.B. Lyon, the third, probably sometime in the mid
12 1990s.
13    Q.  Was that personal legal counsel or was it
14 counsel with respect to the investment activities
15 of the fund?
16    A.  That was personal legal counsel.
17    Q.  When did you begin supplying advice with
18 respect to security laws to -- to either the Lyons
19 or the funds?
20    A.  Probably sometime in the 2000 -- year 2000
21 range.
22    Q.  Can you tell me what your responsibilities
23 were as the chief compliance officer?
24    A.  My primary responsibilities were to put in
25 effect compliance policies and procedures for the

1  Gryphon funds and its employees, monitoring those
2  and ensuring that the funds and the employees
3  comply with those policies and procedures.
4      Q.  Were they written, the policies and
5  procedures?
6      A.  Yes.
7      Q.  Did they have -- did they address concerns
8  about confidential nonpublic information?
9      A.  Yes.
10     Q.  What were the compliance obligations set
11 forth with respect to confidential information?
12     A.  Well, we -- first of all, we had -- there
13 were two written policies.  We had a compliance
14 manual initially that I put in place, I think, at
15 the beginning of 2004, maybe before.  And then in
16 2005, I believe we did an entirely different code
17 of ethics which replaced our initial compliance
18 manual.
19         But, basically, the insider
20 trading provisions set forth in general what
21 constituted insider trading and had a prohibition
22 on the funds and employees engaging in insider
23 trading.
24     Q.  And that was first promulgated in a
25 compliance manual in place sometime in 2004?

1      A.  Sometime in -- in 2003 or 2004.  I can't
2  remember exactly when.
3      Q.  Do you know if that manual was produced to
4  the SEC in the -- the investigation?
5      A.  I'm almost certain that it was.
6      Q.  Prior to the publication of this manual,
7  what procedures and practices were in place to
8  ensure that confidential information wasn't misused
9  by the personnel at Gryphon?
10     A.  I don't know.
11     Q.  Well, I take it from Garden Exhibit 1 that
12 you, and your testimony actually, that you began
13 being officed at Gryphon in May of '03 and this
14 consulting agreement is dated June 1 of '03.
15         So as of June 1, what steps did
16 you take to -- as a compliance officer to ensure
17 the confidential information was not being misused
18 at the Gryphon partnerships?
19     A.  As of June 1?
20     Q.  Right.
21     A.  Well, as of June 1, I think we were just
22 developing.  I just -- I just joined Gryphon or
23 just started officing with them and it took me some
24 time to put the compliance manual in place.  So I
25 don't believe at that time we had any specific.  We

1  certainly didn't have any specific rules or
2  regulations that were written.  Although, as soon
3  as I joined them, trading and -- and -- and general
4  compliance questions would be directed to me.
5      Q.  Did you in this period of time when you
6  were at -- after you signed this consulting
7  agreement and before the publication of the
8  compliance manual, do you recall whether you
9  received any inquiries from anyone at Gryphon about
10 whether -- about how to -- how to treat
11 confidential information?
12     A.  I don't recall.
13     Q.  Now, this compliance manual, if we have
14 it, I'm sorry, I didn't bring it with me.  I'm not
15 familiar with it.
16         But maybe you can recall for
17 us, did it actually set forth procedures or -- or
18 was it simply a description of what the insider
19 trading rules are?
20     A.  It was more of a description.
21     Q.  So there were no procedures set forth
22 to -- as to how to proceed if there was a concern
23 about whether confidential information could be
24 used by the Gryphon entities in the securities
25 markets?

1      A.  I believe there was a procedure that if,
2  based on the -- the particular insider trading
3  statement, that whoever is or might be in
4  possession of material nonpublic information was
5  directed to discuss the matter with me.
6      Q.  Did you ever have such a discussion with
7  anyone at Gryphon?
8      A.  Yes, a number of times through the years.
9      Q.  That's subsequent to the publication of
10 the manual?
11     A.  Subsequent to the publication of the
12 manual, yes.
13     Q.  When is the first such discussion you
14 recall?
15     A.  I don't -- I don't recall the first such.
16     Q.  Well, do you recall any of them?
17     A.  I recall having them on a number of
18 occasions.  I don't recall anything specific right
19 now.
20     Q.  You recall anything specific about what
21 issues were involved?  What issuers?
22         MR. CLARK:  You said issues, then
23 issuers.
24         MR. KIDNEY:  Issuers is what I meant.
25     A.  I don't recall the specific issuers.

1     Q.  (By Mr. Clark) Do you recall who you had
2  the conversations with?
3     A.  I know I had conversations with Bucky
4  Lyon, Ryan Wolters, Mike Scholten and Ryan
5  Vardeman.
6     Q.  Who is Mike Scholten?
7     A.  Mike Scholten was a former employee of
8  Gryphon.  He was a portfolio manager.
9     Q.  And who was -- Ryan Vardeman, was it?
10    A.  Ryan Vardeman.  He also was a former
11 employee of Gryphon and a portfolio manager.
12    Q.  And do you have that -- was this
13 conversation with all of them as a group or are
14 these separate conversations?
15    A.  They would have been primarily separate
16 conversations.
17    Q.  And do you recall how any of them came up?
18    A.  I recall that they would typically come up
19 in the context of the portfolio manager wanting to
20 trade in a particular stock but had had
21 conversations with management prior to that and
22 they had asked me if it was okay to trade in those
23 stocks.  I recall that.
24    Q.  Do you recall any further details of those
25 conversations?

1  document before, either the e-mail or the
2  attachment, other than in preparation?
3     A.  Other than in preparation?
4     Q.  Correct.
5     A.  No.
6     Q.  By the way, while we're on that subject,
7  what did you do to prepare for the deposition
8  today?
9     A.  I had meetings and discussions with my
10 counsel.  I reviewed my -- the transcript of the
11 testimony that I gave to the SEC back in February
12 of 2006 and reviewed various exhibits in connection
13 with that testimony.
14    Q.  Have you read Mr. Thorpe's testimony?
15    A.  I have not.
16    Q.  Have you been provided a copy of it?
17    A.  No.
18    Q.  Have you read any other testimony
19 delivered in this -- in this litigation?
20    A.  Other than my own?
21    Q.  Well, yeah.  Any -- any of the depositions
22 taken since we filed the lawsuit.
23    A.  No.
24    Q.  You haven't read a rough transcript of
25 Mr. Lyon's deposition of two days ago?

1     A.  No.
2     Q.  Do you recall what your counsel was with
3  respect to any one of those conversations?
4     A.  I don't recall my specific counsel.
5     Q.  Do you remember whether you said it was
6  okay to trade or not okay to trade?
7     A.  I remember in general sometimes I would
8  say it was okay to trade; sometimes I would say
9  it's not okay to trade.
10    Q.  But you don't remember any specifics as to
11 where such advice was rendered, right?
12    A.  No.
13              (Sotto voce discussion between.
14              Clark and Garden)
15    MR. KIDNEY:  Is there --
16    MR. CLARK:  I was having a conference.
17    Q.  (By Mr. Kidney) Mr. Garden, I'm going to
18 put before you what was marked two days ago as Lyon
19 Deposition Exhibit 6.  It also was employed in the
20 investigation that was Investigative Exhibit 53.  I
21 recognize this is dated October 24, 2001, which is
22 before you became a independent contractor -- well,
23 let's say before you signed the consulting
24 agreement identified as Exhibit 1.
25              Have you ever seen this

1     A.  No.
2        MR. CLARK:  Do we have one?
3        MR. KIDNEY:  I don't.  Didn't bring it.
4        MR. KIDNEY:  I haven't read it so...
5        MR. KIDNEY:  The I don't knows, I think
6  can be recalled.
7     Q.  (By Mr. Kidney) Have you read any
8  investigative testimony other than your own?
9     A.  What would be investigative testimony?
10    Q.  Recorded -- I mean transcribed testimony
11 given to the SEC during the investigation of this
12 matter prior to the complaint.
13    A.  I don't believe so.
14    Q.  You didn't read either of the two days of
15 Mr. Lyon's testimony at the SEC?
16    A.  No.
17    Q.  How much time did you spend with your
18 counsel preparing for this deposition?
19    A.  Approximately eight hours.
20    Q.  Was your counsel Mr. Letteri here?
21    A.  Mr. Letteri and Mr. Clark.
22    Q.  That was this week?
23    A.  This week, correct.
24    Q.  That was in Dallas?
25    A.  Yes.

1    Q.  Were you shown documents?

2    A.  Yes.

3    Q.  How thick a stack of documents was it?

4    A.  Maybe a foot total.

5    Q.  Were you forwarded the documents to review

6 before you met with counsel?

7    A.  Not all of them.

8    Q.  Some of them?

9    A.  Some of them.

10    Q.  Do you remember which ones?

11        MR. CLARK:  Objection.  I think that's a

12 matter of privilege, the documents we gave the

13 witness, and it's work product.  I'm going to

14 instruct the witness not to answer.

15    Q.  (By Mr. Kidney) All right.  Let's return

16 to Lyon Deposition Exhibit 6.

17    A.  (Witness complies.)

18    Q.  I'm going to ask you to turn to the second

19 page of the document.  I think it's the back of the

20 first page.

21        First, have -- have -- have you

22 seen in the course of your employment as a

23 securities lawyer private placement memorandum?

24    A.  Yes.

25    Q.  And sometimes are they identified by the

1 judgment, once an entity received this memorandum,

2 would it be permissible for them to -- in your

3 judgment, consistent with the rules against insider

4 trading to short the issuer stock in advance of

5 public announcement of this PIPE?

6    A.  Again, it depends on other facts and

7 circumstance.

8    Q.  What other facts and circumstances would

9 you need to know?

10        MR. CLARK:  First of all, that happened

11 too fast for me to object on the ground that you're

12 asking him for an expert opinion.

13        But you can answer.

14        MR. KIDNEY:  Well, you presented an

15 affidavit in which he claims to be a Harvard

16 trained securities lawyer so...

17        MR. CLARK:  If you're going to -- if

18 you're going to stipulate that he's an expert --

19        MR. KIDNEY:  I'm not saying -- stipulate

20 that he's an expert --

21        MR. CLARK:  All right.

22        MR. KIDNEY:  I'm stipulate -- but I'm

23 entitled under the Rules to ask him questions as to

24 when he might have knowledge consistent with his

25 background.  And so --

1 issuer as confidential as is this one?

2    A.  Yes.

3    Q.  And when a client receives a confidential

4 private placement memorandum, in your judgment, may

5 they then use that information to trade in the

6 security without -- as opposed to other than

7 subscribing to the issue as -- as proposed in the

8 placement memorandum?

9    A.  It depends.

10    Q.  Okay.  Well, this particular one, Gentner

11 Communications, is a private placement memorandum

12 concerning a possible PIPE offering by Gentner.

13 You're familiar with a PIPE offering?

14    A.  Yes, I am.

15    Q.  And it says -- it says it's a confidential

16 private placement memorandum.  You can look through

17 it.  The first few pages it repeats confidential

18 private placement memorandum.  Like on page 18671

19 has it, 18672.  And particularly for our purposes

20 at 18673, the third paragraph, read that to

21 yourself if you wish.  Let us know when you're

22 finished.

23    A.  I'm finished.

24    Q.  Okay.  And I want to ask you, in your

25 professional consideration, your professional

1        MR. CLARK:  I never heard that, but I --

2 my objection is on the record.  You can ask him a

3 question.

4        MR. KIDNEY:  You're -- we're not

5 stipulating he's an expert for sure.

6        MR. CLARK:  Okay.

7        MR. KIDNEY:  It will probably be clear by

8 the end of this session.

9    Q.  (By Mr. Kidney) What other facts would you

10 need to know?  What other facts would you want to

11 consider?

12    A.  I would need to know whether or not the

13 recipients agreed to be bound by that provision.

14    Q.  Well, what if they -- they subsequently

15 entered into the PIPE offering?

16    A.  No.

17    Q.  What do you mean no?

18    A.  They subsequently entered into a PIPE

19 offering that would have been after the time that

20 they received the private placement memorandum.

21    Q.  Well, isn't a fair assumption that if

22 someone enters into the PIPE offering after having

23 received the private placement memorandum that the

24 issuer can assume that the participant has agreed

25 to the terms and conditions?

1      A.  Of the private placement memorandum?

2      Q.  Sure.

3      A.  No, absolutely not.

4      Q.  What's your basis for saying that?

5      A.  My basis for saying that is that that

6   doesn't make any sense.

7      Q.  I'm sorry.  You could -- give me a little

8   more specific statement than that.

9      A.  Entering into a PIPE transaction and

10  looking at a private placement memorandum are two

11  entirely different things.

12     Q.  So you don't believe there's any

13  obligation on a person when they're sent materials

14  for purposes of considering whether to enter into a

15  deal and it's clearly marked on the document that

16  this is confidential, intended only for that

17  purpose, that unless the person returns it, says,

18  no, I'm not bound, that they aren't bound at all?

19     A.  No, absolutely not.

20     Q.  You agree with that position?

21     A.  I agree that they're not bound.

22     Q.  So there has to be absolute proof that

23  they actually read it.  Is that your position?

24     A.  No, that's not my position.

25     Q.  Will you, please -- why wouldn't it be?

1      A.  My position is that they have to have

2   agreed not only to receive it but to be bound by

3   it.

4      Q.  And what's the -- what -- what's the basis

5   in law for that conclusion of yours?

6      A.  Do you want me to cite a case law?

7      Q.  Sure.

8      A.  I can't cite a case law.

9      Q.  You're saying that insider trading cases

10  that -- that you might be familiar with in each

11  instance the individual in receipt of the

12  information entered into an overt agreement of

13  confidentiality before -- before trading before

14  they could be liable for insider trading?

15     A.  Well, if you're asking for my view, that's

16  my view.

17     Q.  Well, I'm asking if it's supported by any

18  authority.

19         MR. CLARK:  Yeah, the Merrill Lynch case.

20  I mean, he doesn't have the citations with him,

21  Jim, but we'll get them for you.

22         MR. KIDNEY:  Well, those are citations --

23  those are authorities that you came up with.  I'm

24  asking whether he had any authority --

25         MR. CLARK:  I just told you about them.

1          MR. KIDNEY:  Are you testifying now?  Do

2   you want us to put you under oath?

3          MR. CLARK:  Well, but if you're asking

4   for a citation --

5          MR. KIDNEY:  Do you want us to put you

6   under oath?

7          MR. CLARK:  Yeah, go right ahead.

8      Q.  (By Mr. Kidney) Do you have any

9   authorities?  I don't care if you remember the name

10  of the case.

11     A.  That is my understanding of what the law

12  is.

13     Q.  What was your compensation at -- under

14  this consulting agreement?

15     A.  During what time period?

16     Q.  Why don't you describe it from the

17  beginning to the end to now.

18     A.  My compensation initially, when I signed

19  the consulting agreement, was $25,000 a month.  At

20  the beginning of 2004, the consulting agreement was

21  amended and my new compensation was $34,000 a month

22  and its remained to this day.

23     Q.  Is there any other compensation that you

24  received?

25     A.  I'm also eligible to receive bonuses from

1   Gryphon and its affiliates that are entirely

2   discretionary.

3      Q.  How much did you receive in 2003 for 2003?

4      A.  For 2003?

5          MR. CLARK:  In discretionary bonus,

6   right.

7      A.  I believe I received $300,000.

8      Q.  (By Mr. Kidney) And for 2004?

9      A.  For 2004, I received I believe $400,000.

10     Q.  Same question for 2005.

11     A.  Zero.

12     Q.  For 2006?

13     A.  Zero.

14     Q.  So if I understand your position

15  correctly, if an issuer sends out information to a

16  potential investor which it deems confidential and

17  places prominently on the printed material that it

18  deems it confidential and says if you don't --

19  aren't willing to treat it confidential, you should

20  return it, or alternatively says by acceptance, you

21  are agreeing to it, that is not in your judgment

22  binding as confidential information on the the

23  recipient; is that right?

24     A.  That's correct.

25     Q.  And what in addition would the recipient

1 have to do to make it binding?
2     A.  The recipient would have to either -- the
3 recipient would have to sign an agreement agreeing
4 to the receipt of the PPM and agreeing to be bound
5 by the confidentiality terms, either specifically
6 in a written agreement or perhaps a verbal
7 confirmation that's supported by some other
8 documentation.
9     Q.  So you view security law as fraud is a
10 subsection of contract application?
11     A.  I don't believe I said that.
12     Q.  No.  I'm asking you.
13         You seem to insist on a formal
14 contract before anyone's bound not to use
15 confidential inside information; is that right?
16     A.  I'm not saying that either.
17     Q.  It sounded like that's what you said.
18         Can you maybe elaborate for me
19 why that's not -- not consistent with what you just
20 testified to?
21     A.  I don't know what your question is.
22     Q.  You said that there has to be a specific
23 signed agreement of confidentiality before a person
24 would be bound to treat the information as
25 confidential.

1         MR. CLARK:  Objection.
2     Q.  (By Mr. Kidney) That's what we would call
3 a contract.
4         MR. CLARK:  Objection, misstates the
5 prior testimony.
6     Q.  (By Mr. Kidney) Well, how is that -- well,
7 how is what I just stated incorrect?
8     A.  I think it's because I didn't say that you
9 could just exclusively have a contract.  The
10 contract doesn't have to be exclusively written,
11 but you have to have much more than just receiving
12 the PPM in my view to have agreed to not only
13 receive it but to be bound by the confidentiality
14 provision in it.
15     Q.  You see where it says on 018673 of Lyon
16 Exhibit 6, quote, by acceptance of this
17 confidential private placement memorandum, you
18 agree to promptly return to the placement agent or
19 us this confidential private placement memorandum
20 and the purchase agreement and any other documents
21 or information furnished by or on behalf of the
22 placement agent or us if you elect not to purchase
23 the shares.  You see that?
24     A.  Yes.
25     Q.  Now, in fact, I'll represent to you that

1 Gryphon, in fact, did purchase the shares.
2         Now, is it your judgment that
3 the issuer had no basis on which to believe that
4 when Gryphon purchased the shares it had and did
5 not return the placement memorandum that it agreed
6 to keep the information confidential?
7     A.  I have no idea what the issuer had thought
8 or what its expectations were.
9     Q.  No.  I'm asking whether you thought they
10 had no basis for that.
11         MR. CLARK:  He didn't even see this and
12 he didn't work there at the time.
13         MR. KIDNEY:  I know.  We'll get to one.
14     A.  I can't answer that question.  I don't
15 know what -- I have no knowledge of this deal nor
16 do I have knowledge of what the issuer might or
17 might have -- not have thought.
18         MR. CLARK:  I think you read this wrong
19 though, Jim.  It says, you'll return it if you
20 elect not to purchase the shares.
21         MR. KIDNEY:  Yeah, correct.
22         MR. CLARK:  If.  But Gryphon bought it.
23         MR. KIDNEY:  That's what I said.
24         MR. CLARK:  Okay.
25         MR. KIDNEY:  I didn't misread it at all.

1         MR. CLARK:  Okay.
2     Q.  (By Mr. Kidney) Now I'd like you to turn
3 to the same exhibit, page number 018771, which is
4 titled Purchase Agreement.
5     A.  (Witness complies.)
6     Q.  And I'm just going to note that it's, I
7 believe, 19 pages long, the 19th page being a
8 signature page.  And then there are appendices
9 attachments.
10         MR. CLARK:  Just so it's clear on the
11 record, it's -- it is 19 pages within a several
12 hundred page attachment.
13         MR. KIDNEY:  Yeah, right.  It's the
14 purchase agreement.  We've already addressed this
15 before.
16     Q.  (By Mr. Kidney) And you never saw this
17 particular purchase agreement; is that right?
18     A.  Not before this proceeding.
19     Q.  Right.  Okay.
20         But I'd like you to just look
21 at it -- look at it through.  I'm not going to at
22 this point ask you any specific questions about the
23 contents, but I am going to show you Lyon
24 Deposition Exhibit 8, if I can find it.
25         (Sotto voce discussion between

Clark and Garden)

1
2      MR. KIDNEY:  Let the record reflect that
3  the witness is conferring with his counsel.
4      MR. CLARK:  I asked the witness whether
5  he wanted a bathroom break.
6      MR. KIDNEY:  Well, we don't need --
7      MR. CLARK:  I'll be happy to do it out
8  loud if you...
9      MR. KIDNEY:  You could just ask for a
10  break.
11      MR. CLARK:  I don't want to -- given the
12  time constraints we're under today, I don't want to
13  take a break unless it's absolutely necessary.  So
14  rather than calling for one prophylactically, I
15  want to make sure we need it.  But I'll do it out
16  loud from now on.  Burden the record with it.
17      Q.  (By Mr. Kidney) I'd like you to look at
18  Lyon Deposition Exhibit 8.  It is a five-page
19  document.  Happens to come from ClearOne.  I'll
20  represent this similar document was produced by
21  Gryphon.
22          And if you compare it to the
23  purchase agreement that is in Lyon Exhibit 6, I
24  think you'll see that it is the first page of the
25  the purchase agreement with some information filled

1  in in handwriting followed by the execution page.
2  And Mr. Lyon has already testified that that's his
3  signature executing it.
4          Now my question to you, sir,
5  is, looking at this, do you have any opinion as a
6  securities attorney whether by executing the last
7  page of the agreement and forwarding the first page
8  of the purchase agreement and the signature page,
9  directly or indirectly, to the issuer, Mr. Lyon and
10  Gryphon Master Fund are contractually obligated to
11  comply with the terms of the purchase agreement,
12  pages 1 through 18?
13      MR. CLARK:  Rather than objecting to
14  every question that asks Mr. Lyon (sic) for his
15  current legal opinion about facts he didn't know at
16  the time, I'm just going to put a blanket opinion
17  on the record.  Do you accept that?
18      MR. KIDNEY:  Sure.  Your objection?  I
19  mean, I'm not accepting --
20      MR. CLARK:  No, no, no.  But I'm not
21  going to say it every time.
22      MR. KIDNEY:  That's fine.
23      MR. CLARK:  You can go ahead and answer
24  Warren, if you can, if you have an opinion.
25      A.  Well, I don't know.  I mean, this is --

1  this is -- I'm sorry.  What is your question?
2      Q.  (By Mr. Kidney) By signing the execution
3  page of this  agreement and returning it to the
4  issuer by fax or whatever mechanism, does it bind
5  the signator -- the signee, the one who signed it,
6  to the terms of the agreement?
7      A.  In this particular case?
8      Q.  Yeah.
9      A.  It's not signed by what appears to be the
10  issuer.
11      Q.  No, it's not because it's the -- but for
12  whatever reason, but this indicates an intent.
13  Let's put it that way.
14      MR. CLARK:  Objection.  You're not
15  testifying.  Ask him a question.
16      MR. KIDNEY:  I am.
17      A.  If the issuer didn't sign this, I don't
18  see how the Gryphon Master Fund can be bound by
19  this.
20      Q.  (By Mr. Kidney) Well, let's say -- let me
21  ask you if -- if the issuer went ahead and issued
22  the securities as per the purchase agreement by
23  conduct after having received this communication
24  from Mr. Lyon, would Mr. Lyon be bound by the
25  purchase agreement -- the terms of the purchase

1  agreement?
2      A.  Well, certainly he'd be bound by the
3  number of shares that are indicated in the price
4  per share that are indicated on the first page.
5      Q.  So it's your position -- is it -- is it
6  your position that when someone signs the signature
7  page of a contract which he has received and had an
8  opportunity to read in full --
9      MR. CLARK:  Objection.  Misstates the
10  world.  But go ahead and ask the question.
11      MR. KIDNEY:  The fact that he was
12  reckless and didn't look at it is --
13      MR. CLARK:  Reckless --
14      Q.  (By Mr. Kidney) He's had an opportunity to
15  look at it and signs it that he is -- and, in fact,
16  is the signature page to the -- to the issuer in
17  this case, is it your position that he's not bound
18  by the provisions in that contract assuming it's
19  accepted by the issuer?
20      MR. CLARK:  Objection.  That's a big
21  assumption.
22      A.  I don't -- I can't answer that.
23  There's -- there's too many variables.
24      Q.  (By Mr. Kidney) All right.  Let's try one
25  that maybe you can answer it.

1    What variable, by the way,
2 would you like to -- what variables would you like
3 to have satisfied before you could answer it?
4  A. Well, I'd like to know if both parties had
5 signed the agreement.  I'd like to see the -- the
6 signature of -- of, in this case, Gentner.
7  Q. Well, if -- if Gentner carried out its end
8 of the deal, wouldn't that be the same as having
9 signed it?
10    They provided the -- the shares
11 that were requested at the price requested, the
12 time requested and maintained all its warranties
13 and so forth as represented in the contract even
14 if it didn't formally sign it, wouldn't it --
15 wouldn't that indicate consent?
16  A. It certainly could indicate consent to
17 buying and selling the shares.  Beyond that, I
18 don't know.
19  Q. You don't know.  Okay.
20    Let's turn to one more that you
21 do know.  I'm going to show you Lyon Deposition
22 Exhibit 5.  Lyon Deposition Exhibit 5 which also
23 was, I believe, used with -- in Mr. Massocca's
24 deposition as Exhibit 7 is a Gryphon document --
25 produced by Gryphon rather, GRYPH DC 0313327

1 through 61.
2    And at the top, it says from
3 Bucky Lyon to Warren Garden, Thursday, March 21,
4 2002.  Other than in preparation have you seen this
5 document before?
6  A. Yes.
7  Q. When did you see it?  On or around
8 March 21, 2002?
9  A. I believe I did.
10  Q. Do you know why -- did Mr. Lyon tell you
11 why he was going to be sending these documents to
12 you?
13  A. Yes.
14  Q. What's your recollection as to what he
15 said?
16  A. He was giving me a number of examples of
17 PIPE documents in various transactions that
18 Gryphon entered into in anticipation of me
19 beginning to represent Gryphon in connection with
20 its PIPE activities and drafting investment
21 documents.
22  Q. Did you have occasion to read the
23 limitations that were on the e-mail from Vinnie
24 Devone from a year earlier?
25  A. I don't recall.

1  Q. Did you consider whether there was a
2 confidentiality obligation in connection with the
3 PhotoMedex deal?
4    I mean, I realize it was a year
5 later.  Did that go into your consideration when
6 you were reviewing these documents?
7  A. No.
8  Q. Did you inquire of Mr. Lyon whether they
9 had treated the documents as confidential?
10  A. No.
11  Q. Did you ever counsel Mr. Lyon that it
12 wasn't necessary for him to consider himself bound
13 by any confidentiality restrictions in private
14 placement memorandum he received?
15   MR. CLARK:  Objection, vagueness.
16  A. What time period are you talking about?
17  Q. (By Mr. Kidney) From beginning to end.
18   MR. CLARK:  Objection, vagueness.
19  Q. (By Mr. Kidney) Beginning of your
20 association with him to now.
21  A. I don't believe I specifically counseled
22 him to that effect.
23  Q. Did you ever counsel him that if
24 confronted with a confidentiality provision in
25 connection with his securities trading that he

1 should consult with the opposite party with respect
2 to the limit to that provision before engaging in
3 trade?
4  A. I don't recall having conversations or
5 counseling with him on that.
6  Q. Did you ever counsel Mr. Lyon that by
7 executing only the last page of a contract he
8 wasn't bound by the provisions in the contract?
9  A. I didn't counsel him on that.
10  Q. Did you counsel him what impact signing on
11 the last page of a contract and forwarding only the
12 last page plus the first page of a contract was as
13 to the legal obligations of Gryphon and Mr. Lyon?
14  A. I didn't counsel him on that.
15  Q. Did he ever ask you?
16  A. I don't believe so.
17  Q. In your experience, is it commonplace in
18 the instance of a multipage contract to -- for a
19 businessman to fax only the last page to the contra
20 party to show that it was agreed upon?
21  A. Is it commonplace?
22  Q. In your experience.
23  A. I've seen it happen before.
24  Q. And then in those instances, did you have
25 any opinions as to whether the -- whether the

1  signing party had agreed to the provisions of the
2  whole contract or just the -- those pages that he
3  chose to fax to the opposing party, the contra
4  party?
5      A.  It depends on the facts and circumstances.
6      Q.  Well, what facts and circumstances do you
7  need to know?
8      A.  Well, I'll need to know whether or not the
9  parties and the -- their respective lawyers had
10 been negotiating the agreements and agreed to the
11 specific last version, whether or not the contract
12 had been signed by all the parties and whether or
13 not the parties then subsequently confirmed that
14 they were bound by this particular agreement.
15     Q.  And did you put all that -- did you have
16 any reference to specifically confidentiality
17 obligations or asserted obligations raised in
18 private placement memoranda in the compliance
19 manual that you prepared for Gryphon?
20     A.  I don't understand that question.
21     Q.  Did you address this issue whether
22 confidentiality provision stated in a private
23 placement memorandum was something that the
24 employees at Gryphon should consider in determining
25 whether to trade in the security or not?

1      A.  I don't believe it was specifically
2  addressed.
3      Q.  Did anyone ever come to you and say we've
4  got this confidentiality provision in this private
5  placement memorandum, can we still sell the stock
6  short?  Let me amend that question.
7          Can we still sell the stock
8  short in anticipation of the PIPE offering, which
9  is reflected in the private placement memorandum?
10     A.  I don't recall the specific instance of
11 that.
12     Q.  You don't recall anybody coming to you
13 with that kind of question?
14     A.  I don't recall.
15     Q.  You ever hear of a company called Cobalis?
16     A.  Yes.
17     Q.  How did you come to learn of a company
18 called Cobalis?
19     A.  Through my representation of Gryphon.
20     Q.  And what involvement did Gryphon have with
21 Cobalis?
22     A.  Did -- Gryphon did two PIPE transactions
23 with Cobalis I believe in 2003.
24     Q.  And was there any further consequence of
25 that other than the purchase of the PIPEs?

1      A.  Yes.
2      Q.  What happened?
3      A.  Cobalis -- after the two PIPE transactions
4  were consummated, Cobalis breached a number of the
5  terms of the investment documentation which
6  resulted in Gryphon suing Cobalis in federal court
7  in Dallas which resulted in an agreed judgment
8  entered last year and the case is -- is still
9  ongoing.
10     Q.  It was agreed judgment but the case is
11 still ongoing?
12     A.  The agreed judgment provided that Cobalis
13 would pay Gryphon $1.6 million on April 1, 2007.
14 April 1, 2007 came and went and Cobalis did pay the
15 judgment.
16     Q.  Is this cause of action alleged to be a
17 breach of contract?
18     A.  The initial -- right now it's failure to
19 pay an agreed judgment.
20     Q.  Right.  But I --
21     A.  It was initially primarily a breach of
22 contract, I believe, yes.
23     Q.  Was there any allegations of securities
24 fraud?
25     A.  I'm not sure, but I don't believe so.

1      Q.  What -- what was the jurisdictional basis
2  for being in federal court?
3      A.  There was a -- a choice of venue
4  provision in the purchase documentation.
5      Q.  Well, that might -- well, forgive me, but
6  I'm not -- don't deal in this area very much and
7  you probably are more familiar with it than I.  But
8  choice of venue might determine what -- what state
9  the suit arises in.
10         But on what basis was the
11 lawsuit filed in federal court?  Just diversity?
12     A.  Diversity.  It was -- the choice was
13 either federal court in Dallas or state court in
14 Dallas.
15     Q.  In other words, no federal provision of
16 law that alleged to have been violated in the
17 complaint?
18     A.  No.
19     Q.  What -- what year was it filed?
20     A.  I think the suit was actually filed in --
21 I believe the suit was filed in 2005.  The agreed
22 judgment was agreed to and entered in 2006.
23     Q.  In that action, was there a signed
24 purchase agreement to purchase the PIPEs?
25     A.  Yes.

1     Q.  Was -- do you recall whether it was signed
2  by both parties?
3     A.  I recall that it was signed by both
4  parties.
5     Q.  Do you recall whether Mr. Lyon or Gryphon
6  faxed the signature page as to the issuer as
7  evidence of agreeing to participate?
8     A.  I don't recall.
9     Q.  And the breach of contract was that
10  Cobalis did not register the PIPE offering as it
11  promised to do; is that right?
12     A.  That was one of the breach of contract
13  causes of action.
14     Q.  Let me ask you if -- if PhotoMedex, let's
15  say, or Gentner have failed -- I realize this is
16  hypothetical -- have failed to abide by one or more
17  of the material provisions of the purchase
18  agreement for PIPEs entered into, for PIPEs which
19  Gryphon purchased, in your judgment would Gryphon
20  have a cause of action against the issuer even
21  though he only faxed -- even though Mr. Lyon only
22  faxed the signature page and first page of the
23  agreement?
24     A.  I don't know how I can answer that.
25     Q.  Well, what is -- what is it you don't

1  have?
2     A.  I don't have the other facts and
3  circumstances that were surrounding it.  Did the
4  issuer sign, did -- did he -- did everyone agree to
5  the -- to the entire contract, did the lawyers sign
6  off on it?
7     Q.  So let me see.  Is it your position that
8  if a participant in a PIPE executes the signature
9  page of the purchase agreement and sends it to --
10  as well as the page indicating the price, quantity
11  of the PIPEs that he wishes to purchase, that --
12  and let's further add to that that the PIPEs are
13  issued to that person at the price and in the
14  amount subscribed to, that absent evidence of an
15  actual signature by the issuer, it is not clear to
16  you whether the issuer has any obligations to the
17  signatory on that purchase agreement; is that
18  right?
19     A.  That's incorrect.
20     Q.  Well, how is it incorrect?
21     A.  Well, in the case that you just described
22  where there is a first page and then the signature
23  page and the issuer accepting the money and issuing
24  the securities without a signature, I can see a
25  scenario where the issuer agreed orally to issue

1  those securities and the purchaser agreed to
2  purchase those securities and that that was the contract
3  that they had.
4     Q.  So in your view then -- yeah.  Well, now
5  you've added more facts.
6           In your view, though, the --
7  without them specially orally stating so, none of
8  the obligations in the intervening pages of the
9  contract would be applicable to either party,
10  right?
11     A.  That's quite possible.
12     Q.  That's possible.  Is that your judgment?
13     A.  Yes.
14     Q.  Is that how you would counsel somebody in
15  a business environment, that by executing just the
16  signature page the contra side or the contracting
17  party is not obligated to any of the provisions of
18  the contract except the first page and the
19  signature page?
20     A.  I can't answer.
21     Q.  Is that -- did you counsel Mr. Lyon that
22  way?
23        MR. CLARK:  Asked and answered.
24     A.  No.
25     Q.  (By Mr. Kidney) He never consulted you

1  about his obligations under the purchase agreement
2  by signing the signature page and faxing it back to
3  the issuer, did he?
4     A.  No.
5        MR. CLARK:  Asked and answered.
6           (Sotto voce discussion between.
7           Clark and Garden)
8        MR. KIDNEY:  Let's go off the record.
9  We'll take your break.
10        THE VIDEOGRAPHER:  Off the record,
11  10:08 a.m.
12           (Off the record, 10:08 a.m. to
13           10:15 a.m.)
14        THE VIDEOGRAPHER:  Back on the record,
15  10:15.,
16     Q.  (By Mr. Kidney) Mr. Garden, do you
17  recollect that there was a supervisory procedures
18  and compliance manual in place at Gryphon when you
19  signed -- at or about the time you signed your --
20  your consulting agreement?
21     A.  There was one in place either shortly
22  before or shortly after.
23        MR. KIDNEY:  I'm going to ask that we
24  mark the next exhibit as Garden Exhibit Number 2.
25           (Exhibit No. 2 marked)

1    Q. (By Mr. Kidney) I ask you to look at
2    what's been marked for identification as Garden
3    Exhibit Number 2 and ask if you can identify it.
4    It is production number GRYPH DC 03118919 through
5    51.
6    A. Yes.
7    Q. Can you tell us what it is?
8    A. This appears to be the Gryphon compliance
9    manual that I primarily drafted and put in place in
10    June of 2003.
11    Q. I'd like you to turn to page 12 of this
12    manual, which is also production-stamped 0318933.
13    It's styled Handling and Use of Confidential and
14    Material Nonpublic Information.
15          First, I would back up and ask
16    you, did you write this document?
17    A. I believe I did, yes.
18    Q. If you could read the first section, the
19    introduction, 3.1.1 says, quote, the company
20    regularly comes into possession of confidential
21    information in the course of its business. The
22    company is strongly committed to protecting
23    confidential information, whether that information
24    is entrusted to the company by an actual or
25    prospected investor, generated within the company

1    or obtained from other source.
2          The company is also strongly
3    committed to avoiding the misuse or the appearance
4    of misuse of such information, whether in the
5    connection of trading of securities or otherwise,
6    end of quotation.
7          Did you believe that to be a
8    true statement of the company's policy at the time?
9    A. Yes.
10    Q. And does it say anything about that
11    confidential information shall only be treated as
12    confidential when there is a specific contract of
13    confidentiality or specific agreement of
14    confidentiality?
15    A. Doesn't specifically say it here.
16    Q. Does it imply it anywhere in your
17    judgment.
18    A. In this paragraph?
19    Q. Yes.
20    A. No.
21    Q. All right. Do you see it anywhere where
22    it says it's a contractual -- we will only treat
23    information as confidential to the extent we have
24    an explicit agreement to do so?
25    A. Can I read it?

1    Q. Certainly.
2    MR. CLARK: To save time, Jim, do you
3    want to just direct him to the section that
4    discusses it, 3.2.2, or no?
5    MR. KIDNEY: That's insider information.
6    We're talking about confidentiality agreement.
7    A. What's your question?
8    Q. (By Mr. Kidney) Is there any place in this
9    document where it states that information shall be
10    deemed confidential only if there is a specific
11    agreement to treat it as confidential?
12    A. I don't see where it says it one way or
13    the other.
14    Q. Well, where does it imply that -- that the
15    introduction that you wrote, which I read into the
16    the record, requires an explicit agreement of
17    confidentiality?
18    MR. CLARK: Objection.
19    A. Again, it doesn't say one way or the
20    other.
21    Q. (By Mr. Kidney) Well, if your belief is
22    that an explicit agreement of confidentiality is
23    required before it is binding, why wouldn't you put
24    that in your -- in your compliance manual?
25    A. There's a lot of things I didn't put in

1    the compliance manual.
2    Q. Well, why didn't you put that in?
3    A. I believe that that was implicit.
4    MR. CLARK: And covered in Section 3.2.2.
5    MR. KIDNEY: Excuse me. We'll get to it.
6    Are you amending his answer now? Is that what
7    you're doing?
8    MR. CLARK: No. But you're playing
9    hypotheticals.
10    MR. KIDNEY: No, I'm not playing
11    hypotheticals.
12    MR. CLARK: A waste of time.
13    MR. KIDNEY: I'm asking about
14    confidential information.
15    MR. CLARK: Right.
16    MR. KIDNEY: And you are just trying to
17    amend his answer, Mr. Clark, and that's totally
18    improper. It's not your testimony that's being
19    taken so I wish you'd just be quiet on or off the
20    record about it.
21    Q. (By Mr. Kidney) Now we'll turn to the part
22    that Mr. Clark seems to think is so critical, which
23    is 3.2.2 at page 150418936. We're not hiding the
24    ball on anything.
25    MR. KIDNEY: We're proceeding in a

1    logical, intelligent order which maybe you don't...
2            MR. CLARK:  Keep talking, Jim.
3        A.  What section are you on?
4        Q.  (By Mr. Kidney) We're on 3.2.2.
5            Now, you see where it describes
6    inside information?
7        A.  Yes.
8        Q.  It says inside -- quote -- Section A,
9    quote, inside information includes material
10   nonpublic information received, directly or
11   indirectly, from an issuer of securities, an
12   investor, a person or entity to whom the company
13   owes a fiduciary duty or duty of confidentiality or
14   the company itself.
15           So you've identified inside
16   information as, among other things, material
17   nonpublic information received, directly or
18   indirectly, from an issuer of securities; isn't
19   that right?
20       A.  No.
21       Q.  No?  Isn't that what it says?
22       A.  What's your question again?
23       Q.  You have identified inside information as
24   including material nonpublic information received
25   directly or indirectly from an issuer of

1            But how do you -- how do you --
2    what -- what -- is that the recipient's obligation
3    to find out whether it's public or not?
4        A.  In -- in our case, yes.
5        Q.  So what steps were taken when a
6    confidential placement memorandum was given to --
7    to Gryphon to determine whether the information
8    was, A, nonpublic or, B, material?
9        A.  Well, there's -- there's two things.
10   There's, first of all, you can determine after
11   looking at it whether or not it's material and
12   nonpublic based on your view of the world, but then
13   the question is whether or not you owe a fiduciary
14   duty to that issuer.
15       Q.  That's not how this is worded.
16           MR. CLARK:  Objection.
17       A.  It's exactly how it's worded.
18           MR. CLARK:  He wrote it.
19       A.  It's exactly how it's worded.
20       Q.  (By Mr. Kidney) It says, comma -- it's
21   totally ungrammatical then.
22       A.  Fiduciary duty modifies everything.
23       Q.  Well, it doesn't actually if you read it
24   grammatically.
25       A.  Well, it does, sir, because I wrote it.

1    securities; isn't that right?
2        A.  Yes.
3        Q.  Now, is it in certain circumstances
4    possible that knowledge of a PIPE transaction,
5    advance knowledge of a PIPE transaction, could be
6    material to an issuer?
7        A.  Could mean material to an issuer?
8        Q.  Right.
9        A.  I think that's irrelevant, whether it's
10   material to an issuer or not.
11       Q.  To the issuer of the PIPE?
12       A.  Yes.
13       Q.  Why is that not material?
14       A.  Because whether or not something is --
15   it's not up to the issuer to determine whether or
16   not the information is material or nonpublic.  It's
17   not a -- it's not a question for the issuer to
18   decide.
19       Q.  The issuer is not permitted to decide
20   whether its information should be confidential or
21   nonpublic or not?
22       A.  If an issuer says its information is
23   confidential, it doesn't necessarily make it so.
24       Q.  Well, no, not if people leak it out to the
25   public, it wouldn't be so.

1        Q.  Well, you should have written it more
2    clearly.
3            MR. KIDNEY:  Mr. Clark, you're red in the
4    face.
5            MR. CLARK:  I know I am.  You crack me
6    up, man.
7        Q.  (By Mr. Kidney) You think there's any
8    other obligation.  You said -- your -- your
9    interpretation of this is comma, comma, comma, a
10   person or entity to whom the company owes a
11   fiduciary duty or duty of confidentiality.  Your
12   view is that's not an independent clause.  It's
13   only a modifier for what proceeds it; is that
14   right?
15       A.  That's correct.  It's not my
16   interpretation.  It's what it means because I wrote
17   it.
18       Q.  Well, maybe that's what you intended it to
19   mean.
20       A.  That's what the law is.  That's why I
21   wrote it.
22       Q.  That's what the law is?
23       A.  Yes.
24       Q.  So you can't just simply have it -- in
25   your judgment, you can't have an agreement to keep

1   something confidential?
2           MR. CLARK:  Objection.
3       A.  It's my view that the law is that you have
4   a fid -- if you have a -- you have to have a
5   fiduciary duty to keep the -- keep the
6   information confidential.  That's the requisite
7   part of it.
8       Q.  (By Mr. Kidney) And that's based on how
9   much research that you've done on this issue?  You
10  yourself, not your outside counsel, in connection
11  with this litigation.
12      A.  Hours and hours and hours.
13      Q.  When?
14      A.  Over the last 20 years of my practice in
15  law.
16      Q.  Well, look at paragraph D.
17      A.  (Witness complies.)
18      Q.  Whether information is inside information
19  may depend on all the facts and circumstances of a
20  given situation and the determination may require
21  the application of sophisticated legal analysis,
22  itself depends on the evolving state of the law.
23              Accordingly, when employees
24  have any doubt whatsoever as to whether information
25  in their  possession is inside information from

1   whatever source learned or obtained, they should,
2   one, treat the information as inside information,
3   two, refrain from trading in the company's accounts
4   in their own personal and family accounts, three,
5   refrain from communicating it further, and, four,
6   promptly contact the compliance officer, end of
7   quotation.
8               Now, in your judgment, was it
9   so obvious that confidential private -- that when
10  placement memoranda received stating that they're
11  confidential to be used only for the purpose of
12  deciding whether to participate in a PIPE, they
13  were so obvious that that was not -- not binding on
14  anyone that there's no need to consult with you?
15          MR. CLARK:  Objection.  I don't
16  understand the question.
17      A.  It depends.
18      Q.  (By Mr. Kidney) Nobody did ever consult
19  with you about that subject, did they?
20          MR. CLARK:  Objection.  Misstates prior
21  testimony.
22          MR. KIDNEY:  No, it doesn't.
23      A.  What time frame are you talking about?
24      Q.  (By Mr. Kidney) Anytime.
25      A.  Yes, people have talked to me about it.

1       Q.  About the confidentiality of private
2   placement memoranda?
3       A.  We discussed it sometime.
4       Q.  When?
5       A.  I don't know specifically when.
6       Q.  Was it subsequent to you being employed as
7   an independent consultant?
8       A.  If it was, it was subsequent to that time
9   period.
10      Q.  And who was it with?
11      A.  I don't recall specifically.
12      Q.  What was your counsel?
13      A.  My counsel was you have to have an
14  agreement and a fiduciary duty to keep that,
15  whatever the PPM says, confidential in order for it
16  to be confidential.
17      Q.  And in your judgment, the fact that a
18  private placement memorandum was sent to Gryphon at
19  Gryphon's request was not sufficient to establish
20  any duty to the issuer; is that right?
21          MR. CLARK:  Objection to the hypothetical
22  and the predicate to the hypothetical.
23      A.  What -- what PPM are you talking about?
24      Q.  (By Mr. Kidney) Well --
25      A.  Were you talking about a hypothetical PPM?

1       Q.  Let's talk specifically about PhotoMedex
2   where you saw an e-mail.  I showed it to you
3   earlier.  It was on Lyon Exhibit 6, I think.
4       A.  Exhibit 5?
5       Q.  Exhibit 5.
6           MR. CLARK:  It is Lyon Exhibit 6.
7           MR. KIDNEY:  6, okay.
8           MR. CLARK:  That's been mismarked.
9           MR. KIDNEY:  Lyon Exhibit 6?
10          MR. CLARK:  Which one are you talking
11  about, PhotoMedex?
12          MR. KIDNEY:  PhotoMedex.
13          MR. CLARK:  I'm sorry.  It's 5.
14      A.  Where does it say here that Gryphon asked
15  for the PPM?
16          MR. CLARK:  Anywhere.
17      A.  Anywhere?
18      Q.  (By Mr. Kidney) Well, you're assuming that
19  they just sent this over the transom to Gryphon?
20      A.  That happens all the time.
21      Q.  Well, let's say Gryphon did ask for this?
22      A.  I don't think that's enough if that's what
23  you're asking.
24      Q.  Because why not?
25      A.  Asking for something to be sent that you

1    don't know what's in it doesn't constitute
2    acceptance and agreement to everything that's in
3    it.
4        Q.  Well, they say at the beginning, if you're
5    accepting the materials you agree that they're
6    confidential and will be treated as confidential.
7        A.  Accepting the materials meaning having
8    your inbox receive them?  I don't think that works.
9        Q.  You don't think it works?
10       A.  No.
11       Q.  Where did you get your legal training?
12       A.  Harvard Law School.
13       Q.  And when was that?
14       A.  I graduated in 1987.
15       Q.  And you've been in the securities business
16   ever since?
17       A.  Yes.
18       Q.  And you would counsel your client to -- if
19   they asked to go ahead and use the information
20   however they wish under these circumstances?
21       A.  Under what circumstances?
22       Q.  Circumstances as reflected in Lyon
23   Exhibit 5.
24       A.  What other circumstances?  Did Mr. Lyon
25   agree in writing or verbally to abide by that?

1        Q.  Let's just say it's just this, the four
2    corners of this document --
3        A.  Looking at this --
4        Q.  -- in Lyon Deposition Exhibit 5.
5        A.  Looking at this, with nothing more, he did
6    not have a duty, a fiduciary duty, to keep this
7    confidential.
8        Q.  Did he have any duty to keep it
9    confidential?
10       A.  No.
11       Q.  Did he have any duty to -- to inform
12   either Pacific Growth, from whom this material came
13   directly, or PhotoMedex that he was not going to
14   treat it as confidential?
15       A.  Absolutely not.
16           MR. CLARK:  I just want to restate on the
17   record that now we've spent an hour on Mr. Garden's
18   opinions of legal matters in which he wasn't
19   involved.  And, you know, I certainly welcome your
20   consent to him being designated an expert in this
21   case.
22           MR. KIDNEY:  Well, we don't designate him
23   an expert, but he did provide an affidavit that
24   we'll get to eventually.
25           MR. CLARK:  Of things he knew about.

1            MR. KIDNEY:  Mark this next as Garden
2    Number 3.
3                (Exhibit No. 3 marked)
4        Q.  (By Ms. LeBoeuf) Mr. Garden, we put before
5    you what's been marked for identification as Garden
6    Deposition Exhibit 3.  Have you ever seen this
7    before?
8        A.  (Reviewing document.)
9            MR. KIDNEY:  While Mr. Garden is
10   reviewing the exhibit, I'll note for the record
11   that Garden Deposition Exhibit 3 consists of a
12   cover e-mail and a memorandum from Fish &
13   Richardson dated July 24, 2003, as is the e-mail,
14   produced by Gryphon with production numbers GRYPHON
15   DC 0398134 through 149.
16       A.  I believe I've seen this before.
17       Q.  (By Mr. Kidney) Did you see it at or about
18   the time that's shown on the e-mail?
19       A.  Yes.
20       Q.  Okay.  Am I correct that as -- first of
21   all, who is Mr. Block?  Is he the person you're now
22   aligned with or partnered with or whatever you want
23   to call it?
24       A.  That's correct.
25       Q.  What was his position back in July of

1    2003?
2        A.  He was a shareholder at Fish & Richardson.
3        Q.  Does that mean that he was effectively a
4    partner?
5        A.  Correct.
6        Q.  Okay.  And was he a securities lawyer as
7    far as you know?
8        A.  Yes.
9        Q.  When did he graduate from law school, do
10   you know?
11       A.  When or where?
12       Q.  When.
13       A.  I believe he graduated in the early '80s.
14       Q.  Where did he graduate from?
15       A.  I believe it was Emory.
16       Q.  Did you have respect for his judgment?
17       A.  Yes.
18       Q.  And his research abilities?
19       A.  Yes.
20       Q.  Now, he says, quote, your instincts were
21   right on.  Based on the attached memo, shorting
22   stock after becoming aware of a PIPE is fraught
23   with danger unless the information was learned in a
24   very roundabout way.  Call me if you have further
25   questions or comments.

1          Now, did -- when you received
2    this attachment, did you read it?
3          A.  Yes.
4          Q.  Did you read it shortly after you received
5    it?
6          A.  I'm sure I did.
7          Q.  Did you inform people at Gryphon of the
8    conclusions of this memorandum?
9          A.  I'm sure I discussed at least some of it
10   with them.
11         Q.  Well, did you tell them that based on
12   legal counsel that short-selling the securities on
13   the basis of a nonpublic tip that a PIPE
14   transaction is going to take place may create
15   insider trading liability?
16         MR. CLARK:  Objection.
17         A.  I don't recall specifically telling them
18   that.
19         Q.  (By Mr. Kidney) Well, what did you tell
20   them about this memorandum?
21         A.  I don't recall specifically what I told
22   them about it.
23         Q.  What else would you have possibly told
24   them besides the conclusion?
25         A.  Well, because of things that were changing

1    in the industry at the time, I probably would have
2    told them that the receipt of information prior to
3    a PIPE offering could create situations where they
4    need to be careful about being in possession of
5    inside information in a fiduciary duty context.
6          Q.  Did you tell them how -- be careful about
7    that?
8          A.  I probably would have told them that we --
9    again, because, things were changing in the
10   industry that we need -- needed to be extra careful
11   about it.
12         Q.  Would that include reading some of the
13   materials involved in the offering?
14         A.  Reading some of the materials?
15         Q.  Reading of the materials associated with
16   the offering like the purchase agreement, the
17   private placement memorandum, to see what the terms
18   were for receipt of such information as requested
19   or imposed by the issuer.
20         A.  Not really.  That wouldn't have much
21   bearing on it.
22         Q.  It would not?
23         A.  No.
24         Q.  So in your view, understanding whether the
25   information was even deemed confidential or not

1    would not -- by the issuer would not have any
2    bearing on -- on whether, in fact, there was a duty
3    or not?
4          A.  No, that had no bearing on it.
5          Q.  Now --
6          MR. CLARK:  You going to ask him about
7    the memo itself?
8          MR. KIDNEY:  No.
9          MR. CLARK:  No.  Okay.  Let's move on.
10         MR. KIDNEY:  Let's mark this next as
11   Garden Exhibit 4.
12         (Exhibit No. 4 marked)
13         Q.  (By Mr. Kidney) Garden Exhibit 4, I'll
14   represent, was produced from Gryphon's records,
15   though it's not -- doesn't bear a production
16   number.  Oh, yeah.  Sorry.  It does bear a
17   production number as put on it by our document
18   recognition.
19         MR. KIDNEY:  Oh, that's their number?
20         MR. KELLY:  Yes.
21         MR. KIDNEY:  Oh, okay.
22         Q.  (By Mr. Kidney) GRYPH DC 0081623, it's an
23   e-mail from you, Mr. Garden, to a number of people
24   including Mr. Lyon, dated December 29, 2003.  Do
25   you recognize this?

1          A.  Yes, I do.
2          Q.  Is this an e-mail you sent on December --
3    on or about December 29, 2003?
4          A.  Yes.
5          Q.  And does -- what was the purpose of this
6    e-mail?
7          A.  The purpose of this e-mail is to
8    distribute to all of the employees of Gryphon the
9    latest version of Gryphon's compliance manual.
10         Q.  And so the -- so the manual was attached
11   to this e-mail; is that right?
12         A.  I assume it was.
13         Q.  You certainly intended to.  It says
14   attachments compliance manual?
15         A.  Yes.
16         Q.  Okay.  I'd like to address your attention
17   to the fifth bullet -- no -- fifth bullet point.
18         A.  Yes.
19         Q.  Prohibition on any trading in front of
20   PIPE transactions.  Was this -- so this was one
21   amendment to the earlier compliance manual that we
22   had marked as an exhibit, right?
23         A.  That's correct.
24         Q.  What caused you to determine to put that
25   prohibition in the new version?

1    A.  I think primarily two things.  One was
2  that significant changes in the industry and how we
3  were -- how Gryphon was receiving proposals to do
4  PIPE transactions were changing.
5    Q.  What was changing in the industry?
6    A.  What was changing in the industry was that
7  issuers and primarily placement agents were
8  requiring Gryphon or asking Gryphon to sign either
9  specific confidentiality agreements or blanket
10  confidentiality agreements prior to receiving any
11  information about a PIPE transaction.
12    Q.  Well, did your prohibition as placed in
13  the second version on the compliance manual limit
14  itself to only those transactions in which a
15  confidentiality agreement was specifically signed?
16    A.  I don't have that particular section in
17  front of me, but I don't believe it -- it
18  distinguished.
19    Q.  Why wouldn't it make that distinction?
20    A.  Well, before you asked that other question
21  I had another reason why --
22    Q.  Okay.
23    A.  -- we modified our policy.  And that
24  reason was that there was a number of rumblings
25  within the industry that practitioners were looking

1  at the concept of trading in front of PIPE
2  transactions.
3              And we felt or I felt at the
4  time that combined with the fact that -- that most
5  of our PIPE transactions were being sourced through
6  issuers and placement agents that were requiring
7  written confidentiality agreements, it was just a
8  better practice at that time to just say let's not
9  even mess with it, let's just not short in front of
10  PIPEs.
11    Q.  Had anyone come to you in advance of your
12  circulating this e-mail and compliance manual
13  raising the question of trading in front of PIPEs?
14    A.  I don't think anyone specifically came to
15  me on that.  I certainly discussed the matter with
16  Mr. Lyon and with some of our other traders as they
17  began to receive confidentiality agreements to
18  sign.  They would come to me and over time a
19  discussion about the matter developed culminating
20  in me advising that we should just have a blanket
21  prohibition just so that there are no mistakes
22  made.
23    Q.  In your judgment, does signing a
24  confidentiality agreement establish a fiduciary
25  relationship between the parties?

1    A.  Yes.
2    Q.  And a fiduciary as to all obligations?
3    A.  All what obligations?
4    Q.  All relations let's say between the
5  parties.
6              In other words, does the
7  fact -- does the signature of a confidentiality
8  agreement -- does the signatory to a
9  confidentiality agreement have a fiduciary
10  obligation to work in the best interest of the
11  party on the other side of the agreement?
12      MR. CLARK:  If you know.
13    A.  I don't know.  I don't know what all other
14  obligations you would -- you would talk to.
15    Q.  (By Mr. Kidney) Well, what -- what's your
16  definition of a fiduciary obligation?
17    A.  Well, there's many fiduciary obligations.
18  There's -- for example, there's a fiduciary
19  obligation of -- of due care.  There's a fiduciary
20  obligation of -- of -- of confidentiality.  There's
21  a fiduciary obligation of good faith.  There's a
22  number of fiduciary duties, some of which may be
23  applicable in this case, some of which would not.
24    Q.  Do they apply to duties -- do they
25  establish any duties outside the four corners of

1  the contract?
2      MR. CLARK:  Objection.  I don't
3  understand when you said they.
4    Q.  (By Mr. Kidney) Does it, fiduciary duty,
5  establish any obligations outside the four corners
6  of the contract?
7    A.  I don't know.
8      MR. KIDNEY:  Let's mark this next as
9  Garden Exhibit Number 5.
10      (Exhibit No. 5 marked)
11      MR. KIDNEY:  Garden Exhibit Number 5 is a
12  document dated January 1, 2004, supervisory
13  procedures and compliance manual produced by
14  Gryphon as DC 0082581 to 82610.
15    Q.  (By Mr. Kidney) Can you identify generally
16  what this is, sir?
17    A.  This appears to be Gryphon's compliance
18  manual that was put in effect as of January 1,
19  2004.
20    Q.  So it would have replaced Gryphon
21  Exhibit 2, the June 1 manual; is that right?
22    A.  The 2003 manual?
23    Q.  Right.
24    A.  Yes.
25    Q.  Okay.  Just turn to production Number 608.

1    A.  (Witness complies.)

2        MR. CLARK:  82608.

3    A.  Yes.

4    Q.  (By Mr. Kidney) Addressing yourself to the

5  last sentence of Section 4.1, PIPE Transactions,

6  does this reflect the adoption of the prohibition

7  on trade in advance of PIPE offerings that we

8  discussed in connection with the cover e-mail?

9    A.  Yes.

10   Q.  Okay.  And when was this manual effective?

11   A.  January 1, 2004.

12   Q.  So prior to January 1, 2004, the company

13  had no policy prohibiting trading in advance of a

14  PIPE, correct?

15   A.  It didn't have a -- no, it did not have a

16  written policy.

17   Q.  Which meant that it was permissible to

18  trade in advance of a PIPE?

19   A.  Not as a blanket statement.  Again, if --

20  if -- if -- in the facts and circumstances, if

21  there was no duty not to trade in front of a PIPE,

22  then it was permissible.  If there was a duty

23  established, it was not permissible.

24   Q.  And the duty would be established in your

25  view by a written contract, correct?

1      MR. CLARK:  Objection, misstates prior

2  testimony.

3    Q.  (By Mr. Kidney) Well, by -- by affirmative

4  agreement, oral or written, to maintain information

5  in confidence, right?

6    A.  You would have to have an affirmative

7  agreement to do so, yes.

8    Q.  Mere conduct would not suffice, correct?

9    A.  Not in my view.

10           (Sotto voce discussion between

11            Letteri and Clark)

12       MR. KIDNEY:  Let's mark this next as

13  Garden Exhibit Number 6.

14       MR. CLARK:  We actually -- I need a

15  restroom break and so does the witness.  Can we

16  take a break?

17       MR. KIDNEY:  A quick break.

18       THE VIDEOGRAPHER:  Off the record at

19  10:51 a.m.

20           (Off the record, 10:51 a.m. to

21             10:58 a.m.)

22       THE VIDEOGRAPHER:  Going on the record

23  10:59 a.m.  This is tape two.

24           (Exhibit No. 6 marked)

25   Q.  (By Mr. Kidney) Mr. Garden, I put before

1  you what's been marked for identification as Garden

2  Deposition Exhibit 6.  It doesn't have any

3  production numbers on it, but it's a November 8,

4  2002 letter on the letterhead of Fish & Richardson

5  to Gryphon Master Fund, LP, and it is signed by you

6  as a principal of Fish & Richardson, PC.  You

7  recognize this?

8    A.  Yes, I do.

9    Q.  I also note it was marked in the

10  investigation as Exhibit 23.

11           What is it?

12   A.  This is a legal opinion that Fish &

13  Richardson rendered to Gryphon Master Fund with

14  respect to effecting trades through Canadian

15  brokers.

16   Q.  Does this letter address any analysis

17  under Section 5 of the 1933 Exchange Act -- I'm

18  sorry -- the Securities Act?  All these years, I

19  still don't get it right.  1933 Securities Act.

20   A.  No.

21   Q.  It strictly addresses whether there's any

22  legal exposure to Gryphon Master Fund by trading --

23  by shorting through a Canadian broker under

24  Canadian law, correct?

25   A.  Not just under Canadian law but the

1  propriety of shorting through a Canadian broker.

2    Q.  Okay.  Thank you.

3        MR. KIDNEY:  Please mark this next one as

4  Garden Exhibit 7.

5           (Exhibit No. 7 marked)

6    Q.  (By Mr. Kidney) Mr. Garden, I placed

7  before you what's been marked for identification as

8  Garden Deposition Exhibit 7.  It is a letter dated

9  October 9, 2002 to the Gryphon Master Fund on the

10  letterhead of Macleod Dixon, LLP, Calgary, Alberta,

11  produced with the Gryphon production numbers

12  GRYPHON DC 0386000 to 6001.

13           There is no indication of your

14  name on this, sir, but I'm asking whether you've

15  ever seen it before other than in preparation.

16   A.  Yes, I have.

17   Q.  When did you see it?

18   A.  On or around October 9, 2002.

19   Q.  Okay.  Did this address the same issue as

20  you addressed in the November 8 letter, Garden

21  Deposition Exhibit 6?

22   A.  No.  It addressed a -- a particular subset

23  of the November 8, 2002 letter.

24   Q.  Okay.  And what was that subset?

25   A.  One of the -- the assumptions in the

1  November 8, 2002 letter was that Canadian broker
2  dealers were not subject to compliance with the '34
3  Act in the U.S. And I think that was an important
4  assumption for my opinion. And this opinion, which
5  is rendered by a Canadian law firm, gave the
6  opinion which I needed to make that assumption that
7  they were not subject to the '34 Act.
8      Q.  Did this opinion as reflected in the
9  Macleod Dixon letter include any analysis of
10  Section 5 of the '33 Act?
11      A.  I don't know. The opinion itself does not
12  refer to Section 5, but I don't know if the law
13  firm addressed or analyzed Section 5.
14      Q.  They didn't communicate anything about
15  Section 5 to you?
16      A.  Not that I'm aware of, no.
17      Q.  Or as far as you're aware of to Gryphon
18  Master Fund?
19      A.  Not that I'm aware.
20      Q.  Okay. Thank you.
21      MR. KIDNEY:  Let's mark this next as
22  Garden Exhibit Number 8.
23          (Exhibit No. 8 marked)
24      Q.  (By Mr. Kidney) I placed before you,
25  Mr. Garden, a one-page document with production

1  number GRYPHON DC 0397302. It appears to be an
2  e-mail from you to Mr. Lyon, dated December 17,
3  2003. Do you recognize this?
4      A.  Yes, I do.
5      Q.  Did you write this on or about the date
6  shown?
7      A.  I'm sure I did.
8      Q.  What is the subject, Bobbie Majumba is a
9  knucklehead?
10      A.  If I recall correctly, Bobbie Majumba was
11  a lawyer at a fairly good size law firm here in
12  Dallas.
13      Q.  What firm was that?
14      A.  I -- I don't remember. I know it was one
15  of the big ones and there's only a handful of big
16  ones.
17      Q.  And you titled this Bobbie Majumba is a
18  knucklehead, why?
19      A.  If I recall correctly, I believe that
20  Bobbie Majumba, who had some relationship or
21  clients up in Canada, had suggested to Mr. Lyon or
22  others at Gryphon that you could effect short sales
23  in PIPE transactions using your own restricted PIPE
24  shares to establish and support the short.
25      Q.  To establish and support the short, okay.

1      And here you were stating that
2  Bobbie Majumba is a knucklehead because -- well,
3  first of all, how did it come about that you and
4  Mr. Lyon were talking about Mr. Majumba's opinion?
5      A.  Mr. Majumba -- I can't remember the
6  context of it, but Mr. Majumba met in Gryphon's
7  offices one time, and I don't know why he showed
8  up. I believe he had another client that we were
9  aware of or he was doing some work in -- you know,
10  up in Canada with some U.S. issuer -- or U.S.
11  investors. Again, I don't know how it came up.
12  But I do know -- I do remember him in Gryphon's
13  office on or around this time.
14      Q.  And so why did you feel the obligation or
15  prepare this e-mail? Did Mr. Lyon ask you to do so
16  or did you -- were you responding to Mr. Majumba's
17  observation or what?
18      A.  I think I was responding to Mr. Majumba's
19  observation after we met with Mr. Majumba and he
20  suggested something I didn't believe was sound
21  legal advice and didn't make such sense to me from
22  a number of perspectives, including practicality.
23  But I was just confirming with Mr. Lyon so he had
24  no confusion as to what the SEC's current position
25  on the matter was.

1      Q.  When you say support the short, what is it
2  you mean in this context?
3      A.  In this context, I mean it's this --
4  you're using the shares, whatever they are, to
5  maintain an open short position. You have to have
6  shares to maintain a short position until the short
7  position is closed.
8      Q.  Well, if you use shares you already own
9  for that, you couldn't use unreg -- you couldn't
10  use unregistered securities to do that, could you?
11      A.  I think that's what the point is -- the
12  point of -- of me saying Bobbie Majumba is a
13  knucklehead.
14      Q.  And it's your understanding that -- well,
15  we'll get to it later. Okay.
16      Had you brought up this --
17  given this kind of counsel to Mr. Lyon prior to
18  December 17, 2003?
19      MR. CLARK:  That Bobbie was a
20  knucklehead?
21      MR. KIDNEY:  Well, maybe that.
22      Q.  (By Mr. Kidney) But also regarding what
23  you have termed the SEC's position on shorting
24  unregistered shares against the box.
25      A.  I don't know specifically, but I obviously

1    at this time sent him the position which might
2    suggest that I hadn't sent him the position before,
3    but I -- I don't know.
4        Q.  Do you have any other written -- let me
5    strike that.
6            Do you have any other counsel
7    to Mr. Gryphon or anyone -- I mean to Mr. Lyon or
8    anyone at Gryphon Partners regarding short-selling
9    the -- the -- the tradeable shares of a PIPE issuer
10   in advance of the PIPE's announcement memorialized
11   in writing?
12       A.  I don't recall any -- you know, preparing
13   any lengthy memos or anything like that.
14       Q.  Correct me if I'm wrong, but I believe --
15   I mean, Mr. Kelly will correct me if I'm wrong.
16   Maybe you will.
17           I believe that this is really
18   the only -- outside of an affidavit prepared for
19   purposes of presenting it to the SEC during -- near
20   the conclusion of our investigation, I believe this
21   is the only written memorialized counsel to Gryphon
22   and Mr. Lyon on this subject that we found.
23           I'm just asking you whether we
24   may have overlooked something.  Is there anything
25   that comes to mind?

1        A.  Nothing that comes to mind.
2            MR. CLARK:  Anthony, you want to correct
3    him?
4            (Sotto voce discussion between
5            Kidney and Kelly)
6            MR. CLARK:  He also marked up a document
7    with his counsel in his handwriting that was given
8    to the -- Mr. Lyon so I think there's a lot, but it
9    doesn't matter.
10           MR. KIDNEY:  A lot?
11           MR. CLARK:  He doesn't recall.
12           MR. KIDNEY:  He didn't recall.  I got
13   this.  Yeah.  Why don't we just go right to that.
14           Let's mark this one as Garden
15   Exhibit 9.
16           (Exhibit No. 9 marked)
17           MR. CLARK:  I think I got your copy.
18   I'll pass it to you.
19       Q.  (By Mr. Kidney) We put before you what's
20   been marked for identification as Garden Deposition
21   Exhibit 9.  It is an election of, looks like,
22   different kinds of documents; a cover letter
23   from --
24           MR. CLARK:  Do you need more time to
25   review it, Mr. Garden?

1            MR. KIDNEY:  He can review it while I'm
2    describing it.
3        Q.  (By Mr. Kidney) -- Fahnestock, an NASD
4    questionnaire, a part of one, and concluding
5    statement executed presumably by Mr. Lyon.
6            But what I want to focus my
7    attention on what's production numbered
8    GRYPHON-001040.  But take your time to read the
9    entire exhibit, sir, if you need to.  Let me know
10   when you're finished.
11       A.  I'm finished.
12       Q.  Have you seen all or any part of this
13   document before?
14       A.  Yes.
15       Q.  Which parts have you seen before?
16       A.  I believe I've seen all of it.
17       Q.  Okay.  Now, addressing your attention to
18   page 001040, it appears to be a memorandum from
19   Mr. Richard Leu.  Do you know who Mr. Leu was?
20       A.  Not specifically.
21       Q.  And the memo is from Ryan Wolters who
22   worked at Gryphon at the time, right?
23       A.  Yes.  The memo is from him to Mr. Leu.  It
24   appears, however, that -- that it was a memorandum
25   that was probably drafted by Mr. Leu and he was

1    probably representing the issuer.
2        Q.  Well, can you tell us the circumstances of
3    this -- well, first of all, whose handwriting is
4    that that seems to be trying to amend the last
5    paragraph?
6            MR. CLARK:  Objection to the
7    characterization.
8            Do you want to know whose
9    handwriting it is?
10           MR. KIDNEY:  Yeah.
11       A.  It's mine.
12       Q.  (By Mr. Kidney) Both boxes?
13       A.  Yes.
14       Q.  And that's Mr. Lyon's signature, correct?
15       A.  Yes, it is.
16       Q.  You tell us the circumstances that caused
17   you to be adding to this document with the matters
18   in the boxes?
19       A.  Well, this was a -- an acknowledgment and
20   a representation that the issuer wanted its -- the
21   investors in the PIPE transaction to make.
22   Obviously TI 65 is set forth in the middle of the
23   memo and they wanted Gryphon to confirm that they
24   read Number 65 above and confirm that Gryphon did
25   not have an open short position in Data -- Datatec

1  Systems as of the signature date accompanying his
2  signature below.
3        That statement without the
4  modifications was incorrect because I believe at
5  the time Gryphon did have an open short position in
6  Datatec Systems stock.
7     Q.  Well, what did you mean by -- what did you
8  intend to do by adding the amendments?
9     A.  Well, two things.  I -- if -- if -- if the
10  acknowledgment was meant to relate to TI 65, then
11  the acknowledgement as written was incorrect.  It
12  did not correctly state TI 65.  Also, I made the
13  amendments so that Mr. Lyon in my view could sign
14  it and it would be correct as amended.
15     Q.  Did you have any discussions with Mr. Lyon
16  about these amendments at the time?
17     A.  I believe I did.
18     Q.  Do you recall what they were?
19     A.  I told him that -- I believe I told him
20  that we couldn't make the representation because we
21  did have an open short position, but I believe that
22  as it relates to TI 65, we didn't have a -- an open
23  short position against the box.
24     Q.  And your understanding of against the box
25  was what again?

1     A.  My understanding of against the box is
2  that you were using your own -- in this case you
3  were using your own PIPE shares to open and support
4  the short position as interpreted -- as my
5  interpretation of TI 65.
6     Q.  Does that mean to replace the borrowed
7  shares?
8     A.  No.
9     Q.  What does -- so open and support means to
10  use legended -- would mean -- in your -- your
11  opinion, TI 65 means you're unable -- prohibits use
12  of legended, unregistered securities issued in a
13  qualified distribution to, quote, open and support
14  the short; is that right?
15     A.  In the context of a PIPE transaction,
16  which I believe is what TI 65 is referring to, in
17  that context, that's what I believe the first part
18  of it is talking about.
19     Q.  Now, there was I realize extensive
20  discussion about this in the investigative
21  testimony and I have to say that it's still a
22  little confusing to me.
23        Can you try to explain for us
24  once again as clearly as you can what you mean by
25  open and support the short?

1     A.  In other words, in order to effect a short
2  sale, you have to have shares that open the
3  position.  A short sale is a -- is a transaction
4  that occurs where you sell the stock but you have
5  an open position.  It continues to be open unlike a
6  long sale or a long buy which happens and it's
7  done.
8        So during the time that you
9  have a short sale, a short sale in effect, you have
10  an open position, an open short position, that
11  requires shares to support the position to -- to
12  make it happen to make it still an open position.
13        Typically those shares are
14  shares that you borrow from someone else, take
15  them, deliver them to the buyer.  And the -- the --
16  the shares that you owe back to the lender of the
17  shares are shares then that are supporting that
18  position.  That's what I mean by open and support
19  the position.
20     Q.  Well, let me ask you, can someone open
21  as -- enter into a short sale without already
22  owning any of the securities of the issuer whether
23  they're legended or not, restricted or not?
24     A.  Yes.  That happens probably more
25  frequently than not.

1     Q.  And who goes out and borrows the stock?
2  Is it the investor?
3     A.  Well, the investor is the actual borrower
4  of the stock.  But as a practical matter, it's the
5  investor's broker that finds the borrow for the
6  investor or the broker itself may lend the shares
7  to the investor to effect the short.
8     Q.  Do you know who the -- the lending
9  investor looks to replace the shares if it wants to
10  call the -- call -- wants to sell the stock, if he
11  wants to sell the stock?
12     A.  Yes.  It looks to the borrower of the
13  shares.
14     Q.  Which would usually be the broker.
15     A.  No, the broker is not borrowing the
16  shares.  The broker is just acting as a -- an agent
17  or an intermediary just because the broker is in a
18  better position to borrow usually from other
19  brokers or rather other brokers' clients.  The
20  brokers don't own stock.
21        It's usually -- the brokers can
22  own stock obviously in their own accounts, but
23  usually they will find customers that happen to
24  have shares that are just sitting in their accounts
25  and they lend those shares to other brokers'

1 clients.

2     Q. Now, you recognized in your investigative

3 testimony that one of Gryphon's strategies was to

4 sell a PIPE issuer's stock short and then close

5 the -- close the short by -- at the time that the

6 PIPE's become freely tradeable by ordering the

7 closing of the short and also selling the PIPEs at

8 the same time, right?

9     MR. CLARK: Objection.

10     Q. (By Mr. Kidney) No. Going -- selling the

11 PIPEs now freely tradeable now long in the market,

12 right?

13     A. The -- the typical strategy was if you --

14 if you had a PIPE transaction that you bought PIPE

15 shares long and then had short positions offsetting

16 that long position, that once the registration

17 statement became effective with respect to the long

18 PIPE shares, the long PIPE shares would be sold and

19 the short positions would be covered.

20     Q. And that would be generally the intent at

21 the time the short was established, right?

22     A. The intent to do that?

23     Q. Right.

24     A. Well, there's an expectation that once it

25 became effective that you would -- the transaction

---

1 was effectively done and you would close out both

2 positions.

3     Q. And that was the nature of the hedge,

4 right?

5     A. That was the strategy. It was not -- it

6 was primarily an arbitrage strategy.

7     Q. Are you aware of any other -- besides

8 telephone advice or telephone interpretation

9 number -- well, let's -- let's put it on the record

10 even though I'm sure it's already an exhibit

11 someplace.

12     MR. CLARK: It's right here.

13     THE WITNESS: I can't read that, though.

14     MR. CLARK: Okay.

15     MR. KIDNEY: No. It's dense. Not very

16 little.

17     Let's put this on the record as

18 Garden Exhibit Number 10.

19     (Exhibit No. 10 marked)

20     MR. CLARK: Page 12.

21     Q. (By Mr. Kidney) By the way, you -- you

22 recognized in your -- in your investigative

23 testimony and I just want to ask you if you still

24 recognize it today that in engaging in this

25 arbitrage, it was possible that on -- on some

---

1 occasions a -- the long sale of the now tradeable

2 PIPE shares might actually be acquired by the

3 broker in the market to cover the -- to close the

4 short transaction, right?

5     A. Correct.

6     MR. CLARK: Objection.

7     MR. KIDNEY: You've got to be quicker on

8 your feet.

9     MR. CLARK: I guess I do.

10     Q. (By Mr. Kidney) I'm showing what is Garden

11 Deposition Exhibit 10. I'm sure you've seen this

12 before, but let me ask you. I'm only asking you

13 about, as you might expect, question 65.

14     Do you recognize this document

15 and in particular 6 -- 6 -- Number 65?

16     A. Yes, I do.

17     Q. What is it?

18     A. It's a telephone -- staff telephone

19 interpretation relating to Section 5 and a

20 secondary offering of restricted shares.

21     Q. Okay. Now, I'm not going to -- trying to

22 get into a debate with you because this is all in

23 front of the court, but I am interested in your

24 opinion. This identifies the question by an

25 issuer.

---

1     It's stating that a -- a

2 selling shareholder wanted to do a short sale of

3 common stock against the box and cover the short

4 sale with registered shares after the effective

5 date. Isn't that right, that's -- that's the

6 question?

7     MR. CLARK: It is what it says.

8     MR. KIDNEY: Right.

9     A. That's what it says.

10     Q. (By Mr. Kidney) Okay. And the SEC

11 responds that the issuer was advised the short sale

12 could not be made before the registration statement

13 became effective because the shares underlying the

14 short sale are deemed to be sold at the time such

15 sale is made. There would, therefore, be a

16 violation of Section 5 if the shares were

17 effectively sold prior to the effective date.

18     MR. CLARK: Objection. The SEC didn't

19 say anything.

20     Q. (By Mr. Kidney) Did, in its answer, the

21 SEC seem to be to you relying on the seller's

22 observation that the short would be against the

23 box?

24     MR. CLARK: Objection. Staff of the SEC.

25     Q. (By Mr. Kidney) You can answer the

1    question.
2        A.  Could -- could you rephrase --
3        Q.  Well, all right.  The question, does the
4    SEC or the SEC staff, as Mr. Clark would have it --
5        MR. CLARK:  Or the law.
6        Q.  (By Mr. Kidney) -- refers to a short sale
7    of the common stock against the box.  But there's
8    an answer by the SEC after the second sentence.
9            And does the answer in your
10   judgment seem dependent on whether the sale was
11   against the box?
12       A.  Yes.
13       Q.  And why is that?
14       A.  Well, the -- the short sale against the
15   box refers to the restricted PIPE shares -- that's
16   the share that they're referring to -- because the
17   staff person says, because the shares underlying
18   the short sale are deemed to be sold at the time
19   the sale was made, there would be a violation of
20   Section 5 if the shares were effectively sold.
21           They have to be referring to
22   the restricted PIPE shares because if they were
23   referring to unrestricted shares there couldn't be
24   a violation of Section 5.
25       Q.  Well, you -- you discount any possibility

1    that the interpretation was simply that if the
2    intent, the investment intent, is to -- at the time
3    of the short sale is to close the short at the same
4    time the PIPEs are sold that that violates Section
5    5?
6        A.  I don't think this has anything to do with
7    investment intent.
8        Q.  Section 5 talks about investment intent,
9    doesn't it?
10       A.  Section 5 does, but Section 5 talks about
11   a lot of things.
12       Q.  Right.  But I'm asking if Section 5 -- you
13   don't -- you don't believe that this telephone
14   advice interpretation has anything to do with the
15   intent of the investor?
16       A.  No.
17       Q.  Have you ever, prior to start of the SEC
18   investigation, researched further into the subject
19   of Section 5 and short sales in connection with a
20   PIPE offering?
21       A.  Yes.
22       Q.  What else -- when did you do that?
23       A.  Various times, probably beginning back
24   2000.  I looked at a lot of things.  I just didn't
25   find anything other than TI 65.

1        Q.  You didn't?
2        A.  No.
3        Q.  Well, I'll have to show you a couple of
4    things and see if you looked at those.  First one I
5    want to show you is also from the Manual of
6    Publicly Available Telephone Interpretations and it
7    will be Garden Exhibit --
8        MR. KIDNEY:  What is that, 13?
9        THE REPORTER:  11.
10       MR. KIDNEY:  -- Garden Exhibit 11.
11           (Exhibit No. 11 marked)
12       Q.  (By Mr. Kidney) I put before you what's
13   been marked for identification as Garden Deposition
14   Exhibit 11, sir, and address your attention to
15   which I will represent is pulled off of the
16   internet as the SEC Division of Corporation Finance
17   Manual of Publicly Available Telephone
18   Interpretations.  Only this part of the manual
19   relates to Rule 144.
20           Do you know what Rule 144 is?
21       A.  Yes, I do.
22       Q.  What is it?
23       A.  Rule 144 is a safe harbor exemption from
24   the registration requirements of Section 5.
25       Q.  Now, to address your attention to

1    paragraph numbered 3 which states, quote, a person
2    holds only restricted securities and has held them
3    for less than one year.  Such person cannot effect
4    a short sale of securities of that class and then
5    cover with such persons restricted securities,
6    paren, even though the restricted securities are
7    now eligible for sale, unparen, since the initial
8    short sale did not quality under Rule 144.  It
9    says, see question 82, Release Number 33-6099.
10           Did you come upon this
11   telephone interpretation in the course of your
12   research into Telephone Interpretation 65 under
13   Section 5?
14       A.  Specifically --
15       Q.  Yes.
16       A.  -- in connection with that, I don't
17   believe so.
18       Q.  Have you ever seen this before today?
19       A.  I think I have actually.
20       Q.  When did you last see it?
21           Or when did you first see it is
22   probably a better question?
23       A.  I have no idea.  It looks familiar,
24   though.
25       Q.  Okay.  Let me ask you, having seen this

1  telephone interpretation, would it change your
2  opinion as to whether it was permissible, as far as
3  the SEC staff was concerned, to short the issue of
4  the PIPE -- the issuer's PIPE -- the PIPE shares of
5  an issuer and then sell the PIPE shares at the same
6  time as closing the -- the short with the intention
7  of closing the hedge?
8      A.  No, I don't -- I don't think this has
9  anything to do with that.
10     Q.  Why is that?
11     A.  Well, first of all, it's talking about
12  a -- a -- again, a short sale of restricted --
13  using restricted securities.  Because it says at
14  the end, since the initial short sale did not
15  qualify under Rule 144, that has to mean a short
16  sale of restricted securities.
17          If it was a short sale of
18  unrestricted securities, then 144 wouldn't be
19  impacted.
20     Q.  Well, I'm not going to argue with you.
21  I'm just calling your attention to where it says,
22  such person cannot effect a short sale of
23  securities of that class.
24     A.  Yes.
25     Q.  So it's saying specifically that the short

1  sale is of securities of that class which don't
2  necessarily have to be restricted.  If they were
3  restricted they couldn't be sold short, period,
4  right?
5      MR. CLARK:  Objection.  The -- go ahead.
6      A.  But then it goes on to say, and then cover
7  with such persons restricted securities since the
8  initial short sale did not qualify under Rule 144.
9  So it -- it -- if -- if -- if your interpretation
10  is -- is -- is correct, then it would -- there
11  would be a period after the word class and that's
12  what it would mean.
13          You could never -- if you had
14  restricted securities you could not -- it's meant
15  to say you can never effect short sales of that
16  class.  If you're holding restricted securities, it
17  wouldn't have the rest of it.
18     MR. CLARK:  Do you understand what class
19  means?
20     THE WITNESS:  Yes.
21     Q.  (By Mr. Kidney) What does it mean?
22     A.  It means a class of -- of stock, whether
23  it's common or preferred or whatever.
24     Q.  So class doesn't refer specifically to
25  whether a security is restricted or not.  It's

1  Class A, Class B?
2      A.  That's correct.
3      Q.  We'll at least agree on that.  Okay.
4          Well, that's your
5  interpretation.  But you don't recall the specifics
6  of having seen this paragraph in the course of
7  researching TI 65?
8      MR. CLARK:  Objection, misstates prior
9  testimony.
10     Q.  (By Mr. Kidney) You've seen it before,
11  but --
12     A.  I've seen it before, but I don't believe
13  I've seen -- I've specifically looked at in the
14  context of my research regarding TI 65 and what it
15  relates to.
16          (Exhibit No. 12 marked)
17     Q.  (By Mr. Kidney) Let me show you what is
18  Exhibit 3 to Plaintiff's Memorandum in Opposition
19  to the Motion to Dismiss that was filed in
20  connection with this case, which is a Securities
21  and Exchange Commission Release Number 33-6798,
22  among other parts of the release.
23     MR. KIDNEY:  We're going to mark it as
24  Garden 12.
25          (Sotto voce discussion between

1          Clark and Letteri)
2      MR. KIDNEY:  Temporary rule.
3      MR. CLARK:  I don't remember how accurate
4  they are.
5      MR. KIDNEY:  Doesn't matter.
6      MR. CLARK:  It has some relevance, but
7  whatever.
8      MR. KIDNEY:  It doesn't matter to the
9  paragraph we're going to address.
10     MR. CLARK:  Okay.
11     Q.  (By Mr. Kidney) I'm really going to
12  address your attention to what is on numbered page
13  4.  It says at the top, page 14 of 19.  And there's
14  a paragraph beginning indented as part of Note 17,
15  the Commission has also cautioned.  I'll read it
16  into the record while you read it to yourself.
17     MR. CLARK:  I object to all this stuff.
18     A.  Where are we, page 4?
19     MR. CLARK:  In the footnote in the third
20  paragraph of Footnote 17 and he's going to reed
21  this (indicating).
22     Q.  (By Mr. Kidney) Quote, the Commission is
23  also cautioned that, quote within a quote, any
24  person intending to purchase securities in any
25  registered secondary offering should be on notice

1    that his selling short the same securities prior to

2    the offering may be subject to the registration

3    requirements of Section 5 of the Securities Act as

4    well as other applicable statutes and rules, end of

5    quote within a quote.  And let's just end the

6    quote.  It then cites several securities act

7    releases; one from '74, another from '75, and

8    another from '72.

9            First of all, did this

10    provision either out of this release, which is

11    dated 1988, or out of any of the earlier releases

12    cited therein, come to your attention when you were

13    researching TI 65?

14    A.  It might have, but I can't recall.

15    Q.  Now, if you read to yourself, does this

16    have any impact on your interpretation of whether

17    one may short a PIPE issuer's stock before the --

18    while participating in it before the security is

19    registered for sale?

20    A.  None whatsoever.

21    Q.  Why is that?

22    A.  Well, just reading it here today, first of

23    all, the intro says, the Commission has also

24    cautioned.  So whatever this says is just simply at

25    best a -- the thoughts of the Commission which are

---

1    not law.

2            The second thing is this

3    doesn't even refer to the typical PIPE transactions

4    that Gryphon and others would do.  This refers to

5    registered secondary offerings.

6    MR. CLARK:  Reg Number 105.  I'll also

7    note for the record that each and every one of the

8    releases mentioned here relates to proposed

9    enactments of the Commission thought better of

10    enacting.

11    MR. KIDNEY:  Well, you know, you can --

12    MR. CLARK:  Wait till he answers --

13    MR. KIDNEY:  You say that in your -- you

14    say that in your motion or your response, so what's

15    the point?

16    MR. CLARK:  The point of --

17    MR. KIDNEY:  We're not getting your

18    testimony today, Mr. Clark.

19    MR. CLARK:  I don't know what you're

20    talking about --

21    MR. KIDNEY:  You continue to do it, we'll

22    have to go to the judge.

23    MR. CLARK:  Go ahead, Jim.

24    Q.  (By Mr. Kidney) Did you feel that there

25    would be any necessity once you saw this because

---

1    you believe you've seen it before, to call it to

2    your client's attention that the Commission has

3    concerns about shorting in advance of a PIPE?

4    MR. CLARK:  Objection, misstates the

5    prior testimony.

6    A.  None whatsoever.

7    MR. KIDNEY:  Okay.  Let's mark this next

8    as Garden Exhibit 13.

9          (Sotto voce discussion between

10          Clark and Letteri)

11          (Exhibit No. 13 marked)

12    Q.  (By Mr. Kidney) Mr. Garden, we put in

13    front of you what we have marked for identification

14    as Garden Deposition Exhibit 13, which is also

15    Exhibit 4 to the SEC's Memorandum in Opposition to

16    Defendant's Motion to Dismiss.  It is a Securities

17    Act Release Number 6099, dated August 2, 1979.

18    It's a fairly long release.  Look through it to the

19    extent you feel you need to, but I'm just going to

20    be addressing the question -- or the question 82 in

21    the release, which is at page 25 of the release.

22    At the very top, page -- the court ECF

23    designation is page 26 of 28.

24            Do you see that question 82?

25    A.  Yes.

---

1    Q.  The question is, will a nonaffiliate who

2    sells securities short without placing his

3    restricted securities in the box, later uses the

4    restricted securities to cover the short position,

5    be able to rely on Rule 144 if he complied with

6    its requirements only at the time the short

7    position is covered?

8          Answer:  No.  It is necessary

9    that the initial sales transaction comply with Rule

10    144.  The purpose of this prohibition is to

11    preclude a nonaffiliate from avoiding the

12    requirements of Rule 144F and G by effecting a

13    short sale without complying with those sections

14    and thereafter covering a short position with

15    restricted securities.

16            Do you have that in mind?

17    A.  Pardon me?

18    Q.  Do you have that -- this question and

19    answer in mind?

20    A.  Do I have it in mind?

21    Q.  Yes.  For the next question.

22    A.  Yes, I do.

23    Q.  Okay.  Did this question in this release

24    come to your attention during your research on

25    TI 65?

1    A.  It might have, but I -- I don't recall
2 specifically.
3    Q.  Having read it now, it represents the
4 staff's position.  Does this have any impact on
5 your consideration of whether an entity may sell
6 short a PIPE issuer's securities and then sell the
7 security -- sell the security long at the same time
8 that they are covering the short as Gryphon did?
9    A.  None whatsoever.
10    Q.  Why is that?
11    A.  Because, again, this is specifically
12 relating to a short sale made using restricted
13 shares under 144.  If it didn't, then there would
14 be no reference to 144 because 144 specifically
15 relates to the sale of restricted securities.
16    Q.  Well, isn't it -- but isn't -- by
17 asserting that the restricted securities are not
18 placed in the box, that they are all later used to
19 cover the short position, doesn't that suggest that
20 they were not used to open the short?
21    A.  Yes.
22    Q.  So this would suggest that the in-the-box
23 requirement is not the necessary one to find that
24 shorting with later use of the now tradeable
25 restricted stock is a necessary obligation -- a

1 necessary requirement, right?
2        MR. CLARK:  Objection.  Under what
3 statute?
4        MR. KIDNEY:  Well, under Section 5.
5    A.  No.
6    Q.  (By Mr. Kidney) Doesn't suggest that to
7 you?
8    A.  No, it doesn't.
9    Q.  Why is that?
10    A.  We're talking about in the context of what
11 Gryphon was doing.
12    Q.  Right.
13    A.  Okay.  This has nothing to do with -- this
14 has nothing to do with a PIPE transaction and it
15 appears to relate exclusively to using restricted
16 shares to cover short positions.  That's not the
17 fact pattern in the Gryphon transactions.
18    Q.  How does it differ?
19    A.  Well, it differs because Gryphon never
20 used restricted shares to cover its short
21 positions.
22    Q.  Well, wasn't that its basic intention by
23 selling the security -- the restricted stock now
24 tradeable long at the same time it closed the
25 short?

1    A.  It never sold its restricted stock short.
2    Q.  No, no.  It sold it long at the same time
3 it covered the short, usually within the same
4 minute or sometimes within the same minute.
5    A.  It never used its restricted securities,
6 which, by the way, were not restricted to cover its
7 short positions.
8    Q.  They had been restricted and then they
9 were freely -- became freely tradeable and Gryphon
10 closed the short at the same time it sold the --
11 sold the now tradeable securities long.
12        MR. CLARK:  Objection to the
13 characterization.
14    A.  Again, it never used its restricted
15 securities to cover short positions.
16    Q.  (By Mr. Kidney) Is that because in your
17 view it didn't actually deliver the securities to
18 the broker and say use these to cover the short?
19    A.  That's exactly what it is.  That's a very
20 critical element.
21        MR. KIDNEY:  Let's mark this next as
22 Gryphon 14.
23            (Exhibit No. 14 marked)
24    Q.  (By Mr. Kidney) Before we get to that,
25 Mr. Garden, do you have any understanding as to

1 whether in -- whether in your view Section 5
2 requires an intent to violate Section 5 by your --
3 require scienter as you understood that to be in
4 law school?
5    A.  I -- I -- I'm not certain.
6    Q.  Okay.  Look at Gryphon Deposition
7 Exhibit 14.  It's from Morgan Whatley.  Do you know
8 who that was -- or Whatley Morgan?
9        MR. CLARK:  Garden Exhibit 14.
10    A.  It's Morgan Whatley.  Morgan Whatley used
11 to be Gryphon's chief financial officer.
12    Q.  So he's no longer there; is that right?
13    A.  That's correct.
14    Q.  When did he leave?
15    A.  He left earlier this year, I think, in
16 February or March.
17    Q.  Do you know where he is now?
18    A.  He works at another fund investment
19 company, I believe, down in Houston.  I don't know
20 the name of it, though.
21    Q.  Okay.  So did you receive this e-mail from
22 Morgan Whatley on or around December 8, 2003?
23    A.  I must have.
24    Q.  Do you have any current recollection on
25 it?

1     A.  I don't have current recollection of it.

2     MR. KIDNEY:  Well, for the record, it is

3  an exhibit that was also marked as Exhibit 67

4  during the investigation.  It's produced out of

5  Gryphon's files.  It's bates-stamped GRYPH 89128

6  through 131 and it is an e-mail transmittal of

7  something called Gryphon Partners Pipe Strategy

8  Methodology, dated December 31, 2003 --

9     THE WITNESS:  Uh-huh.

10    MR. KIDNEY:  -- which is obviously a date

11  well after December 8, 2003.

12    Q.  (By Mr. Kidney) Do you know what the

13  Gryphon Partners Pipe Strategy Methodology -- well,

14  let me just ask you.  It -- it -- the subject --

15  let me withdraw that.

16     The subject is new draft of

17  Ernst & Young PIPE memo.  Is this attachment the

18  Ernst -- a draft of the Ernst & Young PIPE memo?

19    A.  I don't know.  I don't know.  I thought I

20  knew what this -- the purpose was for, but the

21  Ernst & Young has kind of thrown me off.

22    Q.  You mean the identification of Ernst &

23  Young?

24    A.  Well, Ernst & Young at the time were

25  Gryphon's auditors.  And before you pointed that

---

1     Q.  (By Mr. Kidney) We put before you a

2  one-page exhibit from Gryphon files, GRYPH DC

3  0315123.  It's from J. Paul Caver to you dated

4  Wednesday, June 12, 2002.  Do you recognize it?

5    A.  Yes.

6    Q.  Can you describe for us the circumstances

7  by which this e-mail from Mr. Caver was sent to

8  you?

9    A.  I think the circumstances were that we

10  were -- I was continuing to get more and more

11  familiar with PIPE transactions and PIPE strategies

12  and the like and as part of that -- and there were

13  things going on again.  I mean, the PIPE industry

14  was -- was in full force and there were various

15  things that were going on.

16     And I wanted as just part of my

17  due diligence and -- and -- and learning, I wanted

18  Paul to call to see if he could talk to the staff

19  about, you know, what -- as I mentioned here what

20  hot issues, you know, what's on -- what is -- what

21  is the SEC and the staff thinking about currently

22  in terms of issues related to PIPE transactions.

23    Q.  Well, how did you pick him to do that?

24    A.  He was the only associate in the section.

25    Q.  Were you the only partner in the section?

---

1  out, just looking at it, I thought it was being

2  prepared in connection with a flip book, you know,

3  a --

4     MR. CLARK:  Marketing.

5    A.  -- a marketing piece, for lack of a better

6  term.  But the fact that it says new draft of Ernst

7  & Young PIPE memo suggests something else.

8    Q.  (By Mr. Kidney) Do you have any current

9  recollection of what this is?

10    A.  No.

11    Q.  Do you know a J. Paul Caver?

12    A.  Yes.

13    Q.  Who is that?

14    A.  J. Paul Caver, who goes by Paul, used to

15  be an associate in the corporate section at Fish &

16  Richardson.

17    Q.  Where is he now?

18    A.  I don't know.

19    Q.  Well, I guess he is no longer at Fish &

20  Richardson?

21    A.  I know he is no longer at Fish &

22  Richardson.

23    MR. KIDNEY:  Let's mark this next as

24  Garden Exhibit 15.

25     (Exhibit No. 15 marked)

---

1    A.  Me and Mr. Block.

2    Q.  Okay.  Did you do anything with this

3  information, particularly the information that this

4  fellow associate director of Corp. Fin. agreed that

5  insider trading rules would apply if PIPE investors

6  were trading on the basis of material nonpublic

7  information?

8    A.  I don't know what I did with -- with that,

9  with this knowledge here.

10    Q.  Did you forward it to Gryphon?

11    A.  I don't know.

12    Q.  I mean, either -- I don't mean necessarily

13  limit it to just forwarding the e-mail, but somehow

14  delivering the information.

15    A.  You know, I don't think -- I don't recall,

16  quite frankly.  But nothing in this memo would have

17  necessarily caused me to forward it or jump on the

18  phone and talk to my clients about it.

19    Q.  Okay.

20    MR. KIDNEY:  Let's mark the next exhibit

21  as Garden Exhibit 16.

22     (Exhibit No. 16 marked)

23    MR. CLARK:  We need to do a quick

24  restroom break.

25    MR. KIDNEY:  Okay.

1      THE VIDEOGRAPHER: Off the record,

2  12:01 p.m.

3      (Off the record, 12:01 p.m. to

4      12:08 p.m.)

5      THE VIDEOGRAPHER: Back on the record,

6  12:08 p.m.

7      (Mr. Letteri did not return

8      after the break)

9    Q.  (By Mr. Kidney) Mr. Garden, I placed

10  before you Garden Deposition Exhibit 16.

11      And for the record, I want to

12  say the reason I asked you all these questions

13  about your legal opinion is not because the SEC, by

14  any means, considers you an expert, but because

15  there were a number of assertions presented by you

16  in this affidavit which was presented to the SEC as

17  part of the Wells Process, I believe --

18      MR. CLARK: No.

19    Q.  (By Mr. Kidney) -- or part of the

20  investigation into Gryphon and Mr. Lyon's conduct.

21  That's why we were asking about this stuff.

22      First of all, let me ask you,

23  who wrote this.

24    A.  Who -- who typed it?

25    Q.  Who wrote it?

---

1    A.  I think it was a combination of a number

2  of people.

3    Q.  Who?

4      MR. CLARK: Objection.

5    Q.  (By Mr. Kidney) You can answer unless

6  you're instructed not to.

7      MR. CLARK: Are any of the people that

8  had input into this your attorneys?

9      THE WITNESS: Yes.

10      MR. CLARK: Then we instruct you not to

11  answer the question.

12      MR. KIDNEY: You know, if this is really

13  being offered as it's essentially his testimony,

14  then you're going to plan to offer this or the

15  equivalent of it in court, I think we're entitled

16  to know whether this is his opinion or whether it's

17  stuff that was written for him by counsel --

18      MR. CLARK: Ask him --

19      MR. KIDNEY: -- or who -- who wrote it?

20      MR. CLARK: Ask him whether it's his

21  opinion.

22      MR. KIDNEY: I'm asking who wrote it.

23      MR. CLARK: Okay. And I just instructed

24  him not to answer the question. If you want to ask

25  him whether it's his opinion, I'm not going to

---

1  object. I'll tell you in advance.

2      MR. KIDNEY: Well, I want to know whether

3  this is his opinion now because counsel told it to

4  him or whether it was his opinion before all this

5  got started, though.

6      MR. CLARK: Go ahead and ask him that,

7  too.

8    Q.  (By Mr. Kidney) Well, first of all, I'm

9  going to ask again, so you can object again, who

10  wrote the first draft of this affidavit?

11      MR. CLARK: Do you recall?

12    A.  I don't recall actually.

13    Q.  (By Mr. Kidney) It wasn't you, was it?

14    A.  It might have been.

15    Q.  Well, do you recall, yes or no?

16    A.  I don't recall.

17    Q.  Did you -- did -- did counsel review and

18  edit this affidavit?

19      MR. CLARK: Objection. I'm instructing

20  the witness not to answer that question.

21    Q.  (By Mr. Kidney) Did counsel propose

22  language that was used in this affidavit?

23      MR. CLARK: Same instruction.

24    Q.  (By Mr. Kidney) Did you have discussions

25  with counsel about what should go into this

---

1  affidavit?

2      MR. CLARK: Same instruction.

3    Q.  (By Mr. Kidney) Okay. Did you follow

4  counsel's instructions in putting in this the

5  information in this affidavit?

6      MR. CLARK: Same instruction.

7    Q.  (By Mr. Kidney) Now, you say -- let's

8  address your attention to paragraph Number 10. And

9  in the middle of that paragraph, it says, in

10  particular, I became aware that Gryphon often began

11  hedging its PIPE transactions as soon as the PIPE

12  securities were purchased, that is, entered into

13  short sales prior to the effectiveness of the

14  resale registration statement for the PIPE

15  securities.

16      Now, so that's your language as

17  you approved it?

18    A.  Yes.

19    Q.  Is there any reason why you didn't note

20  that Gryphon -- maybe it's in here someplace -- I

21  missed it. But not only did Gryphon begin hedging

22  its PIPE transactions as soon as the PIPE

23  securities were purchased but then it began the

24  hedge by shorting the PIPE securities -- or rather

25  issuer securities before the PIPE securities were

1  purchased in some instances.

2        MR. CLARK:  Objection.  I don't

3  understand the question.

4     Q.  (By Mr. Kidney) Well, you don't make any

5  reference here to opening the position before the

6  PIPE securities were purchased, do you?

7     A.  That's correct.

8     Q.  Why not?

9     A.  No particular reason.  There's a lot of

10  things I didn't put in here.

11     Q.  Well, wasn't that part of the focus for

12  the SEC investigation to which this affidavit --

13  for which this affidavit was prepared?

14     A.  Actually, no.

15     Q.  The shorting in advance of the PIPE

16  offering was not a subject of the investigation?

17     A.  It was either not a subject or it was not

18  much of a subject.  It came -- that whole concept

19  came up at the 11th hour, if I recall correctly.

20     Q.  So you don't remember why you didn't

21  include that here?

22     A.  No, I don't.

23     Q.  Why didn't you put in that in this

24  affidavit that at your direction beginning in 19 --

25  in 2004, Gryphon employees were instructed not to

1  trade in advance of a PIPE?

2     A.  Why didn't I put it in there?

3     Q.  Yeah.

4     A.  I have no idea.

5     Q.  Doesn't it have something to do with the

6  instructions you were giving to -- to Gryphon

7  regarding the PIPEs?

8     A.  It has nothing to do with that.

9     Q.  Has nothing to do with the PIPEs?

10     A.  It has nothing to do with any instructions

11  I was given with respect to this affidavit.

12     Q.  Oh, you were given instructions with

13  respect to the affidavit?

14     A.  No, I wasn't.

15     Q.  That's what you just said.

16     A.  I didn't say that.

17        MR. KIDNEY:  Let the record read back the

18  last answer -- question and answer.

19        (Record read)

20     A.  I was rephrasing your question that was

21  read -- that I thought you had asked beforehand

22  about instructions with respect to this affidavit.

23     Q.  (By Mr. Kidney) So which instructions --

24  are you talking about instructions with respect to

25  the affidavit or instructions to your client?

1     A.  I don't know.  You were -- you're asking

2  the questions.

3     Q.  Well, I asked why -- why you did give

4  instructions in the '04 compliance manual not to

5  trade in advance of a PIPE and I'm asking you why

6  you didn't include that as part of the counsel that

7  you gave to your client in the affidavit?

8     A.  I have no idea.  As I mentioned before,

9  there's a lot of things I didn't put in the

10  affidavit.

11     Q.  You say in paragraph 11, that in 2002 in

12  connection with Fish & Richardson's provision of

13  the above-referenced opinion letter, I advised

14  Gryphon and Bucky Lyon that Gryphon's hedging

15  practices did not violate the securities law.

16        You just -- were you just

17  referring to the Fish & Richardson letter as sort

18  of a -- a -- that it was at that time?

19     A.  It was around that time.  It -- it -- the

20  hedging practices that I'm referring to here don't

21  directly relate to the opinion letter.  I'm just

22  talking about a time frame.

23        MR. KIDNEY:  Let's just take a couple of

24  minutes off the record.

25        THE VIDEOGRAPHER:  Off the record,

1  12:18 p.m.

2        (Off the record, 12:18 p.m. to

3        12:21 p.m.)

4        THE VIDEOGRAPHER:  Back on the record,

5  12:21 p.m.

6        MR. KIDNEY:  Thank you, Mr. Garden.  We

7  have nothing further today.

8        Mr. Clark, do you have any

9  questions.

10        MR. CLARK:  I do not.  Thank you.

11        MR. KIDNEY:  Thank you for coming.

12  Mr. Garden.

13        This is adjourned.

14        THE VIDEOGRAPHER:  Off the record,

15  12:21 p.m. The end of the deposition.

16        (Proceedings adjourned,

17        12:21 p.m.)

18

19

20

21

22

23

24

25

```
1        I, WARREN W. GARDEN, have read the foregoing

2   deposition and hereby affix my signature that same

3   is true and correct, except as noted above.

4

5                    _____

6                    WARREN W. GARDEN

7

8   THE STATE OF _____)

9   THE COUNTY OF _____)

10        Before me _____, personally

11  appeared WARREN W. GARDEN, known to me (or proved

12  to me under oath or through_____)

13  (description of identity card or other document)to

14  be the person whose name is subscribed to the

15  foregoing instrument and acknowledged to me that

16  they executed the same for the purposes and

17  consideration therein expressed.

18        Given under my hand and seal of office this

19  _____ day of _____, 2007.

20

21

22                   _____

23                   NOTARY PUBLIC IN AND FOR

24                   THE STATE OF_____

25
```

```
1   STATE OF TEXAS     *

2   COUNTY OF DALLAS   *

3        This is to certify that I, Deborah Marks,

4   Certified Shorthand Reporter, in and for the State

5   of Texas, certify that the foregoing oral

6   deposition of WARREN W. GARDEN, reported

7   stenographically by me at the time and place

8   indicated, said witness having been placed under

9   oath by me, and that the oral deposition is a true

10   record of the testimony given by the witness.

11        I further certify that I am neither counsel

12   for nor related to any party in the case and am not

13   financially interested in its outcome.

14        Given under my hand on this the _____ day

15   of _____, 2007.

16

17

18                   _____

19                   Deborah Marks, Texas CSR 6453

20                   Expiration date: 12/31/08

21

22

23

24

25
```