UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
               :
SECURITIES AND EXCHANGE     :
COMMISSION,         :
               :
        Plaintiff,  :
               :
    -against-    :  06 Civ. 14338 (SHS)
               :
EDWIN BUCHANAN LYON, IV,   :  <u>OPINION & ORDER</u>
GRYPHON MASTER FUND, L.P.,  :
GRYPHON PARTNERS, L.P.,    :
GRYPHON PARTNERS (QP), L.P.,  :
GRYPHON OFFSHORE FUND, LTD., :
GRYPHON MANAGEMENT PARTNERS, L.P., :
GRYPHON MANAGEMENT PARNTERS III, L.P., :
and GRYPHON ADVISORS, L.L.C.,  :
               :
        Defendants. :
               :
-----------------------------------------------------------------x

SIDNEY H. STEIN, U.S. District Judge.

Table of Contents

**I. BACKGROUND** ........................................................................... 3
 A. The "Celsion Offering" ...................................................... 5
 B. The "Gentner Offering" ..................................................... 7
 C. The "MSL Offering" ........................................................... 8
 D. The "PhotoMedex Offering" ............................................. 9
**II. ANALYSIS** .................................................................................. 11
 A. The Summary Judgment Standard ..................................... 11
 B. Insider Trading ................................................................... 12
  1. *The Information Defendants Received Was Both Material and Nonpublic* ...... 13
  2. *Duty of Confidentiality* ............................................ 15
   a. SEC's Summary Judgment Motion .............................. 15
    i. Rule 406 "Routine Practice" Evidence ................... 16
    ii. Existence of a Duty of Confidentiality .................. 18
   b. Defendants' Motion for Summary Judgment ............... 21
  3. *Breach of Duty (Misappropriation)* ....................... 24
  4. *Lack of Personal Benefit to Defendants* ................. 26
  5. *Personal Involvement of Defendant Lyon* ............... 28
 C. SEC's Alternate Theory of Liability .................................. 29
**III. CONCLUSION** .......................................................................... 30

The Securities and Exchange Commission ("SEC" or "Commission") brings this action for securities fraud, insider trading, and unlawful distribution of unregistered securities against Edward Buchanan Lyon, IV, and seven entities—Gryphon Master Fund, L.P., Gryphon Partners, L.P., Gryphon Partners (QP), L.P., Gryphon Offshore Fund, Ltd., Gryphon Management Partners, L.P., Gryphon Management Partners III, L.P., and Gryphon Advisors, L.L.C. (collectively, "Gryphon Entities")—for which Lyon serves as managing partner and chief investment officer.  On January 2, 2008, this Court granted in part and denied in part defendants' motion to dismiss, dismissing the SEC's unlawful distribution claims.  S.E.C. v. Lyon, 529 F. Supp. 2d 444 (S.D.N.Y. 2008). Each side now seeks summary judgment on the remaining insider trading and securities fraud claims.

The action stems from the defendants' involvement in the offering of a series of Private Investments in Public Equities ("PIPEs") and their contemporaneous trading in the stock of the issuing entities.  The surviving claims allege defendants committed insider trading by acting on confidential, nonpublic information that four companies intended to issue PIPEs, thereby violating duties of confidentiality owed to each of the issuing entities.  Defendants maintain they owed no duties to any of the issuers involved and were therefore free to trade on the information in question.  Each side asserts that the factual record developed through discovery is sufficient for the Court to grant summary judgment in its favor.

Because the Court finds that issues of material fact remain in dispute, it concludes that a grant of summary judgment for any party would be inappropriate. Both motions, therefore, are denied.

# I.      BACKGROUND

The following facts are not in dispute: Edwin Buchanan Lyon, IV is the managing partner and chief investment officer of the Gryphon Entities, a collection of onshore and offshore hedge funds and related companies involved in the investment management business.  (Pl.'s Local Civil Rule 56.1 Statement of Undisputed Facts ("Pl.'s 56.1") ¶¶ 5-12.)  Lyon, who is experienced in the securities industry, made investing decisions for the Gryphon Entities with the help of a small staff, including former analyst Ryan Wolters.  (Defs.' Local Civil Rule 56.1 Statement of Undisputed Facts ("Defs.' 56.1") ¶¶ 10, 13; Dep. of Ryan Wolters dated July 17, 2007 ("Wolters Dep.") at 17:11-20:16, Ex. F to Decl. of Christopher J. Clark dated June 10, 2008 ("Clark Decl.").)

Among the types of securities Gryphon Entities invested in were Private Investments in Public Equities, which are frequently referred to by their acronym as "PIPEs."  (Dep. of Edwin Lyon dated Apr. 26, 2006 ("Lyon Dep. I") at 17:11-18:16, Ex. B to Clark Decl.)  PIPEs are unregistered securities issued by companies whose stock is already publicly traded.  Because PIPEs are unregistered, they cannot be offered to the market generally, and once issued, they cannot be resold or traded for a set period of time, usually 60-120 days.  Issuers, through placement agents, target qualified potential investors who are offered PIPEs at a significant discount from the common stock's market price as compensation for the temporary illiquidity.  (Pl.'s 56.1 ¶¶ 13-14.)

The fact that a company intends to issue PIPEs is not initially public information. Issuing companies, through their placement agents, solicit qualified investors until the full offering is purchased, at which point the transaction is completed and "closed."  Only

then will the issuer announce full details about the offering to the public market.  (Lyon

Dep. I, at 63:7-21.)

       The SEC contends that public announcement of a PIPE offering often leads to a

significant drop in the trading price of the issuer's stock.  (Compl. ¶ 51.)  The decline

occurs for two reasons.  First, the offering of additional shares means that each share

represents a smaller percentage of the issuer's total outstanding equity, i.e., each share is

"diluted" in value.  (Id.)  Second, as noted, PIPE shares are usually offered at a price

below the prevailing market for publicly traded shares of the issuer's stock because, as

restricted shares, PIPE shares are not freely tradable for a set period of time.  (Id. ¶ 7, 51.)

The record in this case reflects that in each of the offerings relevant to this litigation,

public announcement of the offering correlated with a drop in the issuer's stock price.

(Pl.'s 56.1 ¶¶ 15, 23; Def's Resp. to Pl's Local Rule 56.1 Statement of Undisputed Facts

("Def's Resp. 56.1") ¶ 23.)

       As noted above, once they are issued, PIPE shares are considered restricted and

cannot be publicly traded for a set period of time.  In the interim, however, PIPE

investors often "hedge" their investments—i.e., attempt to reduce their risk—by selling

"short" the issuer's stock.  (Compl. ¶ 22.)  An investor sells "short" when he borrows a

security from someone else (typically a broker) and then sells it, hoping the stock will fall

so that, at a later date, when the investor "covers" the short position by purchasing the

security and returning it to the lender, he can capitalize on the price differential.  See

ATSI Communs., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 96 n.1 (2d. Cir. 1998) (citations

omitted); see also Lyon, 529 F. Supp. 2d at 454.

Investors in PIPEs frequently short the issuers stock after having invested in the PIPE, thereby seeking to capitalize on the difference between the stock's market price and the reduced offering price the investor paid for the PIPE. The practice is common, and provided the investor establishes his short position in the issuer's stock after the PIPE offering has closed and been publicly announced, the parties agree there is nothing illegal about it. (Pl.'s Resp. to Def's Local Rule 56.1 Statement of Undisputed Facts ("Pl.'s Resp. 56.1") ¶ 16.) In this case, however, defendants shorted the stock of four companies after being informed of those companies' intentions to issue PIPEs but before the offerings were publicly announced to the market. The SEC contends that, in so doing, defendants committed securities fraud.

In particular, the SEC alleges defendants obtained information about the four offerings only after agreeing to keep that information confidential and then breached those duties of confidentiality by using the information to short the issuers' stock, thereby committing fraud in connection with the purchase or sale of securities. Defendants deny they promised to keep information about the offerings confidential or that they breached any duties owed when they traded the issuers' stock.

The following facts are not in dispute regarding the four transactions in question:

A.     The "Celsion Offering"

In the spring of 2003, the Celsion Corporation retained outside placement agent Sterling Investment Group to solicit prospective investors in a PIPE offering. (Pl.'s 56.1 ¶ 29.) Sterling, through its employee Jamie Alpharo, contacted defendants, and in particular, Wolters, regarding the offering. Alpharo has only a "vague" memory of his communications with defendants but testified that the "process" for contacting investors

was to do so "without divulging the name of the [issuer]" and that if the investor was interested, "we may have said something like, do you mind if we bring you over the wall, and if he [gave] the affirmative, then we would go ahead and divulge the name of the company." (Dep. of Jaime Alfaro dated Mar. 24, 2008 ("Alfaro Dep.") at 17:22-20:13, Ex. G to Clark Decl.) Being brought "over the wall," as Alfaro explained, meant the potential investor understood he "would be privy to confidential information." (Id. 20:14-17.) Alfaro further testified that the "process" was to send additional information to potential investors, including an executive summary and private placement memorandum ("PPM") containing detailed information about the offering and "a lot of confidential language" only after bringing investors "over the wall." (Alfaro Dep. at 25:6-26:18.)

On May 21, 2003, Alfaro sent an e-mail to Wolters, attaching an executive summary regarding the Celsion offering. The word "confidential" appears in bold lettering in the upper right hand corner of each page of the summary. (Ex. 11 to Pl.'s 56.1.) Alfaro then sent Wolters the Celsion PPM, which Wolters acknowledged receiving on June 3, 2003. The PPM was labeled "Confidential Placement Memorandum" and stated on its first page that the information contained in the PPM was "being furnished . . . on a confidential basis solely for the purpose of enabling prospective investors . . . to consider an investment in Celsion." (Pl.'s 56.1 ¶ 40.)

Between June 9 and July 2, 2003 defendants acquired a short position of 377,700 shares in Celsion. On July 7, 2003 defendant Lyon executed the signature page of the subscription agreement, by which he agreed to participate in the Celsion PIPE offering, and returned the signed agreement to Sterling. Celsion closed the offering and

announced the transaction to the market on July 8, 2003.  That day, Celsion's stock price

dropped 8.5 percent.  (Id. ¶¶ 43-45.)  The SEC contends defendants subsequently covered

their short—i.e., purchased Celsion stock on the open market at the lower price and

returned the stock to the lender—to net a profit.[1]

Neither Lyon nor any of defendants' other employees deposed in this action is

able to recall specific details of their conversations with Alfaro or whether they knew of

or agreed to terms of confidentiality relating to the offering.  (Id. ¶¶ 27, 30.)

B.      The "Gentner Offering"

On October 24, 2001, defendant Lyon received an e-mail from Ram Capital,

attaching a PPM relating to a proposed PIPE offering by Gentner Communications

Corporation.[2]  Although the e-mail contained no confidentiality notice, the attached

document was labeled "Confidential Private Placement Memorandum."  (Ex. 18 to Pl.'s

56.1.)  The PPM further explicitly provided that "[y]ou agree to use this information for

the sole purpose of evaluating a possible investment in our shares and for no other

purpose" and that "the existence and nature of all conversations regarding us and the

offering must be kept strictly confidential."  (Pl.'s 56.1 ¶ 50.)

On November 15, 2001, Lyon agreed to participate in the offering by signing the

signature page of the purchase agreement and faxing both it and the cover sheet of the

---

[1] The SEC provides an estimate of the profit defendants reaped with regard to each offering in its statement of undisputed facts.  (E.g., Pl's 56.1 ¶ 46.)  It acknowledges, however, that it has yet to provide most of the relevant supporting account documents, and on that basis, defendants, in their response, deny generally each such statement.  (E.g., Defs.' Resp. 56.1 ¶ 46.)  The fact that defendants' intent was to short the issuer's stock and subsequently cover for a profit is not generally in dispute, however.  (Lyon Dep. I, at 28:7-15.)  Therefore, for purposes of resolving these motions, the Court need not dwell on whether, or to what effect, defendants covered any of the short positions relevant to this action.

[2] Ram Capital's relationship to Gentner and to defendants is not set forth by either party.  As discussed below, the fact that defendants' sole communications regarding the offering were with Ram rather than Gentner is of relevance in determining defendants' liability, if any, with respect to that transaction. Accordingly, the lack of clarity in the record about that relationship is itself reason to deny the parties' summary judgment motions with regard to the Gentner transaction.

purchase agreement to Ram Capital.  That same day, defendants sold short 87,500 shares of Gentner stock.  On November 16, 2001, Gentner announced the completion of its private placement offering to the market. The price of Gentner's stock fell nearly five percent.  (Id. ¶¶ 54-55.)

Neither Lyon nor any of defendants' other employees is able to recall any details regarding whether defendants' knew of or agreed to terms of confidentiality relating to the offering.  (Id. ¶ 27.)  Lyon does not even recall whether or not he read the PPM, nor does he recall any other relevant facts about the offering.  (Id. ¶ 52.)

C.      The "MSL Offering"

In early 2002, Manufacturers' Services Limited ("MSL") retained Robertson Stephens to act as a placement agent for a proposed PIPE offering.  Robertson Stephens, through its employee Brian Sullivan, contacted potential investors, including defendants, regarding the MSL offering.  (Id. ¶ 57.)  Sullivan testified that, at the time of the MSL offering, Robertson Stephens had a procedure in place that required employees such as himself to follow a "script" when contacting potential investors.  (Dep. of Brian Sullivan dated Apr. 4, 2008 ("Sullivan Dep.") at 15:14-16:7, Ex. H to Clark Decl.)  The script required that Sullivan ask potential investors to "agree to be restricted in trading the security [before] we would tell them the name of the company."  (Id. at 31:4-10.)

While Sullivan recalled communicating with defendants regarding the MSL PIPE offering, he has no specific memory of the content of those conversations.  However, he did testify that "it would have been routine" for him to have followed the script in those conversations and that "it was my job to do that."  (Id. at 34:20-35:4.)

On February 27, 2002, Sullivan sent an e-mail to Lyon, attaching the PPM for the MSL offering.  The PPM was labeled "Confidential Private Placement Memorandum" and included the following language: "You agree to use this information for the sole purpose of evaluating a possible investment in our securities and for no other purpose," and that "by accepting this confidential [PPM], you agree to comply with these restrictions."  (Pl.'s 56.1 ¶ 67.)  Defendants never participated in the MSL PIPE offering. (Id. ¶ 71.)

Between March 6 and March 11, 2002, however, defendants established a short position of 23,000 shares in MSL common stock.  On March 13, 2002, MSL publicly announced the completion of its PIPE offering, and MSL's stock price declined 4.1 percent that day.  (Defs.' Resp. 56.1 ¶¶ 69-70.)  Neither Lyon nor any of defendants' other employees deposed in this action was able to recall any details of their conversations with Sullivan or whether they knew of or agreed to terms of confidentiality relating to the offering. (Pl.'s 56.1 ¶ 27.)

   D.  The "PhotoMedex Offering"

In 2001, PhotoMedex, Inc. retained Pacific Growth Industries to act as a placement agent for PhotoMedex's proposed PIPE offering.  Pacific Growth, through its employees, contacted potential investors, including defendants, regarding the PhotoMedex offering. (Id. ¶ 74, 78.)  Vincentia Devone, an executive with Pacific Growth, testified to Pacific Growth's general practice at the time of the PhotoMedex PIPE, which was that "before anything could be sent out" to an investor regarding the PIPE offering, "there had to be some sort of confidentiality agreement."  (Dep. of Vincentia K. Devone dated Apr. 4, 2008 ("Devone Dep.") at 15:5-6, Ex. N to Clark

Decl.)  Devone also testified that "we have a confidentiality clause . . . we always include [ ] in our paperwork." (Devone Dep. 14:1-3.)

The record does not indicate whether Devone or anyone at Pacific Growth obtained such an agreement with defendants or not, and Devone did not have any knowledge or memory of whether anyone at Pacific Growth spoke with Lyon or with Gryphon employees Wolters or Warren Garden.  (Id. at 32:22-33:21).

On March 21, 2001, however, Devone sent an e-mail to Lyon, attaching several documents relating to the PhotoMedex PIPE offering and stating: "[b]y accepting the attaching materials . . . you agree that the attached materials and any other information you receive from us or the company . . . will be used by you . . . solely for the purpose of evaluating the potential acquisition of the Company's securities."  The e-mail contained the additional warning that: "By accepting the Confidential Information, you acknowledge that you may be receiving material nonpublic information concerning the Company and are aware that the United States securities laws restrict the purchase and sale of securities by persons who possess certain nonpublic information relating to issuers of securities."  (Pl.'s 56.1 ¶ 78.)

The record does not indicate whether or not defendants participated in the PhotoMedex PIPE offering or ever signed and returned a participation agreement. However, on March 21, 2001, defendants sold short 50,000 shares of PhotoMedex stock. (Id. ¶ 80.)[3]  On March 23, 2001, PhotoMedex publicly announced the completion of its PIPE offering.  That day, PhotoMedex's stock price fell nearly six percent.  (Id. ¶ 81.)

---

[3] Although defendants acknowledge that they acquired a 50,000 share short position on March 21, 2003, they note that they also acquired a 50,000 share long position the same day.  (Defs.' 56.1 ¶ 21.)  The parties disagree over the relevance, if any, of these simultaneous trades, a disagreement the Court addresses in Part II.B.4 below.

Lyon testified that although he is unable to recall whether or not he received an e-mail from Devone containing information about the PhotoMedex PIPE, he has no reason to believe he did not.  (Deposition of Edwin Lyon dated Apr. 27., 2007 ("Lyon Dep. II") at 39:17-40:6, Ex. E to Clark Decl.)  Neither Lyon nor any of defendants' other employees is able to recall any specific details regarding whether defendants' knew of or agreed to terms of confidentiality relating to the offering.  (Pl.'s 56.1 ¶ 27.)

In sum, with regard to each offering, the parties agree that defendants were contacted regarding the offering; that defendants received information identifying the issuing company; that the information included language relating to its confidentiality; and that, contemporaneously, defendants traded the stock of the issuing company.  The disagreement lies in whether, and if so, when, defendants accepted a duty of confidentiality to any or all of the issuers.  Both sides contend, however, that the disagreement can be resolved, as a matter of law, by the Court.

## II.    ANALYSIS

### A.    The Summary Judgment Standard

Summary judgment is appropriate if the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists where the record taken as a whole could lead a reasonable trier of fact to find for the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In determining whether a genuine issue of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party

against whom summary judgment is sought." Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004). The non-moving party, however, "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence" in support of its factual assertions. D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).

The same standard applies where the parties file cross-motions for summary judgment. Morales v. Quitnel Entm't., Inc., 249 F.3d 115, 121 (2d Cir. 2001); see also Ford Motor Co. v. N.Y. City Police Dep't., 394 F. Supp. 2d 600, 609 (S.D.N.Y. 2005). Accordingly, each party's motion is examined independently, with the Court drawing all reasonable inferences against the party whose motion is under consideration. Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981); see also Int'l Action Ctr. v. City of New York, 522 F. Supp. 2d 679, 683 (S.D.N.Y. 2007). Even where both parties move for summary judgment asserting the absence of any issues of material fact, the Court cannot enter judgment for either party without satisfying itself that no such issues of material fact exist. Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993).

B.    Insider Trading

Claims of insider trading brought pursuant to section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), can be premised on either what is known as the "classical" theory of liability or the "misappropriation" theory of liability. United States v. O'Hagan, 521 U.S. 642, 651-52 (1997). Under the classical theory of liability, "§ 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic

information." Id.  Under the misappropriation theory, which is the relevant theory here, a

person commits fraud in connection with a securities transaction "when he

misappropriates confidential information for securities trading purposes, in breach of a

duty owed to the source of the information." Id. at 652.  The misappropriation theory "is

thus designed to protec[t] the integrity of the securities markets against abuses by

'outsiders' to a corporation who have access to confidential information that will affect

th[e] corporation's security price when revealed, but who owe no fiduciary or other duty

to that corporation's shareholders." Id. at 653 (quotations and citations omitted).

Misappropriation liability, therefore, requires a plaintiff to establish (1) that the

defendant possessed material, nonpublic information; (2) which he had a duty to keep

confidential; and (3) that the defendant breached his duty by acting on or revealing the

information in question.  See United States v. Falcone, 257 F.3d 226, 232-33 (2d Cir.

2001).

> 1.   *The Information Defendants Received Was Both Material*
>       *and Nonpublic*

To establish liability for insider trading in violation of the Exchange Act, the SEC

must prove that the information defendants misappropriated was both material and

nonpublic. Information is material if "there is a substantial likelihood that a reasonable

[investor] would consider it important in deciding how to [invest]." SEC v. Warde, 151

F.3d 42, 47 (2d Cir. 1998) (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 231 (1988)).

Material information includes "any fact which in reasonable and objective contemplation

might affect the value of the corporation's stock or securities." SEC v. Mayhew, 121

F.3d 44, 52 (2d Cir. 1997) (quoting SEC v. Texas Gulf Sulpher Co., 401 F.2d 833, 849

(2d Cir. 1968) (en banc)) (emphasis in original).

The SEC asserts that information about a planned PIPE offering meets that standard and points to deposition testimony from individuals involved with each of the relevant offerings attesting to the fact that the issuer—and the industry in general—viewed information about a PIPE offering as likely to significantly effect the issuer's stock price and therefore as "material."  (E.g., Dep. of Edward D. Bagley dated July 10, 2007 ("Bagley Dep") at 33:16-17, Ex. Z to Clark Decl.; Devone Dep. at 15:9-16:8; Sullivan Dep. at 11:5-18.)  Defendants do not offer anything to challenge or contradict that evidence.

The SEC also contends the information was "nonpublic."  Information "becomes public when disclosed 'to achieve a broad dissemination to the investing public generally and without favoring any special person or group.'"  Mayhew, 121 F.3d at 50 (quoting Dirks v. SEC, 463 U.S. 646, 653 n.12 (1983)).  The Commission adduced evidence from each of the four issuers that the information regarding its PIPE offering was not generally known and had not been disseminated to the investing public generally.  (E.g. Deposition of Anthony Deasey dated July 23, 2007 ("Deasey Dep.") at 32:5-10, Ex. R to Clark Decl.; Bagley Dep. at 33:12-13; Devone Dep. at 15:9-17; Sullivan Dep. at 10:23-11:1.)  In response, defendants make no argument that the information in question was generally available to the public.  To the contrary, Lyon admitted that he and other potential PIPE investors learned of the offering before it was publicly announced.  (E.g., Lyon Dep. I, at 57:1-63: 21.)

Accordingly, the Court is satisfied that the SEC has met its burden of establishing that the information in question was both material and nonpublic.

2.      *Duty of Confidentiality*

The existence of a duty of confidentiality—sometimes referred to in this Circuit as a "fiduciary duty or similar relationship of trust and confidence"—is the cornerstone of a misappropriation liability case.  United States v. Chestman, 947 F.2d 551, 566 (2d Cir. 1991).  Such a duty exists "where there is explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties."  Falcone, 257 F.3d at 234 (citing Chestman).  Both sides contend the existence vel non of that duty can be determined by the Court as a matter of law.

a.   SEC's Summary Judgment Motion

The SEC contends defendants explicitly accepted a duty of confidentiality by agreeing either orally or in writing or through their conduct to keep information about each of the four PIPE offerings confidential.  The SEC points to deposition testimony from individuals involved with the offering of three of the PIPEs; documents sent to defendants regarding each of the offerings, and containing clear language indicating that information regarding the offering was confidential; and defendants' willingness to sign two placement agreements governed by confidentiality clauses, as evidence that, with regard to each offering, defendants explicitly accepted a duty of confidentiality.  The Commission further contends the evidence is such that no issue of material fact remains in dispute, and accordingly, that it is entitled to summary judgment.

Before proceeding to the merits of the SEC's summary judgment motion, the Court must make a preliminary admissibility determination with regard to the Commission's testimonial evidence.  Cf. Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir.

1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment" and thus "it is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment") (internal citations omitted).

i.      Rule 406 "Routine Practice" Evidence

Defendants challenge the admissibility of testimony the SEC seeks to introduce from individuals involved in at least three of the relevant PIPE offerings. For the limited purpose of evaluating admissibility, the Court views the relevant testimony neutrally. See id. ("The principles governing admissibility of evidence do not change on a motion for summary judgment.").

Witnesses involved in three of the four relevant PIPE offerings testified in their depositions that their organizations: (1) solicited investors for the relevant PIPE offering; (2) viewed the issuers' intent to issue a PIPE as confidential information; (3) had policies or practices of not disclosing the name of the issuer to a potential investor until after obtaining a guarantee of confidentiality from the investor; (4) had contact with defendants regarding the PIPE offerings in question; and (5) have little or no specific memory of the content of conversations with defendants or their employees.

The SEC contends such evidence is admissible as a "routine practice" consistent with Fed. R. Evid. 406. The Court agrees. Rule 406 provides that "evidence of . . . the routine practice of an organization, whether corroborated or not . . . is relevant to prove that the conduct of the . . . organization on a particular occasion was in conformity with the habit or routine practice." Fed. R. Evid. 406. The SEC's proffered testimony falls squarely within that Rule's ambit. It is relevant, and therefore, presumptively admissible.

Defendants argue the evidence is inadmissible because the SEC did not lay an adequate foundation for such evidence by "fail[ing] to show that the placement agent's alleged practices . . . were sufficiently regular, specific, and semi-automatic." (Defs.' Mem. of Law in Opp. to Pl.'s Mot. for Summ. J. 15).  The argument is without merit. Evidence of an organization's routine practice is admissible provided the proponent of the evidence establishes that the organization acted with "regularity over substantially all occasions or with substantially all other parties with whom the [organization] has had similar business transactions."  Mobil Exploration & Producing U.S., Inc. v. Cajun Constr. Servs., Inc., 45 F.3d 96, 100 (5th Cir. 1995).  Here, three deponents testified to having a "process" or "procedures" or "a script to read" to ensure potential investors agreed to keep the identify of the issuer confidential before being brought "over the wall."  (Alfaro Dep. at 19:19-20:13; Dep. of John Zimmerer dated Mar. 13, 2008 ("Zimmerer Dep.") at 16:15, Ex. I to Clark Decl.; Sullivan Dep. at 10:19-11:3.)  A fourth described imposing a confidentiality requirement as "pretty standard practice." (Devone Dep. at 14:23.)  Moreover, witnesses involved in each of the three transactions testified to the frequency with which the practice was followed, stating that it "would have been routine," (Sullivan Dep. at 34:3-4), that it was "always done," (Devone Dep. at 14:4.), and that the witness "had no reason to believe we deviated" from the practice of requiring confidentiality in his dealings with defendants.  (Zimmerer Dep. at 20:9-17.)  For purposes of resolving this motion, such statements provide sufficient foundation to deem the testimony presumptively admissible.

Defendants further note that courts "carefully screen" what they refer to as "habit" evidence to avoid admitting impermissible character evidence or evidence of a party's

prior bad acts.  That concern is not implicated here, where the evidence pertains to routine business practices of non-parties.  Finally, defendants urge the Court to exclude the testimony under Rule 403 as unfairly prejudicial.  As defendants correctly note, unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Fed. R. Evid. 403 advisory committee's note.  However, defendants fail to show how that is a risk here.

As discussed below, defendants' arguments that the witnesses at times lacked clarity in describing the confidentiality practices or had limited memories of how those practices applied in interactions with defendants do bear on its sufficiency.  But the threshold for admissibility is considerably lower, and for purposes of evaluating the parties' summary judgment motions, the Court finds that the SEC has established an ample foundation for its proffered testimonial evidence.  Therefore, the routine practice evidence can be considered for purposes of resolving this motion.

ii.        Existence of a Duty of Confidentiality

Having determined that the SEC's "routine practice" evidence is presumptively admissible, the Court next turns to the question of whether the Commission's evidence is sufficient to warrant the grant of summary judgment in its favor.  The Court finds that, while strong, it is insufficient for the Court to grant summary judgment as a matter of law.

While the SEC's evidence differs slightly from offering to offering, it consists of (1) the "routine practice" testimony referenced for at least three of the offerings, and (2) documentary evidence—predominantly PPMs and other offering documents—containing confidentiality notices sent to defendants and purporting to bind them to confidentiality

upon receipt relating to all four of the offerings.  The SEC can also establish that defendants agreed to participate in two of the four offerings, and signed participation agreements for those two which contained confidentiality language.

In opposition to the SEC's motion, defendants contend that the Commission's body of evidence is insufficient to establish conclusively that they accepted a duty of confidentiality.  Defendants maintain that the testimonial evidence establishes at best the existence of a routine practice, but not that the practice was actually followed or that defendants actually agreed to be bound.  Defendants also contend the documentary evidence shows only that issuers may have attempted to "unilaterally impose" duties of confidentiality on defendants, duties defendants never agreed to accept.

Viewed in the light most favorable to defendants, the SEC's evidence does not establish conclusively that defendants accepted a duty of confidentiality in any of the four offerings.  The SEC's witnesses, who spoke only to three of the four offerings, at times lacked clarity and specificity in describing the formality and consistency of their organization's confidentiality procedures.  All lacked specific memory of conversations with defendants, and whether those procedures were actually followed in interactions with them.  (E.g. Alfaro Dep. at 20:12-21:5; Devone Dep. at 13:12-13:23; Sullivan Dep. at 18:25-19:10; Zimmerer Dep. at 41:13-43:19.)  Accordingly, a reasonable juror could conclude that the testimony alone leaves open the question of whether the defendants' agreed orally to accept a duty of confidentiality before receiving information regarding those four PIPE offerings.

The question of whether defendants accepted a duty of confidentiality from their receipt, review, and, in some cases, execution of written documents relating to the four

offerings is more complex.  In each of the four offerings, defendants indisputably received documents regarding the offering that were labeled "confidential" and that contained language seeking to preclude recipients from using the information for any purpose other than considering whether or not to invest in the offering.  In at least two instances, defendants signed and executed purchase agreements containing confidentiality language, although at least in one case, it was after defendants had engaged in the trading in question.

As a matter of law, defendants correctly note that "a fiduciary duty cannot be imposed unilaterally by entrusting a person with confidential information."  Chestman, 947 F.2d at 567.  Accordingly, courts will not construct a duty of confidentiality simply because confidential information was thrust on a recipient without obtaining an explicit confidentiality agreement.  As the Chestman court noted, "[r]eposing confidential information in another . . . does not by itself create a fiduciary relationship."  Id. at 568. That, however, is not the issue presented in this case where an explicit duty of confidentiality is alleged to be a term of defendants' relationship with each of the four issuers.

The critical question in this action is whether defendants ever knowingly accepted explicit duties of confidentiality, and if so, when.  To establish that they did accept those duties, the SEC must, at a minimum, show that defendants read the confidentiality language and that the language was sufficient to put defendants on notice that, by accepting the PPMs and other offering material, they were accepting a corresponding duty of confidentiality.  The SEC's evidence, while very strong, when seen in the light most favorable to defendants as it must be, fails to put those issues beyond dispute.  With

20

regard to two of the four offerings, defendants never signed the placement agreements or chose to participate in the offerings.  A reasonable juror, therefore, could conclude defendants never saw or accepted the confidentiality language.  In the other two offerings defendants executed purchase agreements only the day of, or several days after, establishing a short position in the issuer's stock.  Moreover, the language in each document, which differs slightly, is potentially susceptible to differing readings.  Accordingly, the Court concludes that a reasonable juror could find defendants did not read the agreements, or did not do so until after trading the stock.

The Court takes note of the fact that a jury will, of course, consider the SEC's testimonial and documentary evidence cumulatively, and, when taken in tandem, the Commission's testimonial and documentary evidence presents a formidable case.  Nevertheless, the Court is unable to conclude on the basis of that body of evidence that the SEC has established, as a matter of law, that defendants accepted a duty of confidentiality they subsequently breached.  Rather, that issue—the issue of material fact in this case—remains in dispute.

Accordingly, because the SEC's evidence, in the light most favorable to defendants, leaves an issue of material fact in dispute, the Commission's motion for summary judgment must be denied.

b.  Defendants' Motion for Summary Judgment

Defendants also contend that the existence of a duty of confidentiality can be determined by the Court as a matter of law.  As defendants urge, the SEC has not established conclusively that defendants agreed—either orally or in writing—to accept a duty of confidentiality.  Defendants thus maintain the Commission will be unable to

establish a critical element of its case at trial, and therefore that they are entitled to summary judgment.

On defendants' motion, the Court views the same body of evidence in the light most favorable to the SEC.  Viewing the evidence in that manner, a reasonable juror could easily conclude that, in each of the four transactions, defendants manifestly accepted a duty of confidentiality either orally or in writing or through their course of conduct.  A juror could conclude the testimonial evidence establishes that three of the four issuing entities had confidentiality procedures in place, that those procedures were followed in interactions with defendants, and, accordingly, that defendants received information regarding the PIPE offering only after agreeing to keep that information confidential.  Regarding the Gentner transaction, for which the SEC makes no contention that defendants accepted a duty of confidentiality orally, a reasonable jury could conclude defendants accepted a duty of confidentiality through a course of conduct that included: accepting documents labeled "confidential" on the first page and containing the following language:  "[y]ou agree to use this information for the sole purpose of evaluating a possible investment in our shares and for no other purpose"  (Pl.'s 56.1 ¶ 50.); and continuing to possess the information after reading that language.  Alternatively, a reasonable juror could conclude that defendants accepted a duty by signing the placement agreement containing a confidentiality clause, and breached that duty by simultaneously trading in the issuers' stock.[4]

Defendants contend separately that the SEC's documentary evidence fails as a matter of law because "a fiduciary duty cannot be imposed unilaterally by entrusting a

---

[4] The record indicates defendants signed and returned the placement offering on the same day they acquired a short position in the issuers' stock.

person with confidential information." <u>Chestman</u>, 947 F.2d at 567.  While defendants'
correctly state the law, they fail to establish that it bars the SEC's case.  As noted above,
<u>Chestman</u> governs the circumstances under which a court will construct a duty of
confidentiality in the absence of an explicit agreement by the parties to undertake such a
duty.  Here, as noted, the cumulative evidence viewed in the light most favorable to the
SEC could lead a jury to find that defendants knew of, and accepted, explicit duties of
confidentiality with respect to each of the four offerings.

       Defendants make a series of arguments specific to one or more offerings, only one
of which warrants extended discussion.  Regarding the Gentner transaction, defendants
contend that, as a matter of law, no duty of confidentiality can be established because
their dealings were with an intermediary, Ram Capital, rather than Gentner itself.
Defendants misstate the law.  As long as the SEC can establish that defendants owed a
duty to the intermediary, liability under the misappropriation theory is still possible as a
matter of law.  <u>See</u> <u>SEC v. Talbott</u>, 530 F.3d 1085, 1093 (9th Cir. 2008).  Alternatively, if
the Commission can establish defendants owed a duty to Ram and Ram owed a duty to
Gentner, then a "continuous chain" of fiduciary relationships exists and is sufficient to
establish liability. <u>Id.</u> (collecting cases).

       The Court notes the relative lack of evidence in the record regarding Ram Capital,
its involvement in the Gentner PIPE offering, and its relationship to defendants.
Nevertheless, on defendants' motion for summary judgment, viewing the evidence in the
light most favorable to the SEC, a reasonable juror could conclude from the text of the
documents in Ram Capital's possession (and subsequently forwarded from Ram Capital
to defendants), and from testimony about general industry practice, that Ram Capital

obtained the information only by agreeing to a duty of confidentiality, and then passed

the information to defendants under similar arrangement.  Accordingly, at this stage, the

Court is unprepared to find that, as a matter of law, no duty could exist between

defendants and Gentner.[5]

In sum, defendants cannot establish as a matter of law the absence of a duty of

confidentiality.  Accordingly, the Court cannot grant summary judgment in their favor on

the issue.

### 3.    Breach of Duty (Misappropriation)

While the Court has already concluded that the SEC's motion must be denied, it

must nonetheless evaluate defendants' remaining claims to determine if defendants are

entitled to summary judgment.  Cf. Celotex,  477 U.S. at 322-23 (where the non-moving

party bears the burden of proof, summary judgment is appropriate where the moving

party can establish the absence of any evidence in support of any element of the non-

moving party's claim).

Defendants contend the SEC is unable to establish misappropriation with regard

to one of the four PIPE offerings—the PhotoMedex transaction—because the SEC cannot

establish a causal connection between defendants' receipt of confidential information and

---

[5] Defendants' make two other minor objections to the evidence relating to the Gentner and Celsion transactions. First, defendants maintain that because they signed and returned only the cover and signature pages of the Gentner placement agreement, and only the signature page in the case of the Celsion placement, they therefore are bound only by the terms contained on those pages and not by terms contained elsewhere in the placement agreement.  Defendants' argument verges on fatuous, and defendants direct the Court to no authority supporting such a notion.  Under New York law, it is well established that "parties are bound by [their] signature, and cannot be heard to complain that they did not read a document before signing it." Matthews & Fields Lumber Co. v. New Eng. Ins. Co., 113 F. Supp. 2d 574, 577 (W.D.N.Y. 2000); see also Friedman v. Fife, 262 A.D.2d 167, 168, 692 N.Y.S. 2d 61 (1st Dep't. 1999).

Second, defendants argue that because they signed the placement agreements after having engaged in the trading in question, any duty of confidentiality thereby agreed to cannot be imposed retroactively. Defendants' argument, however, hinges on their assumption that they did not accept a duty of confidentiality until they signed and returned the placement agreement.  For the reasons discussed above, the Court concludes that a jury could find otherwise.  Therefore, the argument is insufficient to warrant summary judgment.

the trading activity in question; that is, that defendants' trading was "on the basis" of the material nonpublic information.  Defendants' argument is without merit.

In insider trading cases, the "on the basis of" requirement can be satisfied if "the person making the purchase or sale was aware of the material nonpublic information when the person made the purchase or sale."  17 C.F.R. § 240.10(b)5-1(b).  This "knowing possession" standard does not require the SEC to establish the defendant actually "used" the information in question, but rather that the defendant was knowingly in possession of the information at the time the trading occurred.  See United States v. Teicher, 987 F.2d 112, 119-20 (2d Cir. 1993); see also United States v. Royer, 549 F.3d 886, 899 (2d Cir. 2008) (affirming that Second Circuit "adhere[s] to the knowing possession standard articulated in Teicher").[6]

Defendants do not dispute that the SEC has adduced evidence from which a reasonable juror could conclude that defendants traded while in "knowing possession" of material nonpublic information.  Instead, defendants argue the presumption of causation can be rebutted because the trading in question was part of a "pre-existing trading plan."  Defendants correctly note that the knowing possession standard is subject to several affirmative defenses.  In particular, where defendants "adopted a written plan for trading securities" prior to becoming aware of the information, they may be able to rebut the presumption of causation the knowing possession standard would otherwise allow a factfinder to draw.  17 C.F.R. § 240.10(b)5-1(c).

---

[6] Defendants suggest in their motion for summary judgment that both the SEC and courts have "rejected the knowing possession test in favor of requiring a causal connection between material non-public information and trading."  (Def. Mem of Law in Supp. Summ. J. 30 n.7.)  Defendants confuse the law.  While a "causal connection" is a required element of a securities fraud case, the "knowing possession" test has been embraced by both the SEC and the Second Circuit as the appropriate method of establishing a causal connection.  See Royer, 549 F.3d at 899.  To the extent defendants mean to imply that courts have abandoned the knowing possession test in favor of an "actual use" requirement, defendants are simply incorrect.  Id.

With regard to the PhotoMedex transaction, defendants point to a series of six trades in the two weeks before defendants first learned of PhotoMedex's planned PIPE offering as "evidence" of a "pre-existing trading plan."  (Defs.' Mem. in Supp. of Summ. J. 31.)  Defendants' evidence is plainly insufficient to warrant a grant of summary judgment.  To plead the affirmative defense, Rule 10b5-1 requires defendants to assert the existence of a <u>written</u> plan for trading adopted before defendants became aware of the material nonpublic information.  <u>See</u> 17 C.F.R. § 240.10(b)5-1(c).  Defendants make no such claim.

Indeed, defendants do not assert the existence of any plan or strategy—written or otherwise—underlying the trading activity.  Moreover, defendants' six seemingly unrelated trades within a two-week period are insufficient to establish a history or practice of regular trading that might provide an innocent explanation for the trading in question.  Accordingly, defendants' evidence, seen in the light most favorable to the SEC, fails to rebut the presumption of causation as a matter of law.  Defendants, of course, remain free to present evidence of the six additional trades to the jury and to ask the jury to draw an inference against causation at trial.  But the Court declines to find that defendants have established conclusively that the SEC will be unable to prove causation at trial.

*4.    Lack of Personal Benefit to Defendants*

Defendants contend separately that, as part of that flurry of trading, defendants held short and long positions in PhotoMedex stock in equal amounts at the relevant time. As a result of this "net neutral" position, defendants contend they could not possibly have benefited from the material nonpublic information in question and that a defendant

26

cannot violate Section 10(b) of the Exchange Act and Rule 10b-5 "unless the defendant receives a personal or financial benefit from trading on material non-public information." (Defs.' Mem. of Law in Supp. of Summ. J. 27.)

The SEC does not dispute that defendants held short and long positions in equal amounts at the time of the transaction but contends that under the "misappropriation theory," the Commission need not show a personal benefit to defendant to establish liability. Alternatively, the SEC asserts that defendants benefited from the short position, and that benefit is sufficient, regardless of whether it was diminished or even effectively cancelled out by an equal long position.

At first glance, defendants' argument—that a net financial gain to defendant is an essential element to prove liability in this case—is unconvincing. Undeniably, most cases pursued under the misappropriation theory do involve a financial gain to the defendant, but as the Supreme Court has explained, the fraud "is consummated . . . when, without disclosure to his principal, [the defendant] uses the information to purchase or sell securities." O'Hagan, 521 U.S. at 656. Accordingly, the Second Circuit has declined to impose a "benefit" requirement in misappropriation theory cases, finding instead that the fraud "may simply be thought of as the misuse, by trading, of stolen information." Liberia, 989 F.2d at 600 (internal citation omitted); see also Falcone, 257 F.3d at 234 (2d Cir. 2001) (affirming that the Liberia standard remains applicable post-O'Hagan). Accordingly, as long as the SEC can establish defendant "misuse[d]" the information in question to purchase or sell securities the fraud would appear to be established.[7]

---

[7] Defendants point to no contrary authority. Case law relied upon by defendants relates solely to tipper/tippee liability, an area in which some courts—but not the Second Circuit—have found the existence of a benefit to the tipper or tippee to be a necessary element of a misappropriation theory case. See SEC v. Yun, 327 F.3d 1263, 1275 (11th Cir. 2003); but see SEC v. Sargent, 229 F.3d 68, 77 (1st Cir. 2000); United

However, the Court need not resolve the legal question at this stage because it is unwilling to conclude on this record that defendants, as a matter of fact, realized no financial gain from their trading in PhotoMedex.  That defendants held equal short and long positions at the relevant time does not, of itself, establish that defendants did not "benefit" from nonpublic information regarding PhotoMedex's intended PIPE offering. Defendants are free to present evidence of their multiple trades in PhotoMedex stock to the jury, see Falcone, 257 F.3d at 233, but the Court declines to conclude as a matter of law that defendants' equal short and long positions negate any possibility of causation and therefore warrant summary judgment.

### 5.   *Personal Involvement of Defendant Lyon*

Finally, Lyon himself contends the SEC has failed to establish his individual liability because the SEC has adduced no evidence of Lyon's personal knowledge of any duty of confidentiality owed to the various PIPE issuers.  Acknowledging that there is "some evidence" that Lyon's deputy, Ryan Wolters, engaged in conversations with the issuers and their employees regarding confidentiality, Lyon asserts there is no evidence that Wolters relayed that information to him, and that any knowledge Wolters' may have had can not be imputed to Lyon.  (Defs.' Mem. of Law in Supp. Summ. J. 33.)  Because the record contains more than ample direct and circumstantial evidence from which a reasonable juror could conclude that Lyon was aware of, and intentionally breached, duties owed to the four issuers, Lyon's claim is rejected.

---

States v. Liberia, 989 F.2d 596, 600 (2d Cir. 1993).  As noted, the Second Circuit has never adopted a benefit requirement and instead has "strongly implied . . . in dicta, that there was no need to make an affirmative showing of benefit in cases of misappropriation."  Sargent, 229 F.3d at 77 (citing United States v. Liberia, 989 F.2d 596, 600 (2d Cir. 1993)); see also United States v. Falcone, 257 F.3d 226, 234 (2d Cir. 2001) (affirming that the Liberia standard remains relevant post-O'Hagan).  Therefore, the Court, applying Second Circuit law, would be extremely hesitant to impose an additional benefit requirement on the SEC in this case.

The evidence in the light most favorable to the SEC establishes that Lyon was intimately involved in Gryphon's investing decisions, and that Wolters, one his "key employee[s]," brought all information regarding PIPEs to him.  (Wolters Dep. at 17:11-20:16.; Defs.' 56.1 ¶ 13.)  Accordingly, a reasonable juror would certainly be able to conclude that Wolters informed Lyon about the terms of each of the relevant offerings, including any requirement of confidentiality.  Moreover, the SEC's evidence, in the light most favorable to it, shows that Lyon personally reviewed and revised at least one of the placement agreements which contained the confidentiality language and received several of the other PPMs directly by e-mail.  Finally, the evidence shows Lyon personally signed two of the placement agreements, and "as a general matter, a party will not be excused from reading a document that he or she has signed."  Blog v. Battery Park City Auth., 234 A.D.2d 99, 101, 650 N.Y.S.2d 713 (1st Dep't. 1996); see also Matthews & Fields Lumber Co. v. New Eng. Ins. Co., 113 F. Supp. 2d 574, 577 (W.D.N.Y. 2000) (collecting cases).  In sum, there is adequate evidence from which a reasonable juror could readily conclude that Lyon read or was told of the contents of each of the placement agreements and understood them to require that he keep details of the offerings confidential.

Whether a jury chooses to reach those conclusions with regard to each offering is a matter for trial.  For now, however, the evidence is sufficient to defeat Lyon's motion for summary judgment.

C.       SEC's Alternate Theory of Liability

In its opposition to defendants' motion for summary judgment the SEC, for the first time, presents a new theory of liability regarding the Celsion and Gentner

transactions, arguing that if defendants executed purchase agreements for those offerings "while knowing, or reckless in not knowing, that they could not perform pursuant to the terms of the agreements, defendants defrauded issuers." (Pl.'s Mem. of Law in Opp. to Summ. J. 31.) The SEC's theory is that if, as defendants contend, they signed purchase agreements only _after_ trading in the issuers' stock, then defendants committed fraud in connection with the purchase of securities by accepting contracts containing a confidentiality provision they knew they had already violated. Defendants object to the new theory on the grounds that it amounts to a new claim, asserted in violation of Fed. R. Civ. P. 15. Defendants further contend they will be prejudiced by the new claim.

While the SEC's theory is not a new "claim" for Rule 15 purposes—the Commission stated a claim for securities fraud in its complaint (Compl. ¶¶ 70-72)—it is a new _theory_ of that fraud claim. Fed. R. Civ. P. 9(b) requires a party alleging fraud to plead, with particularity, the circumstances constituting fraud or mistake. Because the SEC did not plead this theory of fraud with particularity in its complaint, the Court will not consider it in resolving this motion.

## III.    CONCLUSION

Because issues of material fact remain in dispute—namely, whether defendants accepted a duty of confidentiality with regard to each of the four PIPE offerings—the parties' cross-motions for summary judgment are denied.

Dated: New York, New York
       March 23, 2009

SO ORDERED:

_____
Sidney H. Stein, U.S.D.J.